w+!2
530

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

**FILED**

Name  GREENWOOD  GEORGE           G.  MAY - 9 2008
      (Last)                  (First)                  (Initial)

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Prisoner Number  C-57110

Institutional Address  SAN QUENTIN STATE PRISON, SAN QUENTIN, CA 94974

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**CV 08  2410**

GEORGE G. GREENWOOD
Full Name of Petitioner

Case No.(To be provided by the
clerk of court)  **WH**

vs.

ROBERT L. AYERS, Warden    PETITION FOR A WRIT OF HABEAS CORPUS **(PR)**
Name of Respondent
(Warden or jailor)

Read Comments Carefully Before Filling In

When and Where to File

    You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your

petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.   What sentence are you challenging in this petition?   DENIAL OF PAROLE

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):   BOARD OF PAROLE HEARINGS

_____        _____
                   Court                                                Location

(b)   Case number, if known _____
(c)   Date and terms of sentence _____
(d)   Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes  X  No

Where? ____ SAN QUENTIN STATE PRISON; SAN QUENTIN, CA 94974 ____
                  (Name of Institution)                         (Address)

2.   For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

NOT CHALLENGING CONVICTION. CHALLENGING DENIAL OF PAROLE

SEE ATTACHED PAGES PETITIONER WAS DENIED IN THE STATE SUPREME

COURT. SEE EXHIBIT "E" ATTACHED

3.   Did you have any of the following?   NO

Arraignment: Yes __ No __   Preliminary Hearing: Yes __ No __  Motion to Suppress: Yes __ No __

3

4.    How did you plead?    N / A

Guilty _____    Not Guilty _____    Nolo Contendere _____

Any other plea (specify) _____

5    If you went to trial, what kind of trial did you have?

Jury _____    Judge alone _____    Judge alone on a transcript _____

6.    Did you testify at your trial?  Yes __ No __

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment  Yes __        No __
(b)    Preliminary hearing        Yes        No __
(c)    Time of plea   Yes __       No _
(d)    Trial   Yes __       No __
(e)    Sentencing   Yes __       No __
(f)    Appeal        Yes _ __        No
(g)    Other post-conviction proceeding    Yes __        No __

8.    Did you appeal your conviction?    Yes __ No __

(a)    If you did, to what court(s) did you appeal?

Court of Appeal    Yes __    No __
_____        _____
(Year)                          (Result)

Supreme Court of
California    Yes-__    No __
_____        _____
(Year)                          (Result)

Any other court    Yes __    No __
_____        _____
(Year)                          (Result)

(b)    If you appealed, were the grounds the same as those that you are raising in this
petition?    Yes __ No __

(c)    Was there an opinion?    Yes    No

(d)    Did you seek permission to file a late appeal under Rule 31(a)?
Yes        No

4

If you did, give the name of the court and the result:

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes $\chi$        No __

I HAVE A FEDERAL HABEAS BEFORE THIS COURT REGARDING MY
2005 PAROLE CONSIDERATION HEARING.

5

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.    N/A

I.    Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a.    _____

b.    _____

c.    _____

d.    _____

Result _____    Date of Result _____

II.    Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a.    _____

b.    _____

c.    _____

d.    _____

Result _____    Date of Result _____

III.    Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____ Date of Result _____

    (b)   Is any petition, appeal or other post-conviction proceeding now pending in any

court?    Yes __ No __

_____

(Name and location of court)

## B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need more space. Answer the same questions for each claim.

Note: You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

Claim One: __SEE ATTACHED PAGES 1-9__ _____

Supporting Facts: _____

_____

_____

_____

Claim Two: __SEE ATTACHED PAGES 10-15_____

_____

Supporting Facts: _____

_____

_____

_____

Claim Three: SEE ATTACHED PAGES FOR ADDITIONAL CLAIMS_____

_____

Supporting Facts: _____

_____

_____

_____

If any of these grounds was not previously presented to any other court, state briefly which

grounds were not presented and why:

_____

_____

_____

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

SEE ATTACHED PAGES

Do you have an attorney for this petition?    Yes __ No X    I REQUEST APPOINTMENT OF
                                                             COUNSEL DUE TO THE
If you do, give the name and address of your attorney:       COMPLEXITIES OF THIS CASE :

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on __MAY 5, 2008__    __George D. Brunner__
             Date                Signature of Petitioner

( rev. 5/96)

9

## CONTENTION

### I.

#### PETITIONER HAS A STATE AND FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS, IN HAVING THE BOARD OF PRISON HEARINGS CONSIDER ALL FACTS DURING PETITIONER'S HEARING AND NOT MAKE A DETERMINATION WITHOUT "SOME EVIDENCE"

On July 19, 2007 George G. Greenwood, (Petitioner)

appeared before the Board of Parole Hearings (Board) and was

denied parole for two years. In its denial of parole the

Board relied on the following reasons for its decision:

> We find that commitment offense was carried out in a very cruel and rather callous manner.
>
> And basically, while the victim, Mr. Frank Coffey, was really bent over at one of these newspaper stands, the inmate and his crime partner basically came up behind him **with the intent of trying to lift the victim's wallet out of his back pocket,** and during that time, there was -- could have been a litte scuffle, but it basically - apparently, the prisoner ended up hitting the victim. The victim stumbled for a little bit and then fell down, and while he was down, it was seen that Mr. Greenwood basically stood over him and went through his pockets to basically take the wallet.
>
> It really - the activities surrounding the death of Mr. coffey in this attack really shows a total disregard for human suffering and human life.
>
> It's going after this man because Mr. Greenwood thought he had a fat wallet and -- but very trivial in relation to the offense.
>
> Regarding a prior record, there's no getting around it that Mr. Greenwood, the prisoner, does have a record of assaultive behavior and definitely an escalating pattern of criminal conduct.

(Exhibit "A" pp 71-73)

The Board also stated that Petitioner s disciplinary

write-ups and the psychologist reports were their reasons for

denial. However, there is no "some evidence to deny

Petitioner parole. Exhibit "A" p. 73-74

California uses indeterminate sentences for most
non-capital murders, with the term being life imprisonment
and parole eligibility after a ceratain minimum number of
years. A first degree murder conviction yields a base term of
25 years to life and a second degree murder conviction yields
a base term of 15 years to life imprisonment. (In re
Dannenberg 34 Cal.4th 1061, 1078 (Cal.), Cert. denied, 126
S.Ct. 92 (2005); Cal. Penal Code § 190.). The Board relied
primarily on the commitment offense to deny Petitioner
parole, which is one of only two immutable factors, (the
other is the previous record of violence) The over-arching
factor regarding a prisoner's suitability for parole is
whether the prisoner poses a current threat to public
safety. As stated in California Penal Code (Cal. Penal Code)
§ 3041 a parole date is to normally be set for prisoners
unless various factors exist. Specifically, one year prior to
prisoner's minimum eligible release date, a panel of the
Board shall normally set a parole released date "unless it
determines that the gravity of the current convicted offense
or offenses, or the timing and gravity of current or past
convicted offense or offenses, is such that consideration of
the public safety requires a more lengthy period of
incarceration for this individual. Cal. Penal Code §
3041. Therefore, a conviction for murder does not render one
unsuitable for parole. (In re Smith (2003) 115 Cal.App.4th
343, 366)

In In re Dannenberg, 34 Cal.4th 1061 094 (2005), The

2

California Supreme Court held that the Board may rely solely
on the commitment offense to deny parole by weighing the
degree of violence used and the amount of viciousness shown
by the prisoner. In the instant petition this court will find
that there is not even a 'modicum of evidence' that this
Petitioner committed this offense with more than the minimum
force necessary to convict him of this offense.

In the instant petition the Board admitted that
Petitioner was attempting to lift the victim's wallet out of
his back pocket. A "scuffle occurred, and Petitioner hit him
with the side of his hand positioned in a clapping motion
(Petitioner slapped the victim) Exhibit "A" p. 14. Petitioner
than grabbed the victim's wallet and fled the area. This
offense could hardly be considered exceptional, or committed
with more than the force necessary to convict him of that
offense. Petitioner's offense was based on the felony murder
rule. In a recent decision the Santa Clara County Superior
Court in In re Arthur Criscione, Case No. 71614 (August 30
2007), pointed out that "[t]he Board's focus must be upon how
the inmate "actually committed his crimes" not the
"incorporeal realm of legal. constructs." (In re Lee, 143
Cal.App.4th at p. 1413.). The Criscione court further stated
that:

> This is especially significant when the murder
> conviction is based on the felony murder rule,
> provacative act doctrine, or accomplice liability
> such that the inmate did not intend to kill or
> may not have even been the actual killer. The
> Board has ample guidance before it in the decisions
> of the various reviewing courts to constrain its
> abuse, but has failed to avail itself of the
> opportunity to do so.

Although the California legislature has found that a
killing in the perpetration of robbery can be classified as
first degree murder, the purpose behind the felony murder
rule is to deter risk-taking criminal behavior that might
result in death. People v. Robertson, 34 Cal.4th 156, 165
(2004). "The felony-murder rule eliminates the need for proof
of malice in connection with a charge of murder, thereby
rendering irrelevant the presence or absence of actual malice
both with regard to first degree felony murder and second
degree felony murder." Id. "In such cases, the intent to
commit a dangerous felony that actually results in death is
substituted for malice, thus establishing the extent of
culpability appropriate to murder." People v. Rios, (2000) 23
Cal.4th 450, 460, fn. 6 (2000) But this does not show
particularly atrocious or callous behavior by the Petitioner.
Petitioner's offense falls short of the Dannenberg standard
of degree of viciousness.

Petitioner's offense initially was intended to be
nothing more than a robbery. However, as result of
Petitioner's slapping the victim and the victim falling and
incurring other injuries, when compared to Elkins in In re
Elkins, 50 Cal.Rptr.3d 503 (Cal.App. 1 Dist. 2006), who
repeatedly struck his victim in the head with a bat in order
to get him to stop moving, so he could rob him. sheds no
light as to whether his murder was "especially brutal" or
"gruesome." The Elkins court further held that "striking a
robbery victim may, of course, show an especially brutal
first degree murder." Just as in Elkins, where that court

4

found true, that the fatal encounter, was never a plot to kill his victim in order to rob him. (Elkins, supra, at 519.) Petitioner's offense is very similar, in that the intention was to pick the victim' wallet, and only struck the victim after attempting to lift his wallet. Petitioner never knew that the victim had sustained any serious injury.

### A. Continued Reliance on Unchanging factors Violates Petitioner's Due Process.

Petitioner cannot escape the underlying offense It is an historical event that will never change. But time has changed this Petitioner. He is a different person today.

As stated above, the commitment offense is only one of only two factors indicative of unsuitability a prisoner cannot change, and the reliance on such an immutable factor may be unfair, and "runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs v. Terhune, 334 F.3d at p. 917 (See In re Scott, 34 Cal.Rptr.3d 905, 920 (Cal.App.1 Dist. 2005).

At this point, the underlying offense is no longer "some evidence" that will rationally support a finding that the public safety requires that he be found unsuitable for parole. (Irons v. Carey (9th Cir. 2007) 479 F.3d 658, 663-665 "indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest that flows from the relevant California statutes.")

The Board s reliance on the commitment offense does not

withstand constitutional scrutiny. Focusing on the commitment offense, the Board found that Petitioner's actions demonstrate a callous disregard for human life and suffering. Petitioner attempted to rob the victim and only slapped the victim once to dislodge the wallet from him. Petitioner's actions due not demonstrate that he used more than the minimal force to convict him of the instant offense, as held by the Dannenberg standard.

Several federal district courts have found that reliance on unchanging factors violates due process. Recently, the Central District (federal court), in ordering Rosenkrantz, released, found: "While relying upon petitioner crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances after nearly two decades of incarceration and half a dozen parole suitability hearing-- violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the 'some evidence' standard. After 20 years of rehabilitation, the ability to predict a prisoner s future dangerousness based simply on the circumstance of his or her crime is nil." Rosenkrantz v. Marshall, (C.D. Cal. 2006) 444 F.Supp 2d 1063. 1084.

The Board's other findings regarding Petitioner's past criminal history and disciplinary infractions, also do not constitute as some evidence. First of all the Board itself pointed out that Petitioner's 128's were not of serious

nature. The Board stated: Basically, these 128-As were for
being late, absent, disrespectful to staff, and playing your
T.V. too loud. (Exhibit "A" p. 44) The Court in In re
Lawrence, 59 Cal.Rptr.3d 537, 571 equated 128's to overdue
parking tickets and jaywalking that did not provide "some
evidence. The Lawrence court stated: "Unlike the far more
serious conduct which can result in disciplinary actions,
these minor infractions tell us nothing about the prisoner's
predisposition to be a danger to public safety if released on
parole.(Lawrence, supra at 571) In another recent the federal
district court (Northern District) in Martin v. Marshall,
(N.D. Cal. 2006) 431, 1038, 1048, (a prisoner who was serving
a sentence of 20 years to life for killing two people and
injuring another) that court also found an aging commitment
conviction fell short of providing "some evidence" sufficient
to justify a denial of parole. The Martin court also found
that Martin's, disciplinary and past criminal history were
insufficient to deny parole. Marshall had received
disciplinary infractions (20) for possession of drugs, weapons
materials and gambling paraphernalia." Yet, Marshall was found
suitable for parole. (compare Petitioner's offense with
Marshall regarding the exceptional standard of California Code
of Regulations (Cal. Regs.) Title 15 § 2402 (c).

The Board's determination that the psychologist report
is not totally supportive of parole is not a factor of
suitability, in that it is to state that a prisoner is
suitable for parole. Rather, the overarching factor is whether
a prisoner poses a threat to public safety. The psychologist

7

stated that Petitioner poses little lower than average degree
of dangerousness in comparison to inmates who have committed
similar crimes. The court in Martin, found that the
psychologist findings that Martin fell in the low-moderate
range for future offense within the community as long as he
abstained from substance abuse. The psychologist also found
that Martin to be a low-medium risk for future violence. (See
Martin v. Marshall, supra at 1041.)

In Willis v. Kane, 475 F.Supp.2d  1126, (N.D. Cal.
2007). the Willis, court stated:

> There was sufficient evidence for the BPH to
> determine that Willis committed the offense the
> offense in an especially cruel manner. The facts of
> that crime will be just as terrible 20 years from
> today as they are today and as there were 20 years ago.

·(Willis, supra, at 1 35).

The U.S. Supreme Court has stated that: [i]n a variety
of contexts, the Court has recognized that a governmental
decision resulting in the loss of an important liberty
interest violates due process if the decision is not
supported by any evidence."(see Superintendent v. Hill, 472
U.S. 445, 455 (1985). The Supreme Court then held that "the
requirements of due process are satisfied if some evidence
supports the decision. Furthermore,the evidence relied upon
must possess "some indicia of reliability " Biggs v. Terhune,
(2003) 334 at 395; (See McQuillion, supra, at 904; Jancsek,
833 F.2d at 1390 (adopting the "some evidence" standard set
forth by the Supreme Court in Superintendent v. Hill, 472 U.S.
445, 457, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). The
must review the Board's finding to determine if there is "some

8

evidence" that Petitioner is a danger to public safety "The test is not whether some evidence support the reasons ⌈cited] for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety." In re Lee (2006) 143 Cal.App.4th 1400, 1408. The "some evidence" standard, while low, is not empty or meaningless. "Some evidence" "does not mean literally 'any evidence. If it did, the protection afforded by the due process would be meaningless... Evidence that lacks any real probative value cannot constitute 'some evidence.' ⌈Citation omitted.] Otherwise, the requirement of 'some evidence could be satisfied by baseless speculation, superstition, or stereotyping. That, too, would reduce the requirement of 'some evidence' to a sham or a mockery." Rosenkrantz v. Marshall, (C.D. Cal. 2006) 444 F.Supp 2d 1063, 1083- 084.

Petitioner's offense does not provide "some evidence" to constitute continuous denials of parole. Petitioner evoked his right to not speak about the offense according to Cal. Penal Code § 5011. Petitioner has taken responsibility for the commitment offense. Petitioner fears that if he elaborates about the commitment offense the Board will again accuse him of not taking full responsibility for his actions. In In re Elkins, supra the Elkins court recognized that prisoners are reluctant to deny parts of their offense for which they actually know they did not partake in, or did not do, but are afraid to marshall out the facts for fear of being accused of not taking full responsibility.

9

II.

## THE DENIAL OF PAROLE BY THE BOARD OF PRISON HEARINGS WAS AN ARBITRARY AND CAPRICIOUS AND VIOLATED PETITIONER'S STATE AND FEDERAL DUE PROCESS RIGHTS

Petitioner's July 19, 2007 parole consideration hearing was an arbitrary and capricious decision. In In re Rosenkrantz 29 Cal.4th 616, 665, it states that a parole decision with no basis in fact and not supported by any evidence in the record would be an arbitrary and capricious, and would effect the liberty interest and violate principles of due process of law.

Petitioner's claim is supported when a historical review of past parole hearings are considered. In 1997 Petitioner went to his Initial parole consideration hearing and was denied for three years for the following reasons:

1. The commitment offense.

2. The Offense was carried out in an especially cruel and callous manner.

3. The offense was carried out in a manner which exhibits a callous disregard for the life and suffering of another

4. Previous criminal behavior, and tumultuous relationships with others.

5. Prisoner must involve himself again, in NA and/or AA.

Exhibit "B"

Petitioner again appeared before the Board for a parole suitability hearing in 2001 and stipulated for two years. Petitioner then again appeared before the Board in 2003 for a parole suitability and was denied for one year. This Panel found the following:

1. The offense was carried out in a very callous

10

manner.

2. The offense was carried out in a manner that showed a total disregard for consequences of his actions.

3. The motive for the crime was very trivial in relation to the offense.

4. Prisoner's unstable social history, and past criminal.

Exhibit "B-1"

In 2005 Petitioner again appeared before the Board and was found unsuitable for parole. The Board denied Petitioner parole for the following reasons:

1. The commitment offense.

2. The offense was carried out in a very dispassionate way.

3. The offense was carried out in a manner that demonstrates a callous disregard for human suffering.

4. The motive for the crime was very trivial in relation to the offense.

(Exhibit "B-2" p. 78)

In the 2005 denial the Board also stated: "The specific reasons for this finding are as follows. Primarily, its the commitment offense and the inmate's prior history." This is basically the same reasons for Petitioner's 2007 parole denial. Petitioner did not give any cause for another two year denial. If any thing Petitioner provided evidence of excellent programming and parole suitability.

The role of the reviewing court under these circumstances has been addressed previously in the specific context of Parole Board actions:

> "[Courts have] an obligation, however, to look beyond the facial validity of a statute that is

11

> subject to possible unconstitutional administration
> since a law though fair on its face and impartial
> in appearance may be open to serious abuses in
> administration and courts may be imposed upon if
> the substantial rights of the persons charged are
> not adequately safeguarded at every stage of the
> proceedings. We have recognized that this court's
> obligation to oversee the execution of the penal
> laws of California extends not only to judicial
> proceedings, but also to the administration of
> the Indeterminate Sentence Law." (In re Rodriquez
> (1975) 14 Cal.3d 639, 648, quoting Minnesota v.
> Probate Court (1940) 309 U.S. 270, 277.)

In In re Minnis, (1972) 7 Cal.3d 639, 645, the case similarly, and closest on point to the instant action, the California Supreme Court stated: "This court has traditionally accepted its responsibility to prevent an authority vested with discretion from implementing a policy which would defeat the legislative motive for enacting a system of laws." Where, as here, the question is whether determinations are being made in a manner that is arbitrary and capricious, judicial oversight "must be extensive enough to protect limited right of parole applicants 'to be free from an arbitrary parole decision .. and to something more than mere pro-forma consideration.'" (In re Ramirez (2001) 94 Cal.App.4th 549 at p. 564, quoting In re Sturm (1974) 1 Cal.3d 258 at p. 268.)

As shown above, Petitioner's offense does not fit the criteria set forth in Cal. Regs. § 2402 (c) (1) as "especially heinous, atrocious or cruel." Yet, each and every time Petitioner has denied parole these very exceptional factors. In Little v. Hadden, 504 F.Dupp 558, 561, the Court addressed the same type of problem and abuse, (arbitrary and capricious decisions) as present in the instant cause of action. Little court found:

12

> It is clear to the court from the record in this case that the commission has attempted to continue Little in custody beyond the guidelines because of its **ad hoc decision** regarding the seriousness of the offense, but the factors relied upon are either unsupported by the record or were already considered in a formulating the guidelines... In short, **the commission's decision is arbitrary and capricious because it is not based on anything in the record before it.**

(Little v. Hadden, supra at 561.).

Petitioner would ask this court to take judicial notice (Evidence Code § 452 (d). of a recent decision by the Santa Clara County Superior Court See (Exhibit "C") In In re Criscione, Case No. 71614 (Aug. 30 2007), that court found that statistics studied by professionals regarding prisoners whose offense was considered exceptional, the use of Cal. Regs § 2402 (c) (1), "Especially heinous, atrocious or cruel" was found to be used in every case. (In re Criscione, p. 10-1 ). The Criscione court held that "[W]hat this reduces to is nothing less than a denial of parole for the very reason the inmates are present before the Board - i.e. the committed murder." (In re Criscione, supra, at p 14)

There was no evidence to warrant a denial of parole, nor was there any evidence to deny Petitioner parole for two more years. Petitioner, again, asks this Court to take judicial notice according to Evidence Code § 452, of a recent decision the California Court of Appeals Third Appellate District in In re Fidel Jessie Lozano, Case No. C051792 found that there was no evidence to deny Lozano three more years. Specifically the Lozano court found that it would not take Lozano three years to fulfill the Board's recommendations nor

13

would one year not be enough to fulfill the Board's recommendations. In the instant petition, Petitioner was recommended to get more insight because the Board felt that Petitioner did not have enough. The Board also recommended Petitioner to firm up parole plans, which  Petitioner has already developed employable skills and has a place to live As in Lozano, so in the instant petition, there was not any evidence to deny Petitioner parole for two years. Furthermore, The United States Supreme Court in CAL. DEPT. OF CORRECTIONS v. JOSE RAMON MORALES, (1995) 5 4 US 499, 131 L Ed 2d 588 1)5 S Ct 1597, stated:

> "First, the amendment applies only to a class of prisoners for whom the likelihood of releases on parole is quite remote. The amendment enabled the Board to extend the time between suitability hearings only for those prisoners who have been convicted of "more than one offense which involves the taking of a life."

(CAL. DEPT. OF CORRECTIONS v. MORALES, 131 L Ed 2d, 597).

Petitioner should not have been denied parole, nor should Petitioner have been denied parole for two years, because there is no evidence to support such denial, nor does Petitioner fall under the Morales criteria, as noted by the U.S. Supreme Court.

The Board's arbitrary and capricious decisions are clearly seen when this Court reviews every decision made by the Board. In every decision the Board found Petitioner's offense to meet the exceptional rule, although the judge ruled the offense to be a felony murder. (Petitioner's hearing's are clearly what the Santa Clara County Superior Court found to be true in In re Cricione, supra. Exhibit "C"). Petitioner should

14

not have been denied parole, at the very least, the Board's
unsuitability finding should not have been more than one year.

## CONTENTION

### III.

### THE SUPERIOR COURT DECISION WAS AN UNREASONABLE DETERMINATION OF THE FACTS; AND AN UNREASONABLE DETERMINATION OF STATE AND FEDERAL LAW, THEREBY VIOLATING PETITIONER'S DUE PROCESS

On December 19, Petitioner received a denial of his habeas
petition claims by the superior court. Exhibit "D" The superior
court decision was an unreasonable determination of state and
federal law, thereby violating Petitoner's due process. The
superior court found that the Board used two immutable factors
to justify their denial of parole. (Exhibit "D" p. 1) The
superior court contradicted itself when it stated all the reasons
the Board used to deny Petitioner parole and then state that
the reasons stated by the Board may not justify a finding of
unsuitability. (Exhibit "D" p. 2) The superior court did not
state why or how the record substantiates the one overarching
factor that Petitioner is still a threat to public safety.

Recently, the United Stats Court of Appeals for the Ninth
Circuit held that the very same factors the Board and the
superior courth upheld in this instant action, were over several
years (50) ago and did not support the decision that he still
posed a threat to society. See Exhibit "E" (RONALD HAYWARD V.
JOHN MARSHALL, Case No. 06-55392 (2008) p. 53) although the
psychologist in the HAWARD case found that Hayward posed "a
low-to-moderate risk of danger to society." Exhibit "C" p. 51

In another recent decision in In re Dannenber, Case No.

15

H03003 (11/16/07), the Dannenberg Court pointed to In re Jacobson, (2007) 154 Cal.App.4th 849, stating: "Jacobson held that a parole unsuitabiolity decision must be upheld so long as some evidence supports a finding that the offense was "especially heinous" wihtout regard to whether there is a nexus between this finding and a conclusion that the prisoner currently poses an unreasonable risk of danger to society if released. We reject this criticism of Scot, Lee, and Elkins.(See In re Dannenber, supra, at p. 12-13).

Furthermore, if the circumstances of Petitoner's offense and past criminal and social behavior can be used after over 26 years to deny him parole, even though those factors do not provide evidence that Petitioner still poses a threat to publc safety. Nor do these factors provide evidence that a two year denial  is warranted or justified, especially since the superior court recognized that Petitioner has continued to program as extensively as he has.

For the above mentioned reasons, this Court should grant this Petition for Writ of Habeas Corpus.

//////////////////////
//////////////////////
//////////////////////

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioner respectfully prays that this Court would:

1. Issue writ of habeas corpus;

2. Issue an Order to Show Cause;

3. Order an Evidentiary Hearing;

4. Order the Board to immediately schedule Petitoner for a new parole consideration hearing that comports with due process;

5. Order the Board to set Petitioner a parole date and immediately release him;

6. Appoint Counsel;

7. Grant any and all other relief deemed appropriate.


Dated: this $5$, day of May 2008.

George G. Greenwood
In Pro Se

17

EXHIBIT "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )            CDC Number:  C-57110
Hearing of:                )
                           )
GEORGE GREENWOOD           )          **INMATE COPY**
_____)

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

July 19, 2007

1:54 p.m.


PANEL PRESENT:

Janice Eng, Presiding Commissioner
Chuck Wolk, Deputy Commissioner


OTHERS PRESENT:

George Greenwood, Inmate
Pat Fox, Attorney for Inmate
Alexis Delagarza, Deputy District Attorney
Two Correctional Officers Unidentified




CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____   No           See Review of Hearing
_____   Yes          Transcript Memorandum


Michelle Bodem, WPU, Inc.

# I N D E X

Proceedings ............................................... 3

Case Factors ............................................. 15

Pre-Commitment Factors ................................... 16

Post-Commitment Factors .................................. 39

Parole Plans ............................................. 48

Closing Statements ....................................... 63

Recess ................................................... 71

Decision ................................................. 71

Adjournment .............................................. 81

Transcriber Certification ................................ 82

## P R O C E E D I N G S

**PRESIDING COMMISSIONER ENG:**  Okay.  Good afternoon.
This is a subsequent parole consideration hearing for George
Greenwood, CDC number C-57110.  Today's date is July 19th, 2007,
and the time is 1:54 in the afternoon.  We are located in San
Quentin State Prison.  The inmate was received on December 3rd,
1982 from Los Angeles County.  His life term began on that same
date, December 3rd, 1982, and his minimum eligible parole date
was November 3rd, 1998.  The controlling offense for which the
inmate has been committed is murder one, case number A369782,
Count One Penal Code 187, along with Count Two Penal Code 211,
Robbery, in which the sentence for the 211 was stayed.  The
inmate received a total term of 25 years to life.  This hearing
is being recorded so for the purpose of voice identification,
each of us will be required to state our first and last name,
spelling out our last name.  So, sir, when it comes to your
turn, after you spell your last name, please provide us with
your CDC number, okay?  I'll start, we'll move around the room
to my left.  My name is Janice Eng, E-N-G, Commissioner.

**DEPUTY COMMISSIONER WOLK:**  Chuck Wolk, W-O-L-K, Deputy
Commissioner.

**DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Alexis Delagarza,
D-E-L-A-G-A-R-Z-A, Deputy District Attorney, Los Angeles
County.

**ATTORNEY FOX:**  Pat Fox, F-O-X, Attorney for Mr.

1    Greenwood.

2         **INMATE GREENWOOD:**  George Greenwood, G-R-E-E-N-W-O-O-D.

3         **PRESIDING COMMISSIONER ENG:**  CDC Number?

4         **INMATE GREENWOOD:**  C57110.

5         **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you, sir.  For

6    the record, we also have two correctional officers present, but

7    they will not be participating in hearing.  Before we go any

8    further, I'd like to ask if you would kindly read aloud the ADA

9    statement in front of you.  And you can begin.

10        **INMATE GREENWOOD:**  ADA Statement.  "The ADA" -- I mean

11   "the Americans with Disabilities Act, ADA, is a law to help

12   people with disabilities.  Disabilities are problems that make

13   it harder for some people to see, hear, breathe, talk, walk,

14   learn, think, work, or take care of themselves than it is for

15   others.  Nobody can be -- nobody can keep -- can be kept out of

16   a public place, places or activities, because of a disability.

17   If you have a disability, you have the right to ask for help to

18   get ready for your BPT hearing and talk, read forms and papers,

19   and understand the hearing process.  BPT will look at what you

20   ask for to make sure that you have a disability that is covered

21   by the ADA and that you have asked for the right kind of help.

22   If you do not get help, or if you don't think you got the kind

23   of help you need, ask for BPT 1074 grievance form.  You can

24   also get help to fill it out."

25        **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you, sir.  In

5

1    general, do you understand what your rights are under the

2    Americans with Disabilities Act?

3        **INMATE GREENWOOD:**  Yes.

4        **PRESIDING COMMISSIONER ENG:**  Okay.  Well just to be

5    sure, we're going to go over a few more things.  I see that you

6    did sign a BPT 1073 back on March 20th, 2007.  And, sir, that

7    form is a reasonable accommodation notice and request according

8    to the provisions of the ADA.  and what that means is that form

9    allows you to identify if you have any of the disabilities as

10   defined under ADA.  And on this form, you checked off that you

11   do not.  And you also checked off that you didn't need any help

12   for your parole hearing and that you appear to understand what

13   those rights are.  So is that information current and correct?

14       **INMATE GREENWOOD:**  Yes.

15       **PRESIDING COMMISSIONER ENG:**  Okay.  And do you have any

16   problems walking up or down stairs, or for distances of a

17   hundred yards or more?

18       **INMATE GREENWOOD:**  No.

19       **PRESIDING COMMISSIONER ENG:**  Okay.  And do you need

20   glasses or a magnifying device in order to read documents?

21       **INMATE GREENWOOD:**  Not to read.

22       **PRESIDING COMMISSIONER ENG:**  Okay.  Not yet.  Okay.  And

23   how about -- do you have any hearing impairments?

24       **INMATE GREENWOOD:**  No.

25       **PRESIDING COMMISSIONER ENG:**  Okay.  Have you ever been

1   included in the Triple CMS or EOP program?

2          **INMATE GREENWOOD:**  No.

3          **PRESIDING COMMISSIONER ENG:**  Okay.  Do you know what

4   those are?

5          **INMATE GREENWOOD:**  Yes.

6          **PRESIDING COMMISSIONER ENG:**  They are in the mental

7   health.

8          **INMATE GREENWOOD:**  Okay.

9          **PRESIDING COMMISSIONER ENG:**  Okay.  Generally, you know

10  when you have been in that.  Have you taken any psychotropic

11  medications either in prison or on the streets?

12         **INMATE GREENWOOD:**  No.

13         **PRESIDING COMMISSIONER ENG:**  Okay.  And, sir, how far

14  did you get in school?

15         **INMATE GREENWOOD:**  Eleventh grade.

16         **PRESIDING COMMISSIONER ENG:**  Eleventh grade?  Okay.  And

17  do you recall when you were growing up if you were enrolled in

18  any special education classes?

19         **INMATE GREENWOOD:**  No.

20         **PRESIDING COMMISSIONER ENG:**  Okay.  So do you suffer

21  from any disability that would prevent you from participating

22  in the hearing today?

23         **INMATE GREENWOOD:**  No.

24         **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you.  Ms.

25  Fox, are there any ADA issues that you believe need further

1   discussion?

2       **ATTORNEY FOX:**  No.  Thank you.

3   **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you.  Sir, this

4   hearing is being conducted pursuant to the Penal Code and the

5   rules and regulations of the Board of Parole Hearings governing

6   parole consideration hearings for life inmates.  So the purpose

7   of the hearing today is to, once again, consider your

8   suitability for parole, and in doing so, we'll consider the

9   number and nature of the crimes for which you were committed,

10  your prior criminal and social history, your behavior and

11  programming since your commitment, and your plans, if released.

12  So we've already had a chance to review your central file, and

13  you'll be given an opportunity to make any corrections or

14  clarify the record for us.  Okay.  We will consider your

15  progress since your commitment, your counselor's reports and

16  your mental health evaluations.  But we will focus on your

17  progress and any new reports since your last hearing.  So if

18  you have had changes to your parole plans, that should be

19  brought to our attention.  Okay?  We will reach a decision

20  today and inform you whether or not we find you suitable for

21  parole, and, of course, the reasons for our decision.  So if

22  you are found suitable for parole, the length of your

23  confinement will be explained to you at that time.  Okay?

24  Before we recess for deliberations, the District Attorney's

25  representative, who is present, your attorney, and you

1  yourself, will all have an opportunity to make a final

2  statement regarding parole suitability.  Now you don't have to

3  make a statement if you don't want to.

4         **INMATE GREENWOOD:**  Okay.

5         **PRESIDING COMMISSIONER ENG:**  But if you choose to, you

6  should focus on why you believe you are suitable for parole

7  today.  Okay?

8         **INMATE GREENWOOD:**   Okay.

9         **PRESIDING COMMISSIONER ENG:**  Okay.  After that, we will

10 take a recess.  We'll clear the room and we'll begin our

11 deliberations.  And once we finish deliberations, we'll resume

12 the hearing and announce our decision.  Okay?  So the

13 California Code of Regulations states that regardless of time

14 served, a life inmate shall be found unsuitable for, and denied

15 parole, if, in the judgment of the panel, the inmate would pose

16 an unreasonable risk of danger to society if released from

17 prison.  But sir, you do have certain rights.  Those rights

18 include the right to a timely notice of this hearing, the right

19 to review your central file, and the right to present relevant

20 documents.  Okay?  Ms. Fox, so far, have your client's rights

21 been met?

22         **ATTORNEY FOX:**  Yes, as to this hearing.

23         **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you.  Sir, you

24 have the additional right to be heard by an impartial panel.

25 You have been introduced to this panel.  Do you have any

1  objections?

2  **ATTORNEY FOX:**  At this time, Mr. Greenwood doesn't

3  believe it is possible for him to receive a fair hearing before

4  any panel compromised of members of the Board of Parole

5  Hearings as it's currently constituted, and that's based on the

6  policies, practices and procedures.

7  **PRESIDING COMMISSIONER ENG:**  But specific to the two

8  commissioners sitting in front of you, okay, do you have

9  objections to the two of us in conducting this hearing?

10  **INMATE GREENWOOD:**  No.

11  **PRESIDING COMMISSIONER ENG:**  Okay.  And if you did, you

12  know -- it has to do with impartiality if you don't believe --

13  **INMATE GREENWOOD:**  But I don't know what I would base

14  that on.  I don't know you, so --

15  **PRESIDING COMMISSIONER ENG:**  Exactly.

16  **INMATE GREENWOOD:**  -- I would assume that I would get a

17  fair hearing, but --

18  **PRESIDING COMMISSIONER ENG:**  Okay.  Right.

19  **INMATE GREENWOOD:**  -- I'm doing what my attorney said.

20  **PRESIDING COMMISSIONER ENG:** Generally, if there is

21  ground for impartiality, if you knew either one of us from the

22  past, or if you knew one of us was good friends with -- or a

23  relative of the victim, or anybody else, or any of the

24  families, okay.  Well, Ms. Fox, do you have any objections to

25  the panel?

1    **ATTORNEY FOX:**    Not other than what has already been

2    stated.

3    **PRESIDING COMMISSIONER ENG:** Okay.  Thank you.  Sir,

4    okay, you will receive a copy of our written tendered decision

5    today, and that decision does become final within approximately

6    120 days.  So a copy of the final decision and a copy of the

7    hearing transcript will be sent to you later on.  Okay.  Please

8    note that on May 1, 2004, the regulations regarding your right

9    to appeal a decision made at this hearing were repealed and you

10   basically have to go to court.  So if you have questions about

11   that policy, you should discuss that with your legal counsel or

12   review the policy at your prison law library.  Okay.  Sir, you

13   are not required to admit to or discuss your offense, but this

14   panel does accept as true the findings of the court.  So do you

15   understand what that means?

16   **INMATE GREENWOOD:**    Yes.

17   **PRESIDING COMMISSIONER ENG:** Commissioner Wolk, is there

18   any confidential material in the file, and, if so, will we be

19   using it?

20   **DEPUTY COMMISSIONER WOLK:**    There is some confidential

21   material in the file.  However, we will not be using it.

22   **PRESIDING COMMISSIONER ENG:** All right.  Thank you.

23   Okay.  I've already passed a hearing checklist around to your

24   legal counsel and to the Deputy District Attorney, and we've

25   all signed off on it.  And we do this, sir, this is marked

1  Exhibit 1, to make sure that all of us are operating off the

2  same set of documents for your hearing.  So (cough), on that,

3  excuse me, Ms. Fox, are there any additional documents to be

4  presented to the panel besides the few that we have?

5      **ATTORNEY FOX:**  There are letters of support -- and

6  that's it.

7      **PRESIDING COMMISSIONER ENG:** Okay.

8      **ATTORNEY FOX:**  The letters of support.

9      **PRESIDING COMMISSIONER ENG:** All right.  Any preliminary

10  objections?

11      **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  No, but we reserve

12  the right to interpose any that be necessary as the hearing

13  proceeds.

14      **PRESIDING COMMISSIONER ENG:** Okay.  And will the -- will

15  your client be speaking with us?

16      **ATTORNEY FOX:**  Yes.  Mr. Greenwood will be discussing

17  various items with the hearing panel, but he will not be

18  discussing the facts of the crime of commitment.  He does

19  stipulate to the statement of facts.  I believe it was the 2004

20  Board report, which contained the prisoner's version.  No?

21      **PRESIDING COMMISSIONER ENG:** You need a minute?

22      **ATTORNEY FOX:**  In 1997, as part of the -- I'm sorry.

23  Strike what I just said regarding the 2004.  But what he said

24  at the 1997 parole consideration hearing --

25      **INMATE GREENWOOD:**  And also in 2003.

1    **ATTORNEY FOX:** And in 2003 at the hearing.  So it would

2    be in the transcripts.

3    **PRESIDING COMMISSIONER ENG:** Well, I'm not going to go

4    digging through the transcripts right now, okay.  So does your

5    client have a version of the facts of the crime in any of these

6    Board reports or in one of the psychological evaluations?

7    **ATTORNEY FOX:**  (No audible response).

8    **PRESIDING COMMISSIONER ENG:** I usually take the most

9    recent one that I can find in the documents, and that's usually

10   in one of the Board reports because it has -- it's -- the

11   counselors usually have an interview with the inmate, or I

12   don't have to read any of his versions in.

13   **ATTORNEY FOX:**  No.  It looks like when he was

14   interviewed by the counselors, he declines to make a statement,

15   and then they include a statement attributed to him in the

16   probation officer's report.  But again --

17   **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  I'm sorry, Counsel,

18   because of the fan, I can't hear you.

19   **ATTORNEY FOX:**  Oh, I'm sorry.

20   **PRESIDING COMMISSIONER ENG:** With all the fans going ,it

21   is a little difficult, so we have to all speak up.

22   **ATTORNEY FOX:**  Okay.  Well, we don't have a statement

23   other than the testimony he made at the hearing in 1997 and in

24   2003.

25   **PRESIDING COMMISSIONER ENG:** So you're stating that we

1    are going to have to go back into the '97 transcript, as well

2    as the 2003 transcript to get an idea about your client's

3    position?  So that it is not reflected as what's in the 2004

4    Board report; is that correct?

5        **ATTORNEY FOX:**  That is correct.

6        **PRESIDING COMMISSIONER ENG:** Is that correct, Sir?

7        **ATTORNEY FOX:**  That's correct.

8        **INMATE GREENWOOD:**   Are your directing the question to

9    me or my attorney now?

10       **ATTORNEY FOX:**   That's correct.  We need to just get the

11   transcripts, and I believe they are here.  I'll look it up if

12   you want.

13       **DEPUTY COMMISSIONER WOLK:**  What year?

14       **ATTORNEY FOX:**   2003 --

15       **INMATE GREENWOOD:**  1997.

16       **ATTORNEY FOX:**   -- and 1997.

17       **DEPUTY COMMISSIONER WOLK:**  You are going to take -- read

18   from two different transcripts?

19       **PRESIDING COMMISSIONER ENG:**  I'm going to tell you right

20   now this is not acceptable, okay.  It is absolutely not

21   acceptable right now because this is going to take some time,

22   which we've already been delayed for close to one hour, and I'm

23   not happy with this.  But if this is the only thing we can do,

24   we're going to have to take a recess; we're going to have to go

25   through this because we're going to be sitting here all

1    afternoon trying to read his version.  Now, which is it going
2    to be?  Is it in both?

3        **INMATE GREENWOOD:**  Ms. Eng, can I say one thing?

4        **PRESIDING COMMISSIONER ENG:** Yes.

5        **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  I'm sorry, I can't
6    hear.

7        **INMATE GREENWOOD:**  I'm stipulating to the record.  I
8    will stipulate to the record, and I won't be giving my version
9    of the crime today.  That's -- if that is good enough for you,
10   I'm ready to go.

11       **ATTORNEY FOX:**  Okay.

12       **PRESIDING COMMISSIONER ENG:** All right.  So I -- you
13   don't -- I -- you are not requiring me to read his version into
14   the record?  You can't -- can you hear that?

15       **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  I'm sorry, I can't
16   hear him.

17       **ATTORNEY FOX:**  We prefer that you did, but if you don't,
18   you won't.

19       **PRESIDING COMMISSIONER ENG:**  Sorry.  Can you hear better
20   if this is down here?

21       **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Fine.  I can hear
22   almost everybody.  I couldn't hear the inmate.

23       **ATTORNEY FOX:**  I'm sorry.

24       **PRESIDING COMMISSIONER ENG:** It is difficult.  You have a
25   very deep voice and sometimes with the all the background

1  noise, it is difficult to hear.  Okay, all right.  I still have

2  to swear you in on any of the other issues that we may discuss,

3  okay, so please raise your right hand.  Do you solemnly swear

4  or affirm that the testimony you give at this hearing will be

5  the truth, the whole truth, and nothing but the truth.

6       **INMATE GREENWOOD:**  Yes, I do.

7       **PRESIDING COMMISSIONER ENG:**  Okay.  All right.  So let

8  me go ahead.  I'm going to read into the record the statement

9  of facts about the life crime.  I'm going to take that from the

10 Appellate decision in the legal section of our packets, pages 2

11 through 3.  And this does state that on June 29, 1981 at

12 approximately 8 a.m., Frank Coffey, Sr. ("Coffey") C-O-F-F-E-Y,

13 was struck to the ground by an assailant and robbed.  Jesse

14 Davis ("Davis") who was inside a nearby store, looked outside

15 when he heard a noise.  He saw Defendant holding a man who

16 appeared elderly.  Defendant's left hand was in the man's left

17 rear pocket.  Davis observed Defendant swing the flat part of

18 his clinched right fist down in a clapping motion against the

19 back of Coffey's head.  Coffey fell forward onto his face into

20 the street.  When Defendant pulled his hand out of Coffey's

21 pocket, Davis observed a black wallet in Defendant's hand.

22 Defendant ran off with the wallet.  Orlando Mason ("Mason")

23 told police Defendant had requested his help in robbing an old

24 man.  Mason responded that he did not want to get involved.

25 Defendant left, heading towards the street where Coffey was

1   attacked.  Shortly thereafter, Defendant returned with the

2   wallet.  According to Mason, Defendant later stated he had

3   gotten only "crumbs" from the wallet.  Mario Jancy ("Jancy"),

4   J-A-N-C-Y, saw Defendant at approximately 9 a.m.  Defendant had

5   in his possession a credit card bearing the name Frank C. Sims,

6   S-I-M-S, and a driver's license issued to Frank Coffey.  Jancy

7   asked how defendant had acquired the credit card.  Defendant

8   answered, "I slammed this old man and took his wallet."

9   Defendant also noted he had warned people in the vicinity of

10   the crime scene, "of any of you blank, blank s tell, I'll come

11   back and kill you".  Then again, per Ms. Fox and her client,

12   during the recess, the panel will go back and read the 2003 and

13   1997 --

14         **ATTORNEY FOX:**  Yes.

15         **PRESIDING COMMISSIONER ENG:**  -- prisoner's version, the

16   discussion, during our recess.

17         **ATTORNEY FOX:**  Thank you.

18         **PRESIDING COMMISSIONER ENG:**  Okay.  Take a look at your

19   client's prior record, and I know I had it in here somewhere.

20   Okay.  Look, this is according to the probation officer's

21   report that, sir, you had one of your first arrests, or

22   contacts with law enforcement, was when you were about 13 years

23   old, November 30, 1975 with the Los Angeles Police Department,

24   is that correct, for possession of marijuana?

25         **INMATE GREENWOOD:**  Yes.

1      **PRESIDING COMMISSIONER ENG:** Okay.  It states here that

2   you were counseled and released, that you were in a vacant car

3   when some of the boys were smoking marijuana.  Okay.  Were you

4   smoking marijuana back in those days?

5      **INMATE GREENWOOD:**  Yes.

6      **PRESIDING COMMISSIONER ENG:**  Okay.  Had you started

7   before you were 13?

8      **INMATE GREENWOOD:**  Around that time, age 13.

9      **PRESIDING COMMISSIONER ENG:**  About age 13, and then you

10  got caught with some of your friends, huh?

11      **INMATE GREENWOOD:**  Yes.

12      **PRESIDING COMMISSIONER ENG:** Okay.  Right after that,

13  1977, September 22nd, I'm going to have -- let's see, he was

14  arrested; he was counseled and released for Penal Code 415.  He

15  got on a bus with no money and his friend threatened the bus

16  driver.  Okay.  So nothing happened; they just picked you up

17  and said you shouldn't be doing that?

18      **INMATE GREENWOOD:**  Basically, yes.

19      **PRESIDING COMMISSIONER ENG:**  Then January 7, '78, you

20  were arrested for kidnapping.  Says the Petitioner was

21  requested, was sustained; you were declared what, a ward.  It

22  states here that you walked past the victim, a young girl.  You

23  turned around and produced a light brown leather case, unzipped

24  it, and removed an unknown type of black handgun, and basically

25  stated to this young girl, "Let's go into the alley."  You

1  walked into the alley, she cried, and you stated to "Give me

2  your purse." She handed over the property and then you took

3  off. Is that what happened?

4       **INMATE GREENWOOD:** Yes.

5       **PRESIDING COMMISSIONER ENG:** Well, you were about 14

6  years old?

7       **INMATE GREENWOOD:** Yes.

8       **PRESIDING COMMISSIONER ENG:** How old was this young girl

9  about?

10       **INMATE GREENWOOD:** About 18, about 18 or 19, I guess.

11       **PRESIDING COMMISSIONER ENG:** Where did you get the gun?

12       **INMATE GREENWOOD:** It was a pellet gun.

13       **PRESIDING COMMISSIONER ENG:** It was a pellet gun?

14       **INMATE GREENWOOD:** Yes.

15       **PRESIDING COMMISSIONER ENG:** I'm going to have to ask

16  you to speak up because with all the background noise, and be

17  sure that you speak into the microphone, too, so we make sure

18  that everything gets picked up.

19       **ATTORNEY FOX:** And Mr. Greenwood would decline to

20  further discuss his juvenile record.

21       **PRESIDING COMMISSIONER ENG:** So you don't want to answer

22  any questions that I have about your juvenile record; is that

23  correct?

24       **INMATE GREENWOOD:** That's correct.

25       **PRESIDING COMMISSIONER ENG:** Okay. That's your

1  prerogative.  Okay.  Well, let's see, then he also -- it looks
2  like there was a petition requested for a 211 robbery.  It is
3  the same date as the kidnapping, so that must have changed
4  over.  It was part of the kidnapping.  And then, okay, then at
5  age 15, on March 19, '78, vandalism, which ended up being
6  consolidated with I guess the kidnapping and the robbery.  And
7  then in June of 1978, he was arrested and, again, there's three
8  counts of robbery.  It says all three counts were sustained.
9  So you -- the minor was ordered into the camp or community
10  placement program with a maximum confinement of four years.  So
11  it looks like they just put all of these cases together.  There
12  is something else here.  I don't want to miss it, but there
13  seems to be quite a bit of things of -- apparently on January
14  11th, 1979, so about six months later, police officers responded
15  for assault-with-a-deadly-weapon call.  Just trying to see, it
16  says a lady who was driving a gray Buick indicated that the
17  Defendant had jumped in the car, threatened to kill her if she
18  did not drive him out of the area and, apparently, other
19  witnesses indicated that the Defendant had committed an assault
20  with a pipe on an unknown female, black, prior to entering that
21  Buick, and this woman had been picked up and driven away for
22  medical treatment by another female.  And Mr. Greenwood had
23  related that he was walking to the bus stop when he came upon
24  the two ladies, asked them how his sherm, sherming, and one of
25  them pulled a knife out on him.  So he states that she came

1   towards him with a knife and started fighting back.  But I

2   don't see any disposition that had really occurred with this,

3   so --

4       **ATTORNEY FOX:**  Right, and so we'd --

5       **PRESIDING COMMISSIONER ENG:**  Okay.

6       **ATTORNEY FOX:**  -- ask that those be disregarded simply

7   because the petitions were not sustained, and there's no

8   substantiating facts.

9       **PRESIDING COMMISSIONER ENG:**  His adult history.

10      **DEPUTY COMMISSIONER WOLK:**  If I may, I would ask the

11  panel to review the 2005 transcript as to that particular

12  incident and all the incidents.  The inmate did, in fact,

13  discuss them, so he basically gives his version of those

14  offenses, and that is contained in the record.

15      **PRESIDING COMMISSIONER ENG:**  Okay.  And, again, I did

16  not have any of the information from the 2005, and this panel

17  is going to go back and review the last three transcripts.  So,

18  again, it's at the panel's discretion in what we're going to

19  consider and we can review everything if we choose to and we

20  give it our own weight, whatever we feel.  So your point is

21  noted, but again, all this shows, it's not just one thing, you

22  know.  Your client has a series of arrests and contacts with

23  law enforcement starting at a very young age, and I don't think

24  that you could dispute that, so that's all we'll go with right

25  now.  Adult history, we see that on 5/7/81, possession of

1  marijuana.  He listed the incorrect birth date.  It was

2  referred to juvenile probation as a petition request and then

3  it was closed on 6/12/81 since he was already in the CYA parole

4  program.  Okay.  Sir, when were you placed in CYA?

5  **INMATE GREENWOOD:**  In 1979.

6  **PRESIDING COMMISSIONER ENG:**  Okay.  So I guess -- I

7  think that would be it, right?  As a -- was that just that

8  possession, but then that was because of the wrong birth date?

9  **ATTORNEY FOX:**  That is what the record shows, I think.

10  **PRESIDING COMMISSIONER ENG:**  Okay.  So the only thing --

11  because you were 18 when this life crime occurred, so that was

12  -- I think that was your only adult arrest, correct?

13  **INMATE GREENWOOD:**  Yes.

14  **PRESIDING COMMISSIONER ENG:**  Okay.  So let me take a

15  look at your personal history.  Born 2/26/63, so again, you

16  were 18 when the life crime occurred, and you are now 44,

17  correct?

18  **INMATE GREENWOOD:**  Yes.

19  **PRESIDING COMMISSIONER ENG:**  And I saw that you were --

20  I found something somewhere else.  Born in Oakland and then

21  raised in Los Angeles.  You were raised with mother, father and

22  grandmother in the home, correct?

23  **INMATE GREENWOOD:**  Yes.  My grandmother lived next door,

24  though.

25  **PRESIDING COMMISSIONER ENG:**  She lived next door?  Okay.

1    But still she was right there.

2            **INMATE GREENWOOD:**  Yes.

3            **PRESIDING COMMISSIONER ENG:**  Which is good.  All right.

4    And that -- are you one of five or one of six?

5            **INMATE GREENWOOD:**  One of six.

6            **PRESIDING COMMISSIONER ENG:**  One of six, okay.  And

7    you're the middle child?

8            **INMATE GREENWOOD:**  Yes.

9            **PRESIDING COMMISSIONER ENG:**  So you have older brothers,

10   or older sisters, or both?

11           **INMATE GREENWOOD:**  I have an older sister, older

12   brother, two younger brothers, and one half-sister.

13           **PRESIDING COMMISSIONER ENG:**  Okay.  Did any of your

14   other siblings have -- were they having problems with the law

15   when they were young, too?

16           **INMATE GREENWOOD:**  Not until they were adults, as far as

17   I know.

18           **PRESIDING COMMISSIONER ENG:**  So you were the only one at

19   a young age getting into trouble?

20           **INMATE GREENWOOD:**  Yes.

21           **PRESIDING COMMISSIONER ENG:**  Okay.  So -- I mean you

22   went in to -- you started having problems at 13, which was '76,

23   and you said, okay, so you were about 16 when you went to CYA.

24   Basically, though, while you were growing up, did the family

25   stay intact?

1    **INMATE GREENWOOD:**  No.  My parents were divorced.

2    **PRESIDING COMMISSIONER ENG:**  They ended up getting

3    divorced?

4    **INMATE GREENWOOD:**  Yes.

5    **PRESIDING COMMISSIONER ENG:**  How old were you?

6    **INMATE GREENWOOD:**  I was about 10 when they separated,

7    1973.

8    **PRESIDING COMMISSIONER ENG:**  Okay.  Yeah, I see that,

9    sorry.  I'm going all over the place because I can't quite get

10   all the information in one place.  Okay.  So your father was a

11   postal worker; your mother worked at Department of Motor

12   Vehicles.  Okay.  Father was strict.  So you were close with

13   your mother, correct?

14   **INMATE GREENWOOD:**  Yes.

15   **PRESIDING COMMISSIONER ENG:**  Okay.  So did you live with

16   your mother when they split, or did you go with your father?

17   **INMATE GREENWOOD:**  I lived with my mother until I was

18   14.  I lived with my father for about maybe five months when I

19   was 14, '77, 1977.

20   **PRESIDING COMMISSIONER ENG:**  And then you went back to

21   your mother's?

22   **INMATE GREENWOOD:**  Yes.

23   **PRESIDING COMMISSIONER ENG:**  Okay.  How about the rest

24   of your siblings?

25   **INMATE GREENWOOD:**  Everybody grew up with my mother.  I

1    think my younger brothers finished high school living with my

2    father, though.

3           **PRESIDING COMMISSIONER ENG:**  Did you father stay close

4    in the area so that you could see him regularly?

5           **INMATE GREENWOOD:**  Yes.  I saw him pretty regularly.

6           **PRESIDING COMMISSIONER ENG:**  Okay.  Did your father or

7    mother have any problems with law enforcement?

8           **INMATE GREENWOOD:**  Not that I know of, no.

9           **PRESIDING COMMISSIONER ENG:**  But you said that, you

10   know, when everybody was young, they didn't have any problems.

11   So as adults, did any of your brothers or sisters get into

12   problems with law enforcement?

13          **INMATE GREENWOOD:**  I think so, yeah, yeah.

14          **PRESIDING COMMISSIONER ENG:**  Any of them in prison?

15          **INMATE GREENWOOD:**  No, not right now.

16          **PRESIDING COMMISSIONER ENG:**  Not right now, but they

17   were, huh?

18          **INMATE GREENWOOD:**  Yeah.

19          **PRESIDING COMMISSIONER ENG:**  What happened, do you know?

20          **INMATE GREENWOOD:**  I'm not sure.  I'm not exactly sure

21   what happened with that.

22          **PRESIDING COMMISSIONER ENG:**  Okay.  You just heard it

23   through other members that one of your siblings was doing some

24   time?

25          **INMATE GREENWOOD:**  Yes.

1    **PRESIDING COMMISSIONER ENG:** Okay, okay, okay. So it's

2    -- you know, n the probation officer's report, it says that

3    when you were in school, you were doing pretty well, that you

4    received above-average grades in school, but then you stated

5    that, you know -- so why did you drop out?

6    **INMATE GREENWOOD:** I don't know. Growing up, I guess I

7    started doing a lot of things to fit in with my peers, getting

8    high and making wrong choices of friends.

9    **PRESIDING COMMISSIONER ENG:** So that became more

10   important, huh?

11   **INMATE GREENWOOD:** Yeah.

12   **PRESIDING COMMISSIONER ENG:** Okay. So your mother -- or

13   I see here, at least I think that this is correct, that your

14   mother has passed away?

15   **INMATE GREENWOOD:** Yes. She passed away in August of

16   '92.

17   **PRESIDING COMMISSIONER ENG:** In August of '92?

18   **INMATE GREENWOOD:** Yes.

19   **PRESIDING COMMISSIONER ENG:** And your father is still

20   alive?

21   **INMATE GREENWOOD:** Yes.

22   **PRESIDING COMMISSIONER ENG:** Okay. That's right because

23   we have a letter from your father. Okay. Are you in touch

24   with all your siblings?

25   **INMATE GREENWOOD:** I can't get in touch, but I'm

1    basically in touch more with my oldest brother than anybody
2    else, Joseph Greenwood.
3        **PRESIDING COMMISSIONER ENG:**  I'm sorry, I can't hear
4    you.
5        **INMATE GREENWOOD:**  Joseph Greenwood, my oldest brother,
6    I stay in touch with him.
7        **PRESIDING COMMISSIONER ENG:**  Okay.  And he never --
8        **INMATE GREENWOOD:**  More than anybody else, yeah.
9        **PRESIDING COMMISSIONER ENG:**  Did he do time in jail?
10       **INMATE GREENWOOD:**  No.
11       **PRESIDING COMMISSIONER ENG:**  So he --
12       **INMATE GREENWOOD:**  Just my younger brothers.
13       **PRESIDING COMMISSIONER ENG:**  Just the youngest one?
14       **INMATE GREENWOOD:**  Yeah, my two younger brothers.
15       **PRESIDING COMMISSIONER ENG:**  Okay.  Yeah, it says here
16   that some of your brothers have an arrest history, and those
17   were the two younger?
18       **INMATE GREENWOOD:**  Yes.
19       **PRESIDING COMMISSIONER ENG:**  Okay.  All right.  Ever get
20   married?
21       **INMATE GREENWOOD:**  Yes.
22       **PRESIDING COMMISSIONER ENG:**  You were married one time
23   for eight years.
24       **INMATE GREENWOOD:**  I'm still married.
25       **PRESIDING COMMISSIONER ENG:**  You're still married?

1    Okay.   So how long have you been married?

2         **INMATE GREENWOOD:**  Since November the 8th, 1997.

3         **PRESIDING COMMISSIONER ENG:**   Okay.  And you have a step-

4    child, correct?

5         **INMATE GREENWOOD:**  Yes.

6         **PRESIDING COMMISSIONER ENG:**   Okay.

7         **INMATE GREENWOOD:**   16.

8         **PRESIDING COMMISSIONER ENG:**   16?

9         **INMATE GREENWOOD:**  Yeah.

10        **PRESIDING COMMISSIONER ENG:**   Okay.  Is there anything

11   that I have missed that you feel is pertinent to put into the

12   record about your -- either your prior criminal history or your

13   family history?

14        **INMATE GREENWOOD:**   Well, I have an understanding of why

15   I did the things I did growing up, if you would like to hear my

16   explanation or my version of why --

17        **DEPUTY DISTRICT ATTORNEY DELAGARZA:**   I'm sorry, I can't

18   hear inmate.

19        **PRESIDING COMMISSIONER ENG:**   Yeah.  The inmate stated if

20   we wanted to know why he did what he did while he was a

21   juvenile, if we wanted an explanation.  I was under the

22   impression that you didn't want to discuss anything, but if you

23   want to explain that to us, it would be welcome.

24        **INMATE GREENWOOD:**   Yes.  I just wanted to give you an

25   idea of my frame of mind growing up.

1    **PRESIDING COMMISSIONER ENG:**  Can you speak up, sir?

2        **INMATE GREENWOOD:**  The frame of mind that I was in when

3   I was doing the things that I was doing.

4        **PRESIDING COMMISSIONER ENG:**  Okay.

5        **INMATE GREENWOOD:**  Okay.  Growing up, first of all, I

6   believe I started getting high because I wanted to fit in with

7   my peers, basically.  And shortly after, I became my peers.  I

8   started making wrong choices, you know.  However, since I've

9   been incarcerated this time, I have addressed all of those

10  issues, my drug abuse, you know, and my anti-social behavior

11  through self-help groups, and NA, and other programs.  What do

12  I say?  I don't have a direct question to answer.  I'm trying

13  to speak on -- I'm nervous right now.

14       **PRESIDING COMMISSIONER ENG:**  That's okay.  It's okay.

15  We know.  Yeah, just take a couple deep breaths and --

16       **INMATE GREENWOOD:**  There is no direct questions being

17  asked, and I don't really know how to interact in this room.

18       **PRESIDING COMMISSIONER ENG:**  Were you involved with any

19  gang members back then?

20       **INMATE GREENWOOD:**  No, I wasn't.

21       **PRESIDING COMMISSIONER ENG:**  Okay.  So it's just -- so

22  you said that you were just trying to fit in with your peers.

23  And were --

24       **INMATE GREENWOOD:**  I said that's when my -- I guess you

25  would say my criminality began with the getting high.

1      **PRESIDING COMMISSIONER ENG:**  With getting high, okay.

2   Were they supplying that to you or was it --

3      **INMATE GREENWOOD:**  Yes.  We was supplying each other

4   with it.

5      **PRESIDING COMMISSIONER ENG:**  Okay.

6      **INMATE GREENWOOD:**  Okay.  Growing up, I understand that

7   I was spoiled, you know.  I was irresponsible.

8      **PRESIDING COMMISSIONER ENG:**  You were spoiled?

9      **INMATE GREENWOOD:**  Yes, yes, I was, and I --

10     **PRESIDING COMMISSIONER ENG:**  So what do you mean by

11  that?  Did your parents sort of give you everything you wanted?

12     **INMATE GREENWOOD:**  Not in that sense, but they would --

13  I mean as far as disciplining was concerned, I would get

14  lectured, you know.  As you know. I've done time.  My parents

15  was always there for me.  So I guess I probably never took the

16  punishment as seriously as I should have or use it to correct

17  my criminality because it was like a boarding school to me at

18  that time because I was immature.

19     **PRESIDING COMMISSIONER ENG:**  So why do you think you

20  were choosing to disregard your parents?  Okay.  And basically

21  think that big deal, going into CYA is like a boarding school.

22  Why do you think you chose to continue to break the law?  Did

23  you know right from wrong, you think?

24     **INMATE GREENWOOD:**  I knew right from wrong, but I didn't

25  realize the impact that my wrongdoing had on victims, their

1    families, my family, or society.  I never sat back and just

2    really evaluated what I was doing and the effects it had on

3    other people.  And I --

4        **PRESIDING COMMISSIONER ENG:**  But what about the effects

5    it was having on you?  Did you think it was cool to get

6    arrested by the police?  When you think back --

7        **INMATE GREENWOOD:**  I didn't think it was cool getting

8    arrested.  I chose not to speak about my crimes, but I will say

9    that a lot of those crimes that I got involved with turned out

10   to be a lot more serious than my intentions.  I never intended

11   to hurt anybody.  I don't want to really get into talking about

12   my juvenile record, but as you can see, the robbery I had and

13   the attempted kidnap was used with a pellet gun that didn't

14   work.  Nobody got hurt.

15       **DEPUTY DISTRICT ATTORNEY DELAGARZA:** I can't hear,

16   Inmate.

17       **INMATE GREENWOOD:**  Nobody got hurt in these crimes.

18       **ATTORNEY FOX:**  Maybe you should move over here because I

19   don't think he can really talk any louder.

20       **PRESIDING COMMISSIONER ENG:**  Yeah.  It's --

21       **DEPUTY COMMISSIONER WOLK:**  Did you want to use the

22   headphones?

23       **DEPUTY DISTRICT ATTORNEY DELAGARZA:** Everybody -- I can

24   hear everybody else.

25       **PRESIDING COMMISSIONER ENG:**  It is very difficult as I

1   am sitting directly across from Mr. Greenwood, and it is tough

2   to hear because he has a very deep voice.  Okay.  He was just -

3   - now I can't remember, what were you stating, sir?  I'm sorry.

4       **INMATE GREENWOOD:**  I was saying, I don't want to get

5   into -- to the crime.

6       **PRESIDING COMMISSIONER ENG:**  Oh, I know, you were saying

7   something about the pellet gun.

8       **INMATE GREENWOOD:**  Exactly, because I don't want to sit

9   here and appear to be making up excuses for what I did in the

10  past, or to try to downplay it because I understand now how

11  serious those crimes were.

12      **PRESIDING COMMISSIONER ENG:**  But at the time, you

13  didn't?

14      **INMATE GREENWOOD:**  But at the time, I didn't.  I didn't

15  realize that there is a number of things that can go wrong when

16  you committing crimes, up until I committed this crime.

17      **PRESIDING COMMISSIONER ENG:**  Right.

18      **INMATE GREENWOOD:**  I mean I have never committed a crime

19  with the malicious intent to physically harm people or to hurt

20  somebody, or to try to kill somebody.  I never used real

21  weapons.  I didn't -- I never harmed my victims in any crime

22  that I have committed.

23      **PRESIDING COMMISSIONER ENG:**  So do you -- okay.  Let me

24  ask you -- before you go any further, let me ask you something.

25  Do you understand the difference between one person's intent

1    versus another person's perception?  Do you understand what I

2    mean by that?

3        **INMATE GREENWOOD:**  Yeah, yeah.  It's like I might have

4    intentions to do one thing, but it turns out to be something

5    else or the other person looks at it as if it is being worse

6    than what my intentions are.  Yeah.

7        **PRESIDING COMMISSIONER ENG:**  So that if you were, you

8    know, a young person walking around the streets and you got

9    approached by somebody that pulled a gun on you and you have no

10   knowledge of weapons, how would you perceive that?

11       **INMATE GREENWOOD:**  I will assume it's a real weapon and

12   I would just -- I would do what they tell me to do.

13       **PRESIDING COMMISSIONER ENG:**  Exactly, exactly.

14       **INMATE GREENWOOD:**  Yeah.

15       **PRESIDING COMMISSIONER ENG:**  So that's a critical thing

16   for you to understand, the difference between what intent

17   versus perception is, okay.  So your point's taken, and is

18   there anything else that you would like to add in terms of

19   explaining to the panel?

20       **INMATE GREENWOOD:**  What, about my juvenile --

21       **PRESIDING COMMISSIONER ENG:**  Whatever you wanted right

22   now.  Yeah, we were talking about the juvenile.  So at that

23   time, you did clearly state that the results ended up to be

24   much more significant and severe than what you thought it would

25   be.  When did you figure that out?  After -- when you got sent

1    to CYA, or when you were much older when you were doing your

2    time for this life crime?  When did you figure it out?

3       **INMATE GREENWOOD:**  After I was arrested for this crime,

4    or actually after this crime occurred.

5       **PRESIDING COMMISSIONER ENG:**  After the life crime?

6       **INMATE GREENWOOD:**  Yes.

7       **PRESIDING COMMISSIONER ENG:**  Okay.  So up until all that

8    time, you -- what were you thinking, that you were just unlucky

9    or what, about all your prior arrests?

10      **INMATE GREENWOOD:**  I knew I was doing things that I

11   shouldn't have been doing.  I got arrested.  I was sent to

12   camp.  I was also sent to YA, and I understand that I didn't

13   correct my behavior then because of the attitude that I had at

14   that time.

15      **PRESIDING COMMISSIONER ENG:**  Okay.

16      **INMATE GREENWOOD:**  And I didn't real feel that -- I'm

17   trying to use the right words here.  I didn't think what I was

18   doing was as severe at that time.  However, I do understand the

19   seriousness of my actions today.

20      **PRESIDING COMMISSIONER ENG:**  Right, okay, okay, yeah.

21      **INMATE GREENWOOD:**  And I have for many years now.

22      **PRESIDING COMMISSIONER ENG:**  Right.  The so-called

23   punishment that you received as a juvenile, when you were young

24   and got that punishment, did you think that it was a punishment

25   at all?

 1          **INMATE GREENWOOD:**  Yes.

 2          **PRESIDING COMMISSIONER ENG:**  Did you think it was

 3  serious or really not a big deal?

 4          **INMATE GREENWOOD:**  A little bit of both, I guess.

 5          **PRESIDING COMMISSIONER ENG:**  Not as big of a deal,

 6  though, in order to curtail your activities?

 7          **INMATE GREENWOOD:**  Well, I believe that I had a problem

 8  with drugs back then.  Not that I was addicted, but I was a

 9  drug abuser.  And anybody who is on narcotics is not in their

10  right frame of mind.  And I certainly wasn't at age 15, 16 or

11  17, or even 18.

12          **PRESIDING COMMISSIONER ENG:**  So what drugs were you

13  taking?

14          **INMATE GREENWOOD:**  I was using PCP.  I have experienced

15  with P -- I mean free-basing cocaine at that time, and

16  marijuana.  And I have also drank some alcohol before.

17          **PRESIDING COMMISSIONER ENG:**  How old were you when you

18  starting free-basing cocaine?

19          **INMATE GREENWOOD:**  I was 18.

20          **PRESIDING COMMISSIONER ENG:**  Okay.  So at first, you

21  were just smoking marijuana, correct?

22          **INMATE GREENWOOD:**  And PCP.

23          **PRESIDING COMMISSIONER ENG:**  You started off with PCP?

24          **INMATE GREENWOOD:**  I started off with marijuana.

25          **PRESIDING COMMISSIONER ENG:**  Okay.  And then would you

1    say that your drug of choice was which one of those?

2         **INMATE GREENWOOD:**  Marijuana.

3         **PRESIDING COMMISSIONER ENG:**  Marijuana, okay.  Did you

4    smoke it like almost every day, or every week, or what?

5         **INMATE GREENWOOD:**  Not every day, but when I did, I

6    guess I would do a little bit more than I should.  The problem

7    with me was when I would use the hard drugs.  And I'm just

8    saying this to get you to understand my frame of mind.  I'm not

9    trying to use none of this as an excuse because I realize that

10   it was my choice and I just happened to make wrong choices, and

11   as a result of those wrong choices, I was getting into

12   trouble --

13        **PRESIDING COMMISSIONER ENG:**  Right.

14        **INMATE GREENWOOD:**  -- being arrested, going to camp YA.

15        **PRESIDING COMMISSIONER ENG:**  But what in you -- because

16   -- and again, a lot of people, sir, do drugs.  A lot of people

17   have drinking problems and drug problems, whether it be, you

18   know, heroin, or cocaine addiction, or methamphetamine,

19   anything.  But not everybody that takes these drugs or drinks

20   to excess, you know, on a regular basis, they don't all go out

21   and kill people.  So what do you think in you, because, you

22   know, when you're talking about smoking marijuana, a lot of

23   times smoking marijuana doesn't bring out in people more

24   aggressiveness and assertiveness.  It sort of makes people more

25   laid back.  So what do you think is in your basic

1  characteristic that you could get violent and take somebody's

2  life?

3      **INMATE GREENWOOD:**  Okay.  My understanding of drug abuse

4  now, it takes a certain personality.  They said if you have

5  addictive personality, then you would be more prone to abusing

6  drugs then somebody who doesn't.  I understand that drug

7  treatment is generally used to stop a person from using drugs.

8  I never had drug treatment growing up as a juvenile.  I've just

9  been involved with NA programs, which focus is on preventing

10  one from relapsing who has used drugs.  I believe that the root

11  of my problem is, first, my wrong choices, and, secondly, my

12  drug abuse, my choice, to choose to drug abuse.

13      **PRESIDING COMMISSIONER ENG:**  Oh, I got that.

14      **INMATE GREENWOOD:**  And I feel that --

15      **PRESIDING COMMISSIONER ENG:**  But I'm stating, and you're

16  not answering, I stated that there is a lot of drug abusers;

17  there is a lot of alcoholics.  They don't all kill, okay.  So

18  all I'm stating is that yes, you had a drug problem.  But

19  you're also stating that the drugs didn't, at least I don't

20  think you stated, that the drugs -- did the drugs cause you to

21  kill?

22      **INMATE GREENWOOD:**  No.  But you have to understand when

23  you're under the influence of any controlled substance, you're

24  usually moving around recklessly.  You're not really focused

25  and aware of the things that can go wrong around you.  And

1    again, I'm not using that as an excuse because I accept full

2    responsibility for my actions today.

3         **PRESIDING COMMISSIONER ENG:**  But what I'm stating is

4    that a lot of times, drugs or drinking will allow you to drop

5    your inhibitions.

6         **INMATE GREENWOOD:**  Yes.

7         **PRESIDING COMMISSIONER ENG:**  Right?

8         **INMATE GREENWOOD:**  That is exactly what I'm saying,

9    yeah.

10        **PRESIDING COMMISSIONER ENG:**  So what I'm saying is that

11   once your inhibitions are dropped, you killed.  Not everybody

12   does that.

13        **INMATE GREENWOOD:**  Unintentionally.

14        **PRESIDING COMMISSIONER ENG:**  Or there would be a lot

15   more dead people out there, right?

16        **INMATE GREENWOOD:**  Yes.  But I'm -- my case is

17   unintentional.  There was no weapon involved.  There was no

18   forethought and it wasn't planned.  It was basically --

19        **PRESIDING COMMISSIONER ENG:**  Without getting into that,

20   that's right.  There was no weapon, but --

21        **INMATE GREENWOOD:**  And there was no intent to kill.

22        **PRESIDING COMMISSIONER ENG:**  Well, you ended up getting

23   aggressive and assaultive with a person who ended up losing

24   their life.

25        **INMATE GREENWOOD:**  And for that, I'm very sorry.

1    **PRESIDING COMMISSIONER ENG:**  And it was very up close

2    and personal.  So still, you escalated to violence, and not

3    everyone does when they inhibitions drop.  So that is why I'm

4    asking you, okay, that that happened.  There's no ifs, ands, or

5    buts.  You know, you were found guilty of this crime.  A man

6    lost his life, and you stated that you were under the influence

7    and we've talked about what that means about, you know,

8    reducing your inhibitions, and you did escalate to violence.

9    Whether it was your intention or not, it doesn't make a

10    difference.  Bottom line is it happened.  So what have you

11    learned about yourself that would prevent you from that ever

12    happening again?  If you know that you have it in you and your

13    basic characteristics, you have the ability to kill somebody

14    with your hands.

15    **INMATE GREENWOOD:**  Yeah.

16    **PRESIDING COMMISSIONER ENG:**  Okay?  So what have you

17    discovered to try to keep that under control for the future?

18    **INMATE GREENWOOD:**  I've done many things since I've been

19    incarcerated.  I guess it became with having self-respect.  I

20    respect myself; I respect others.  Not only am I sorry for this

21    case, I'm ashamed of what I've done.  And to prevent myself

22    from ever doing it again, I know I won't be using drugs anymore

23    and I intend on being in some type of NA program when I get

24    out, or drug treatment program, in order to make sure that I

25    stay on the right track.  Since I have been incarcerated, I

 1  have educated myself.  I got my diploma; I picked up some

 2  college units.  I have three marketable skills now.

 3          **PRESIDING COMMISSIONER ENG:**  Okay.

 4          **INMATE GREENWOOD:**  Electronics --

 5          **PRESIDING COMMISSIONER ENG:**  Okay.  We're getting off

 6  track, but I was just trying to get an idea if you have

 7  anything specific where you have been able to dig deep inside

 8  and understand what do you think triggered you to be able to do

 9  that when all your inhibitions and control mechanisms were --

10          **INMATE GREENWOOD:**  By educating myself with my drug

11  abuse.

12          **PRESIDING COMMISSIONER ENG:**  Okay.  Well, let's go ahead

13  and go on.  Again, is there anything else about your family

14  history or your priors that you want me to add into the record,

15  or we've pretty much completed that?

16          **INMATE GREENWOOD:** Pretty much covered everything.

17          **PRESIDING COMMISSIONER ENG:**  Okay.  Okay, good.  We're

18  going to move on and Commissioner Wolk is going to bring us up

19  to date on what you've been doing in the institution.  Okay?

20          **INMATE GREENWOOD:**  Yeah.

21          **PRESIDING COMMISSIONER ENG:**  Okay.

22          **DEPUTY COMMISSIONER WOLK:**  Okay.  I'll go through,

23  briefly, what you've done prior to this hearing, prior to the

24  last hearing, and then I'll let you bring me up to date on

25  anything that you've done recently.  You have two trades.

1        **INMATE GREENWOOD:**  Three.

2        **DEPUTY COMMISSIONER WOLK:**  Electronic data processing,

3    janitorial, and what else?

4        **INMATE GREENWOOD:**  Office services from Folsom.

5        **DEPUTY COMMISSIONER WOLK:**  Oh, okay.

6        **INMATE GREENWOOD:**  I completed the --

7        **DEPUTY COMMISSIONER WOLK:**  When did you complete that?

8        **INMATE GREENWOOD:**  I completed it in '05.  I'm not

9    exactly sure what month it was, but it was Office Service

10   School in Folsom.

11       **DEPUTY COMMISSIONER WOLK:**  You've also worked in the

12   print shop and culinary as a -- in the yard crew.  You were

13   involved in the warehouse for maintenance and worked in the

14   warehouse for several years.  And you also worked as a porter,

15   and in vocational educational and PIA.

16       **INMATE GREENWOOD:**  Yes.  I'm currently in PIA.

17       **DEPUTY COMMISSIONER WOLK:**  As you previously stated, you

18   have your GED and your high school diploma, which you got back

19   in the mid '80's.

20       **INMATE GREENWOOD:**  Yes.

21       **DEPUTY COMMISSIONER WOLK:**  And you have taken a math

22   class from Patten University, and you went to school at Folsom

23   Prison for a year back in the mid '90's.

24       **INMATE GREENWOOD:**  Yes.  It was the mid '80's.

25       **DEPUTY COMMISSIONER WOLK:**  Mid '80's?  It says '90's in

1  the --

2  **INMATE GREENWOOD:**  High school, yeah, high school

3  program.

4  **DEPUTY COMMISSIONER WOLK:**  You've programmed in the

5  self-help area in a very exemplary manner.  You have been in

6  AA, and/or NA, since 1990, and you continue to be in NA today.

7  **INMATE GREENWOOD:**  Yes, through the trust and impact.

8  **DEPUTY COMMISSIONER WOLK:**  You have all of your

9  certificates that you receive for the vocational electronic

10  data processing and your janitorial trades, including chemical

11  use, machinery use, floor care and maintenance, specialty

12  cleaning, shop and site safety.  You have all of the necessary

13  math vocational education required and related arithmetic and

14  math.  You have a certificate of completion in hotel/motel

15  services, business management, vocational janitorial, job prep,

16  anger management, vocational education, vocational education,

17  anger management, vocational education Windows, prison

18  ministries, Network for Life, electronic typing, breaking

19  barriers, elementary office services and related technologies,

20  violence prevention project impact, math 50 class, two math 50

21  classes, participated in a trust workshop, human development,

22  assessment of individual capacity and community marketability,

23  re-entry and release planning in community development,

24  voluntarily enrolled in the Network for Life class, a faith-

25  based pre-release program consisting of 13 two-hour sessions,

1      **DEPUTY COMMISSIONER WOLK:**  But -- so what you're saying

2   is, you don't want to tell me where that came from.

3      **INMATE GREENWOOD:**  There is no anger involved at all.  I

4   was just trying to lift his wallet.

5      **DEPUTY COMMISSIONER WOLK:**  Okay.  You don't see that

6   taking someone's property is a violent act?

7      **INMATE GREENWOOD:**  Yes, I understand that now.  But I

8   didn't think so then.

9      **DEPUTY COMMISSIONER WOLK:**  Okay.  I'm going to go into

10  your disciplinary history and then your psych report.  You have

11  received 34, approximately 34 128-As since coming to the

12  institution.  The most recent was in 2004 from being absent

13  from an assignment.  Basically, these 128-As were for being

14  late, absent, disrespectful to staff, and playing your T.V.

15  loud without headphones.  They were all in those categories.

16  In 2004, you decided you weren't going to do anymore 128-As.

17  What happened in your head that said "I'm going to stop getting

18  128-As"?

19     **ATTORNEY FOX:**  Well, there just aren't anymore).

20     **INMATE GREENWOOD:** Yeah, I don't --

21     **DEPUTY COMMISSIONER WOLK:**  I mean you've been getting

22  them right along all these years.

23     **INMATE GREENWOOD:**  128 --

24     **ATTORNEY FOX:**  Why did you decide not to do this

25  anymore?

1    comments you'd like to make about any of these 115's?

2        **INMATE GREENWOOD:**  No, sir.

3        **DEPUTY COMMISSIONER WOLK:**  Okay.  You're psych report is

4    from 2005, so it's a couple years old.  Dr. Starrett, February,

5    2005, in his report under the DSM diagnosis, Dr. Starrett

6    diagnoses you under Axis I as Polysubstance Abuse, and under

7    Axis II, Antisocial Personality Disorder.  Do you know what an

8    antisocial personality disorder is?

9        **INMATE GREENWOOD:**  Kind of, yes.

10        **DEPUTY COMMISSIONER WOLK:**  Could you tell me?

11        **INMATE GREENWOOD:**  I think antisocial disorder would be

12    considered someone who doesn't function within the realms or

13    the rules of society.  I believe that that would make you

14    antisocial.

15        **DEPUTY COMMISSIONER WOLK:**  That's a good answer.  The

16    doctor says that under aggravating circumstances, on page 6,

17    the crime involved great violence and great bodily harm,

18    disclosing a high degree of cruelty or viciousness.  The

19    Defendant threatened witnesses.  The planning of this matter

20    indicates premeditation.  The inmate engaged in a pattern of

21    violence conduct, which indicates serious danger to society.

22    Prior juvenile record contained three incidents of crimes

23    involving circumstances of violence and a petition, which was

24    sustained, for kidnapping and assault.  There are no mitigating

25    circumstances.  Inmate does have an extensive history of

47

1  juvenile violence leading up to the current case.  The inmate

2  obviously had prior attempts at probation and released from

3  Juvenile Hall in the Youth Authority, but his behavior

4  continued.  The inmate relapsing in the use of alcohol and

5  drugs is always a possible problem.  He seems to be taking care

6  of that in the last five years with continuous treatment.  The

7  inmate does seem to have developed some insight into his

8  criminal behavior and some insight into his addictive behavior.

9  He does seem to take responsibility for his crime now.  The

10  story, however, has changed somewhat across time from him

11  initially not talking about it and now saying that the other

12  individual hit the victim and he may have swung at him, but he

13  does not remember hitting him.  In the past, he's said that he

14  hit him with an open hand.  In the actual report, it says that

15  he hit him with a closed fist on his head.  There is also

16  minimization of the crime by saying that the victim already had

17  a lot of health problems.  His rating in the personality

18  factors would be in the average range in terms of dangerousness

19  in comparison to inmates with similar violent crimes.  The

20  inmate has made parole plans and he seems to be carrying

21  forward with them.  This would lower his risk factor.  Given

22  these factors, it is my professional opinion that in terms of

23  historical factor, the inmate represents a moderate degree of

24  dangerousness because of his past behavior in comparison to

25  inmates with similar violent crimes.  And on the personality

1   factor, he appears to represent average of little lower than

2   average degree of dangerousness in comparison to inmates who

3   have committed similar crimes.  Any comments to make regarding

4   the psych report?

5        **ATTORNEY FOX:**  No.   Thank you.

6        **DEPUTY COMMISSIONER WOLK:**   Okay.  Any comments regarding

7   anything that we've gone over?

8        **ATTORNEY FOX:**  No.   Thank you.

9        **DEPUTY COMMISSIONER WOLK:**   Okay.  I'll turn it back to

10   Commissioner Eng.

11        **PRESIDING COMMISSIONER ENG:**   Okay.  Mr. Greenwood, let's

12   talk about your parole plans.  According to the -- this most

13   recent life evaluation report, it states here that if paroled

14   and allowed, you would like to reside with your wife, Brenda

15   Johnson Greenwood, and your 15-year-old stepson, Frederick Egan

16   Johnson, on 21st Street in Los Angeles, and a telephone number

17   is provided.  And that you could also reside at the family home

18   that you have a shared inheritance in with your father, Joseph

19   Greenwood, and siblings, and that's on Normandy Avenue in Los

20   Angeles.  What's the shared inheritance?  Is it your

21   grandmother or --

22        **INMATE GREENWOOD:**   No.  When my mother passed away, she

23   left the house to me and my siblings.  And my father is holding

24   the deed at the house right now.

25        **PRESIDING COMMISSIONER ENG:**   Is your father living in

1          **PRESIDING COMMISSIONER ENG:**  Is he on parole?

2          **INMATE GREENWOOD:**  No.  He's not on --

3          **PRESIDING COMMISSIONER ENG:**  That would be a wise choice

4    if he is guilty of domestic violence.

5          **INMATE GREENWOOD:**  No.  He's not on parole right now.

6          **PRESIDING COMMISSIONER ENG:**  Sorry.  Okay.  So that

7    would be your second choice.  And, again, that you have been

8    married to Brenda for what, at least 10 years?

9          **INMATE GREENWOOD:**  Ten years this year.

10         **PRESIDING COMMISSIONER ENG:**  Okay, okay, okay.  So Ms.

11   Fox did present us with some documents, and one is, I assume --

12   let me see how updated this is.  We have a resume of Mr.

13   Greenwood, okay.  We'll take a look at that.

14         **ATTORNEY FOX:**  Maybe a few new skills to add to that.

15         **PRESIDING COMMISSIONER ENG:**  Did you have -- yeah,

16   because you do -- you did the vocation in janitorial, correct?

17         **INMATE GREENWOOD:**  Yes.

18         **PRESIDING COMMISSIONER ENG:**  And you completed that?

19         **INMATE GREENWOOD:**  Yes, in 2000, June, 2000.

20         **PRESIDING COMMISSIONER ENG:**  Okay.  And also one in

21   office?  What was it, office services?

22         **INMATE GREENWOOD:**  Yes.  I have office technician

23   skills.

24         **PRESIDING COMMISSIONER ENG:**  What does that mean?

25         **INMATE GREENWOOD:**  It means that I can operate office --

1  Microsoft Office 2000 program, word processing --

2         **PRESIDING COMMISSIONER ENG:**  So what are the programs

3  under Microsoft Office?

4         **INMATE GREENWOOD:**  It has --

5         **PRESIDING COMMISSIONER ENG:**  This is a test.  This is a

6  test.  What are the programs?

7         **INMATE GREENWOOD:**  (No response.)

8         **PRESIDING COMMISSIONER ENG:**  That's okay.  Take a

9  breath, take a breath.  I caught him unaware and he's very

10 nervous, so I'm going to give you a break.  You think about

11 that and then you can tell me before the end of the hearing, o

12 okay?

13        **INMATE GREENWOOD:**  All right.

14        **PRESIDING COMMISSIONER ENG:**  You can tell me about

15 Microsoft Office.  Okay.  So let's take a look at some of these

16 letters because, again, under employment in the Board report,

17 it states that, been offered assistance with finding employment

18 through the workplace and they work through the offender's

19 employment continuum program.  Okay.  And we do know you have

20 vocational skills.  So let's take a look at some of these

21 letters that we have.  We've got a July 2, 2000, letter from

22 Joseph Greenwood, which is your father.  And he wants to ensure

23 us that you do have a support system should you be paroled with

24 all your relatives.  And your father states that he will

25 personally assist you in seeking employment and helping you to

1   adjust to a completely new environment after being confined for

2   25+plus years.  Okay.  And that -- is this true, your father's

3   been sending you money consistently?

4           **INMATE GREENWOOD:**  Yes.

5           **PRESIDING COMMISSIONER ENG:**  For all these years?

6           **INMATE GREENWOOD:**  Yes.

7           **PRESIDING COMMISSIONER ENG:**  You did state that you were

8   spoiled.

9           **ATTORNEY FOX:**  Continues.

10          **PRESIDING COMMISSIONER ENG:**  Yeah.  Okay.  Well, that's

11  really nice.  You're father is very, very supportive of you,

12  and you're right, he's been there all along.  Did you ever talk

13  one-on-one with him about why you ended up here and what

14  happened?

15          **INMATE GREENWOOD:**  Yes, a few times.

16          **PRESIDING COMMISSIONER ENG:**  Okay.  How did it make you

17  feel after you sort of came clean with your father?

18          **INMATE GREENWOOD:**  It felt good.  It relieved my

19  conscience a little.

20          **PRESIDING COMMISSIONER ENG:**  Do you understand the

21  effect, if any, that it had on your father?

22          **INMATE GREENWOOD:**  Yes.  It's real painful.

23          **PRESIDING COMMISSIONER ENG:**  Pardon me?

24          **INMATE GREENWOOD:**  It was painful for my entire family,

25  actually.

1    **PRESIDING COMMISSIONER ENG:** So if you gave -- if you

2    summed it all up in one word for how your father felt about

3    your criminal background and why you ended up here, what --

4    give me one word that would describe it.

5    **INMATE GREENWOOD:** Hurt.

6    **PRESIDING COMMISSIONER ENG:** Okay. We've got a letter

7    dated June 1st, 2007, from Brenda Greenwood, who is your wife,

8    and she does state right up front, which is good, that, "When

9    granted parole, George will be residing with me and our 16-

10   year-old son, Frederick." And she will provide home, food,

11   clothing and transportation for you until you are able to

12   provide for yourself. Plus, you will have the additional

13   support of your father, and then your brother. Okay. So your

14   wife lives on West 21st Street in Los Angeles. Do you have any

15   idea about that area?

16   **INMATE GREENWOOD:** Yes. It's the Crenshaw district.

17   **PRESIDING COMMISSIONER ENG:** Okay. Do you know, is that

18   relatively -- is that a relatively safe area?

19   **INMATE GREENWOOD:** Yes.

20   **PRESIDING COMMISSIONER ENG:** Okay. Does she own her own

21   home?

22   **INMATE GREENWOOD:** No.

23   **PRESIDING COMMISSIONER ENG:** So is this a house, or is

24   it an apartment, or what?

25   **INMATE GREENWOOD:** It is a three-bedroom house.

54

1          **PRESIDING COMMISSIONER ENG:** It's a three-bedroom house

2    that she's renting?

3          **INMATE GREENWOOD:** Yes.

4          **PRESIDING COMMISSIONER ENG:** Okay. How long has she

5    been renting it?

6          **INMATE GREENWOOD:** For the last year.

7          **PRESIDING COMMISSIONER ENG:** Just for the last year?

8          **INMATE GREENWOOD:** A little over a year now.

9          **PRESIDING COMMISSIONER ENG:** Okay. And what does your

10   wife do?

11         **INMATE GREENWOOD:** She works in food services for the

12   Unified -- Los Angeles Unified School District.

13         **PRESIDING COMMISSIONER ENG:** And how long has she been

14   doing that?

15         **INMATE GREENWOOD:** About 15 years.

16         **PRESIDING COMMISSIONER ENG:** So do you believe that she

17   has ample income and benefits to provide for you, along with

18   her son and herself?

19         **INMATE GREENWOOD:** Yes.

20         **PRESIDING COMMISSIONER ENG:** And if she doesn't, then

21   what are you going to do?

22         **INMATE GREENWOOD:** I plan to get a job as soon as I get

23   home, so --

24         **PRESIDING COMMISSIONER ENG:** Okay. But if it takes a

25   year or two years for you to find a job, what's the plan?

55

1      **INMATE GREENWOOD:**  I don't think it would take a year or

2   two years, but if that was the case, I'm sure I would find some

3   type of way to employ myself.

4      **PRESIDING COMMISSIONER ENG:**  I'm throwing this out to

5   you because I'm trying to throw out -- it's not the worst-case

6   scenario, but not the best-case scenario.  You understand what

7   I'm saying?

8      **INMATE GREENWOOD:**  Yes.

9      **PRESIDING COMMISSIONER ENG:**  Because reality is that

10  things don't turn out the way we always want them to, and

11  you've been out for a long time, out of society, and at such a

12  young age, you didn't have a lot of time to develop any type of

13  a track record in terms of work.

14      **INMATE GREENWOOD:**  Yes, I understand.

15      **PRESIDING COMMISSIONER ENG:**  Okay?

16      **INMATE GREENWOOD:**  Yeah.

17      **PRESIDING COMMISSIONER ENG:**  And the only thing that you

18  have on your resume really is you've been incarcerated for 25-

19  plus years.  So it's not going to be the easiest thing for you

20  to find steady employment that's going to provide you with

21  maybe a decent income, and you really don't know right now,

22  probably, how much your going to need.  I'm not sure.

23      **INMATE GREENWOOD:**  Yeah.  I have a resource package.

24      **PRESIDING COMMISSIONER ENG:**  Okay.  Tell me about that.

25      **INMATE GREENWOOD:**  That has various organizations that

56

1   help employ ex-cons or ex-felons.  I've highlighted some of the
2   places, some of the trade schools, and some of the places I can
3   go to try to find a job.  I plan to work close with the
4   Workplace, downtown Los Angeles, and I'm aware of a few other
5   spots in Los Angeles that does hire ex-felons.

6       **PRESIDING COMMISSIONER ENG:**  Right.  Do you have any
7   idea what type of jobs?  How much money they're going to pay?

8       **INMATE GREENWOOD:**  Yeah.  Most of them pay around $10.00
9   an hour, I'm sure.  I know the Sears warehouse hires ex-felons
10  downtown L.A.  I sent some applications out a few years ago,
11  but I didn't get a response.

12      **PRESIDING COMMISSIONER ENG:**  It's tough.

13      **INMATE GREENWOOD:**  But my wife, she picked up some
14  applications and I filled out a few, and I'm sure that I will
15  find somewhere in this resource packet that I can get
16  assistance.  I brought it with me.  They have drug treatment
17  programs and employment agencies, vocational schools, and --

18      **PRESIDING COMMISSIONER ENG:**  Well, there is a lot of
19  places that anyone can go to for assistance in looking for
20  jobs.  There is a lot of job openings.  It is whether or not
21  you're going to get, number one, to first base in getting an
22  interview, and, number two, whether or not you're going to get
23  hired.  So it is a long, drawn-out process.  I'm not saying it
24  to burst your bubble; I'm trying to give you, you know, a dose
25  of reality because there is a lot of folks out there that have

1  a lot more education and work experience than you do that are

2  struggling to find jobs.  And you have to understand something,

3  that most of the employers out there are inundated with

4  thousands and thousands of resumes a day.  So I'm just trying

5  to get a feel from you whether or not you have gone out into

6  the marketplace, put your feelers out there so you have a more

7  realistic view of what you might be faced with so that you --

8  it's not as big of a shock as it would be had you just stayed

9  in here and not had any ideas.  Does that make any sense to

10  you?

11       **INMATE GREENWOOD:**  Yes, it does.

12       **PRESIDING COMMISSIONER ENG:**  And for you to try to, you

13  know, inundate the market there and just -- even if you have to

14  lay it out and say "These are my jobs," you know, "these are

15  the skills that I have," what type of position, you know, would

16  fit a person that has these skills?  And then what type of job

17  would that be and what would the expectations be and what type

18  of pay level, just to gather information, whatever it's going

19  to take for you to gain more information because the more

20  information that you have in your hands, the better prepared

21  you're going to be and the better decisions that you'll make.

22  And I hope that makes some sense to you.  So you don't have to

23  listen to anything I have to say, but I just think that for you

24  to get a more realistic view and maybe plan for the worst-case

25  scenario, and have some back up plans should something fall

1   through, what are you going to do? That is why I asked you,

2   what if your wife can't afford it, and what if you can't get a

3   job? What if you're going to be relegated to, you know, if

4   you're going to be lucky, and I'm throwing this out, and it's

5   not to put -- maybe you're going have -- you can get a job as

6   part time that is going to be minimum wage at McDonald's. I'm

7   just throwing that out. Okay? How is that going to make you

8   feel and how are you going to deal with that because you're

9   going to be faced with frustrations from a lot of rejections

10  for jobs, so --

11          **INMATE GREENWOOD:** Yes.

12          **PRESIDING COMMISSIONER ENG:** I don't expect an answer

13  now. I'm just throwing this out for you to be thinking about

14  that in terms of planning of a future. So let me go on with

15  this and I'll take a look at that, too. We've got another

16  letter dated -- well, it is stamped, date-stamped, received

17  July 5th, 2007, and it's a general support letter from the

18  Goodwill Missionary Baptist Church in Los Angeles, and I did

19  read through it and it is signed by Pastor James Cannon. So

20  it's a very nice support letter. Did I get all the letters?

21          **INMATE GREENWOOD:** Yes.

22          **PRESIDING COMMISSIONER ENG:** Yeah. Your father and your

23  wife, okay.

24          **INMATE GREENWOOD:** Yes, and Pastor Cannon.

25          **PRESIDING COMMISSIONER ENG:** And the Pastor, okay. Do

1   you have anything else you want -- do you want me to take a
2   look at that?  I think that's very good that you've, you know,
3   tapped into resources, but I also think it helps because I've
4   seen a lot of inmates come in here with sort of a whole chart
5   of all the places that they have written to, and a sample of
6   the letter, and the dates that they sent them, and if they got
7   responses, because a rule of thumb is, you're lucky if you get
8   a one- or two-percent response.  And that's for people that
9   don't have felony convictions, okay.  So don't get discouraged.
10  Don't think it's because of that.  I'm just giving you a rule
11  of thumb, you know, for every hundred resumes and letters that
12  you send out, you're going to be lucky to get a one-, maximum
13  of two-percent response, so it's difficult, okay.  But if you
14  can get out there and at least get more information.  And
15  anybody who is going to offer you a job, let them be specific,
16  okay.  What is it?  What's the job title?  What are you going
17  to get paid?  And what are their expectations?  Because, again,
18  you need to be able to make informed decisions.  You want to
19  know if you're only going to get paid for 20 hours a week, but
20  they're going to expect you to work 40 hours a week, that might
21  not be such a good choice for you to make, if that makes sense.
22  Okay.  So -- but I'm glad that you did get this.  Have you
23  contacted a lot of these folks or written to them?
24          **INMATE GREENWOOD:**  Yes, but it was just last month.
25          **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.  But that is

60

1   good.  Okay.  So do we have anything else, sir?  Anything else

2   you need to add?

3        **INMATE GREENWOOD:**  That's it.

4        **PRESIDING COMMISSIONER ENG:**  Okay, okay.  We also send

5   out Penal Code Section 30-42 notices, and those notices do go

6   to agencies that have a direct interest in your case.  All we

7   had in here, because I don't think in the new information, did

8   anybody see an updated letter from the police department?  I

9   only saw one from 2005.  So on that, we do -- the panel does

10  note that we have present with us a representative from the Los

11  Angeles County District Attorney's Office, who I'm sure will be

12  making a statement regarding parole suitability prior to our

13  recess.  I do also want to note that for some strange reason,

14  the institution put into our packet a lot of outdate -- way

15  outdated letters going back to 2003 and up through 2005, and

16  none of them were updated.  So in the interest of fairness, if

17  I'm not going to read those into the record, I'm not going to

18  read in the record the 2005 letter from the police department

19  either.  Okay.  So on that, I'm going to open up to any follow-

20  up questions that the panel might have, and I'm going to ask my

21  fellow commissioner if he has anything?

22       **DEPUTY COMMISSIONER WOLK:**  I have nothing at this time.

23       **PRESIDING COMMISSIONER ENG:**  Okay, neither do I.  Okay.

24  So, Ms. Delagarza, do you have any questions you would like

25  posed to Mr. Greenwood through the panel?

1    **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Yes.  I would have
2    one question of the inmate.  During the last hearing, the
3    inmate became so upset, that he was escorted out of the hearing
4    prior to the end of the reading.  I would ask the inmate what
5    was it that he said that caused Commissioner Smith to have him
6    removed from the hearing.

7    **ATTORNEY FOX:**  I'm going to object based on speculation
8    and relevance as to consideration of suitability.

9    **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  There is no
10   speculation.  It's contained within the transcript of the
11   hearing on page 82.  I don't know if it came across on the
12   tape, but I asked for Mr. Greenwood to be removed as a result
13   of a vulgar comment made by him during the decision.  My action
14   was based on Mr. Greenwood's vulgarity, and no other reason.

15   **PRESIDING COMMISSIONER ENG:**  Okay.  Sir --

16   **ATTORNEY FOX:**  Well, I wasn't aware of that.  I didn't
17   know what allegedly the Commissioner said, and what his
18   thoughts were would be speculation.

19   **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  I don't believe it
20   would be speculation.  Commissioners --

21   **PRESIDING COMMISSIONER ENG:**  Okay, okay.  Stop right
22   there because I don't want this getting into a discussion
23   between defense counsel and District Attorney.  Okay.
24   Basically, I'm trying to find it.  Do I have that?

25   **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  It's page 82 of the

62

1   2005 transcript.

2       **PRESIDING COMMISSIONER ENG:**  Okay.  Wait one second.

3   Let me just take a look.  Well, I'm going to ask you the

4   question.  Do you recall in that hearing, did you get upset?

5       **INMATE GREENWOOD:**  Yes.

6       **PRESIDING COMMISSIONER ENG:**  Okay.  And when you got

7   upset, did it have to do with the denial or was there something

8   specific, do you recall, that really upset you?

9       **INMATE GREENWOOD:**  Yes.  I felt that my attorney wasn't

10  representing me.

11      **PRESIDING COMMISSIONER ENG:**  So you were upset with your

12  attorney; you weren't upset with the panel?

13      **INMATE GREENWOOD:**  Yes.

14      **PRESIDING COMMISSIONER ENG:**  Okay, all right.  And did

15  the panel members see something that caused them to have you

16  removed, do you think?  Or was that what was stated?  That's

17  what I'm trying to say.  Okay.  But you did get upset.  And did

18  you -- okay.  Yeah, it does say that "I asked for Mr. Greenwood

19  to be removed as a result of a vulgar comment that he made

20  during the reading of the decision."  Okay.  Okay.

21      **INMATE GREENWOOD:**  I remember what I said.

22      **PRESIDING COMMISSIONER ENG:**  You do remember?

23      **INMATE GREENWOOD:**  I told my attorney this is bullshit

24  and do something, please, and he told me to leave.

25      **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.

63

1       **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  I have no other

2  questions.

3       **PRESIDING COMMISSIONER ENG:**  Okay.  Ms. Fox, any

4  questions?

5       **ATTORNEY FOX:**  No, no questions.

6       **PRESIDING COMMISSIONER ENG:**  Okay.  Okay, so we'll

7  move into final statements then.  Okay, Ms. Delagarza?

8  **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Thank you.  The District

9  Attorney's Office of Los Angeles County opposes the granting of

10  parole today for this inmate, and this inmate had an extensive

11  criminal history as a juvenile, and in almost every instance,

12  and to go through them, there was either violence, or a threat

13  of violence, by this particular inmate.  A bus driver was

14  threatened when an inmate -- when the inmate got on the bus and

15  had no money and he demanded money.  He threatened a young girl

16  with a gun and robbed her.  And then there was another incident

17  where he assaulted an unknown woman with a pipe, and then when

18  people came to her defense, the inmate then forces his way into

19  a car and threatens the woman to drive him away or he is going

20  to kill her.  In this particular instance, the inmate has made

21  many inconsistent statements about the life crime.  He has

22  minimized his involvement in the crime, and he has actually

23  blamed another person saying that the other person, Bernard

24  Mason, was the one who had struck the victim.  The testimony by

25  the witnesses were very clear.  It was the inmate who saw the

1   victim as he was leaning over to -- older -- he was an elderly
2   man, and as he was leaning over, the inmate struck him from the
3   back of the head and tried to rob the victim, and, actually, he
4   did ultimately rob the victim.  However, from the autopsy, it's
5   clear that the victim sustained multiple injuries.  According
6   to the coroner's report, the cause of death was multiple
7   cranial cerebral injuries and acute bronchopneumonia due to
8   consequences of blunt force trauma, and he also had fractured
9   ribs.  The inmate, in his minimization of the crime, for a long
10  time tried to put it off on the victim saying that the victim
11  was elderly, that he had medical problems and that's why he
12  died.  However, when you look at the coroner's report, it is
13  clear that the coroner testified that he did not suffer from
14  pre -- he did not die form pre-existing medical condition, but
15  he died as a result of the multiple cranial cerebral injuries
16  that he got as a result of the beating that the inmate
17  inflicted on him.  Since he has been in prison, the inmate has
18  programmed in a   limited manner.  He does have the positive
19  programming with respect to different classes that he's taken,
20  self-help courses that he's taken, but then you have to rate
21  that against the numerous 115's and CDC 128's.  The eight
22  115's, the -- I believe it was 33 128's that he's gotten during
23  the course of the time that he has been in prison.  In terms of
24  minimizing, the inmate has learned certain buzz words to say at
25  different times with respect to the crime.  As I indicated, at

1   one point, he learns that the victim has a medical condition
2   and he tried to minimize his actions by asserting that the
3   victim died as a result of his pre-existing medical conditions.
4   Again, as I indicated, that was shown not to be true.  But even
5   if that was true, it doesn't matter how frail the victim was or
6   whether or not he had a medical condition.  The inmate has
7   called this death an accident, but there was nothing accidental
8   about this.  This inmate saw this victim, and he took this
9   frail man and he basically hit him in such a manner that caused
10  him to suffer the brain injuries, which resulted in his death.
11  There was nothing accidental about those particular actions.
12  Additionally, the inmate has said as recently as today that he
13  is a different man because he has gained respect for himself
14  and respect for others.  However, that is inconsistent.  When
15  you look at the number of 115's and 128-A's, what they indicate
16  is a pattern of an individual who has no regard for anybody but
17  for himself.  In terms of his actions, as late as 2005, even if
18  he didn't get a 115 for it, he has no control of his temper,
19  and when the hearing did not go the way he wanted, this inmate
20  made a statement that was overheard by the Commissioner to the
21  point that the Commissioner stopped the hearing and had the
22  inmate removed.  This is a man who is a long way from being in
23  control of his actions.  He continues to pose a threat to
24  society.  And when you look at the most recent psychological
25  evaluation, again, you have the statement where he says it was

66

1    an accident and, again, minimizing his actions.  Dr. Starrett
2    talks about that throughout his report.  And then with respect
3    to the assessment of dangerousness, what the doctor basically
4    says is that this inmate would be in the average range for
5    killers, and, obviously, that is not a suitable assessment for
6    somebody to be released.  He says, "The inmate is average range
7    in terms of dangerousness in comparison to inmates with similar
8    violent crimes".  So he's rating him against other killers and
9    he says that he's within the average range.  As I indicated,
10   based on everything that is before this panel, it is clear that
11   this inmate continues to pose a threat to society.  He has made
12   some gains, I would submit.  He still lacks insight.  He still
13   lacks impulse control.  And for those reasons, he continues to
14   pose a threat to society, and parole should be denied.  Thank
15   you.

16        **PRESIDING COMMISSIONER ENG:**    Okay, thank you.  Ms.
17   Fox, final statement?

18        **ATTORNEY FOX:**    Yes, thank you.  I respectfully disagree
19   with the colleague from Los Angeles.  Mr. Greenwood would have
20   you find him suitable for parole.  The Board report is
21   supportive.  The psychological evaluation is, in many respects,
22   supportive, including a global assessment functioning rating of
23   between 80 and 85, which is a high rating for people who are
24   incarcerated.  I would refer to the probation officer's report,
25   which states that the defendant expressed extreme remorse, or

67

1  extreme regrets for his involvement, and, further, that he had

2  no intention to harm the man, and in his belief, the blow that

3  Mr. Greenwood hit Mr. Coffey with was not one of extreme force.

4  We've talked at length I think already about Mr. Greenwood's

5  juvenile experiences and also his frame of mind at that time,

6  and I think that was important.  He didn't perhaps understand

7  the effect of his actions on other and the effects that -- the

8  perceptions of other people.  Certainly in this case, he did

9  not intend to kill Mr. Coffey.  And it's relevant to refer to

10  the Appellate decision, which at page 14, states, "There was

11  never a determination of the issue of whether Mr. Greenwood

12  intended to kill Mr. Coffey."  So it would be inappropriate to

13  state otherwise today.  And he has programmed very well, taking

14  advantage of the vocational and educational offerings that are

15  made available to him.  Turning -- and there's been no gang

16  involvement.  I'm glad that didn't come up as a comment today

17  because I know in the past, that was discussed and early on

18  that was dismissed entirely.  So I'm glad that didn't come up

19  today.  Turning to the -- and it must be noted that Mr.

20  Greenwood did, in fact, turn himself into the police department

21  early on in the matter as soon as he became aware that Mr.

22  Coffey had died.  Turning to the parole plans, Mr. Greenwood

23  has viable parole plans, including two verifiable residential

24  plans, and he possesses numerous marketable skills.  And during

25  the transitional period between getting the job he wants and

68

1    when he actually gets out of prison, that period of time, his
2    wife is available to help support him.  His father remains
3    steadfast in his support, and Mr. Greenwood has availed himself
4    of resources available.  So I think the prognosis for a
5    successful parole is appropriate.  Lastly, I would request that
6    the panel disregard the extraneous and inflammatory comments
7    from the District Attorney regarding conduct as a juvenile,
8    which -- and even as an adult, which did not result in
9    convictions.  Those are not evidence and, in fact, there was a
10   misstatement that I think an inference would be that Mr.
11   Greenwood threatened the bus driver and, in fact, the reports
12   are other than that, that Mr. Greenwood got on without paying,
13   but that the person he was with may have threatened the bus
14   driver, but is was not Mr. Greenwood.  Nonetheless, Mr.
15   Greenwood may have had -- may had been perceived by the bus
16   driver in a particular way.  So to sum up, Mr. Greenwood would
17   have you find him suitable and set a date, and I'll submit
18   based on that and Mr. Greenwood has comments he'd like to share
19   as well regarding his suitability.

20   **PRESIDING COMMISSIONER ENG:**    Okay.  Mr. Greenwood, go
21   ahead, final statement.

22   **INMATE GREENWOOD:**  Yeah.  First of all, I'd like to
23   express my remorse, my deepest sympathy to Frank Coffey, Sr.,
24   his family and his friend, as well as my family and society at
25   large.  I feel that I am a good candidate for parole because

1  I've spent the majority of my time wisely, working on self-
2  improvement through vocational, education vocational, and other
3  various self-help groups. I feel that this incident will never
4  occur again. I don't mean to come across as sounding like
5  somebody who's trying to play down my role in this case, but
6  there was never any intentions to kill in this case. However,
7  I understand that I'm -- I was found guilty of first-degree
8  murder because of the felony murder rule, because of the fact
9  that I was lifting his wallet and he died in the event of this
10  crime. I understand that. I've always been sorry for that.
11  I've always felt terrible about this crime. I realized once
12  the warrant was issued for my arrest, the only thing that
13  prevented me from immediately going in -- at that time, I was
14  still at home with my parents, and they felt that it would be a
15  wise choice for me to wait until they obtain an attorney and a
16  bails bondsman before I went in, and that's the only reason why
17  it took me a extra week after knowing that the warrant was
18  issued for my arrest. However, I did turn myself in for
19  justice to be served. I realized that I did do something wrong
20  and I did realize that I did have to pay my debt to society for
21  this crime.

22        **PRESIDING COMMISSIONER ENG:**   Okay. Anything else?
23        **INMATE GREENWOOD:**   And I would just like this board to
24  overlook the disciplinaries, not basically overlook, but take
25  into consideration the degree of -- excuse me.

1       **PRESIDING COMMISSIONER ENG:**  It's okay.

2       **ATTORNEY FOX:**  Keep reading.

3       **PRESIDING COMMISSIONER ENG:**  You're doing well.

4       **INMATE GREENWOOD:**  In other words --

5       **ATTORNEY FOX:**  The upgrading.

6       **INMATE GREENWOOD:**  In other words, what I'm in prison

7 for doesn't define who I am as a person.  I don't consider

8 myself to be a violent person.  I never had any intentions on

9 harming this man.  I'd like to state that once again.  This was

10 an unintentional murder.  I don't mean to say that is was an

11 accident, but really it was because there was no intent to

12 kill.  But I understand because of my actions, the man did

13 ultimately lose his life, and, for that, I am very truly sorry.

14 There is no amount of words that I can say to express how sorry

15 I am for this crime.  And I would like the Board to consider

16 the changes that I have made during my time and let that be

17 more of a fact than what I did as a juvenile.  Because I sit

18 before you today, a 44 year-old man.  I was 18 years-old at the

19 time that these crimes took place, and I've matured a lot more

20 since then.  I've grown a lot since then, and I'm ready to go

21 out and be a productive member of society.

22       **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you for

23 those comments.  We'll now recess for deliberations.  The time

24 is 3:30.

25                  **R E C E S S**

71

**CALIFORNIA BOARD OF PAROLE HEARINGS**

**D E C I S I O N**

1

2

3     **PRESIDING COMMISSIONER ENG:**  Okay.  The time is

4  3:55, and all parties that were present prior to our recess for

5  deliberations has since returned.  In the matter of George

6  Greenwood, CDC number C-57110, the Panel has reviewed all the

7  information received from the public and relied on the following

8  circumstances in concluding that the prisoner is not suitable

9  for parole and would pose an unreasonable risk of danger to

10  society if -- or a threat to public safety if released from

11  prison.  We find that commitment offense was carried out in a

12  very cruel and rather callus manner.  And basically, while the

13  victim, Mr. Frank Coffey, was really bent over at one of these

14  newspaper stands, the inmate and his crime partner basically

15  came up behind him with the intent of trying to lift the

16  victim's wallet out of his back pocket, and during that time,

17  there was -- could have been a little scuffle, but it basically

18  -- apparently, the prisoner ended up hitting the victim.  The

19  victim stumbled for a little bit and then fell down, and while

20  he was down, it was seen that Mr. Greenwood basically stood over

21  him and went through his pockets to basically take the wallet.

22  It really -- the activities surrounding the death of Mr. Coffey

23  in this attack really shows a total disregard for human

24  suffering and human life.  I mean the man is down, and,

25  **GREENWOOD, GEORGE   C-57110       DECISION PAGE 1      7/19/07**

1   Basically, you go through his pockets and never even bother to

2   go for help or anything.  The motive for the crime was robbery.

3   Plain and simple, it was greed.  It's going after this man

4   because Mr. Greenwood thought he had a fat wallet and -- but

5   very trivial in relation to the offense.  This man lost his

6   life, and Mr. Greenwood ended up with a life term in prison.

7   These conclusions are drawn from the statement of facts where on

8   June 29th -- I'm trying to remember what year that was, I'm

9   sorry.  1981, at approximately 8:30 a.m., Mr. Frank Coffey, who

10  is the victim, 54 years of age, was bent over at a newspaper

11  rack in front of a liquor store, and while he was either placing

12  his coin in the machine or looking at the paper, he was

13  approached from the rear by Mr. Greenwood.  Mr. Greenwood ended

14  up delivering a blow, using his hand to the victim's head, and,

15  basically, the victim sort of staggered off the sidewalk into

16  the street and basically fell.  While the victim was down, the

17  Defendant did remove his wallet from his pocket and fled the

18  area.  Okay.  Basically the autopsy -- it wasn't until July 4,

19  1981, that the -- that Mr. Coffey succumbed to his injuries.

20  The autopsy indicated that the cause of death, multiple cranial

21  cerebral injuries and acute bronchopneumonia due to or as a

22  consequence of blunt force trauma.  He also had a fracture of

23  the tenth rib.  Regarding a prior record, there's no getting

24  around it that Mr. Greenwood, the prisoner, does have a record

25  **GREENWOOD, GEORGE   C-57110      DECISION PAGE 2      7/19/07**

1   of assaultive behavior and definitely an escalating pattern of

2   criminal conduct.  He has failed to profit from society's

3   previous attempts to correct his criminality.  These attempts,

4   they do include juvenile camp and CYA commitment.  His prior

5   criminality, again, goes back and indicates somewhat of an

6   unstable social history, even though his family life seemed to

7   be rather stable, but Mr. Greenwood chose to start doing drugs

8   at a fairly young age, and that's when his first arrest occurred

9   at the age of 13, and it was for possession of marijuana where

10  he was counseled and released.  But that didn't stop there.  He

11  continued with his drug use since he was smoking marijuana, he

12  -- the inmate claims PCP, and then he moved up to -- and was

13  also -- had done free-basing cocaine.  But, again, he had -- he

14  was basically arrested on, and then committed to the Youth

15  Authority for the attempted kidnap and assault with a deadly

16  weapon.  But he did have additional contacts with law

17  enforcement as a juvenile for a couple different robberies, and

18  also for vandalism.  He did parole, though, in 1980 from the

19  Youth Authority, and then ended up committing this life crime in

20  1981 when he was 18 years of age.  Institutional behavior, the

21  prisoner's misconduct while incarcerated does include 33 128-A

22  counseling chronos, the last one being on May 5th, 2004, for

23  being absent from work, and he has eight more serious ones; 15

24  disciplinary reports, the last one being September 6th of 2000,

25  **GREENWOOD, GEORGE   C-57110      DECISION PAGE 3      7/19/07**

74

1   for disruptive behavior.  The psychological report dated

2   February 8th, 2005, and authored by Dr. R. Starrett, S-T-A-R-R-

3   E-T-T, this panel finds is not totally supportive of release in

4   that Dr. Starrett does diagnose Mr. Greenwood under Axis II with

5   having Antisocial Personality Disorder.  And also, the

6   assessment of dangerousness, it was a concern, his history of

7   violence, and that he would be considered a conduct-disordered

8   young man because of his juvenile -- his record, his history of

9   juvenile violence that led up to the incident offense.  So that,

10  therefore, he would rate from the historical factor in the

11  moderate range in terms of his dangerousness compared to other

12  inmates, and that his prior attempts at probation and release

13  from juvenile home and the Youth Authority, his bad behavior

14  continued, so that would also increase his risk.  However, in

15  terms of his compliance and with AA and NA, he had been going

16  and been compliant at least for five years with good behavior

17  there.  But I think of tremendous concern is that Dr. Starrett

18  states that in terms of insight and personality, that this

19  inmate does seem to have developed some insight into his

20  criminal behavior and some insight into his addictive behavior.

21  He does seem to take responsibility for his crime now, and the

22  story, however, has changed somewhat across time, from him

23  initially not talking about it, and now saying that the other

24  individual hit the victim and he may have swung at him,

25  **GREENWOOD, GEORGE   C-57110      DECISION PAGE 4      7/19/07**

75

1   but does not remember hitting him.  And also, that there is --
2   Dr. Starrett states that there is also minimization of the crime
3   by saying that the victim already had a lot of health problems.
4   So overall, the inmate represents a moderate degree of
5   dangerousness because of his past behavior in comparison to
6   inmates with similar violent crimes.  And on the personality
7   factor, he appears to represent average to a little lower than
8   average degree of dangerousness in comparison to inmates who
9   have committed similar crimes.  Regarding the parole plans, the
10  prisoner did provide us with -- at least we had a letter from
11  his wife that clearly stated that she would be providing a
12  residence for the prisoner upon release.  There was a letter of
13  support from his father, but -- and we talked about if you don't
14  get a date today that in the future, get more specific
15  information because the last thing you would want, sir, is for a
16  letter that you are presenting to the Board to end up with us
17  having more questions asked about it.  So it should be providing
18  answers and not triggering more questions because then you're
19  like, oh, okay, what's going on?  How come this letter is
20  causing them to question, you know, have so many more questions?
21  So it's not giving us what we need.  And that your father, if he
22  holds the deed to the house or something, or whoever's living
23  there, it should clearly state that, you know, there is a house
24  located at such-and-such, this is the person that's living in
25  **GREENWOOD, GEORGE   C-57110      DECISION PAGE 5      7/19/07**

1   it.  There is a room, you know, for Mr. Greenwood to parole to

2   and how you're going to get transportation, just a lot

3   more detail, and we talked about that.  And, again, that

4   he was unable to provide the panel with any documented

5   evidence of acceptable employment plans at this point in

6   time.  30-42 responses, the panel does note that the

7   representative from the District Attorney's Office in

8   Los Angeles County was present and did state their

9   office's opposition to parole.  We do feel that this

10   prisoner should be commended for a few things.  Number

11   one, that he has obtained two vocations that can be used

12   on the outside, and that his continued self-help

13   programming throughout his -- almost seems his entire

14   incarceration period.

15   **DEPUTY COMMISSIONER WOLK:**  Three vocations.

16   **PRESIDING COMMISSIONER ENG:**   Oh, three vocations, I'm

17   sorry.  I had janitorial, office services, and what was the

18   third?

19   **DEPUTY COMMISSIONER WOLK:**  Janitorial and electronic data

20   processing.

21   **PRESIDING COMMISSIONER ENG:**  Oh, electronic data

22   processing.  I'm sorry, I'm missed that one.  Okay, so he's

23   actually obtained three vocations.  So it would be nice to see

24   if there's any possibility of him using any of those vocations

25   **GREENWOOD, GEORGE   C-57110      DECISION PAGE 6      7/19/07**

77

1   when he starts looking for jobs on the outside.   And,
2   again, the continued self-help programming, and the fact
3   that he has excellent work reports from his efforts he
4   has done in the PIA, but he's been involved in a lot of
5   very, very good programs, just -- impact trust, Kiros,
6   some very, very good ones.   But these positive aspects
7   of his behavior do not outweigh the factors of
8   unsuitability.   This is a two-year denial.   In a
9   separate decision, the hearing panel finds that it's not
10  reasonable to expect that parole would be granted at a
11  hearing during the following two years.   Specific
12  reasons for this finding as follows, again, the prisoner
13  did commit the offense in a very cruel manner.
14  Specifically, he made the decision to go after this man
15  as he was very, very vulnerable, on the street, going
16  for a newspaper, and basically surprised him and tried
17  to lift his wallet, basically hit the man.   The man fell
18  down, and this did not stop Mr. Greenwood from
19  proceeding.   He basically still went through his pockets
20  and took his wallet and then took off.   Unfortunately,
21  the victim succumbed to the injuries and lost his life.
22  The way this was done really shows a total disrespect
23  and disregard for human life and human suffering and,
24  again, the motive was greed.   It was for basically a
25  **GREENWOOD, GEORGE   C-57110      DECISION PAGE 7      7/19/07**

1  robbery.  This prisoner, again, does have an extensive
2  history of criminality and misconduct that goes back to
3  when he was first arrested at the age of 13, and did not
4  stop.  In fact, it got to a point where he did end up
5  doing some time in juvenile hall and in CYA.  The
6  psychological report dated, the most recent one,
7  February of 2005, by Dr. Starrett does indicate a need
8  for a longer period of observation.  One of the key
9  things, sir, is we hope that you'll be able to continue
10 with your programming, but hopefully, one of these
11 programs will be more effective in having you be able to
12 continue to develop the insight into the causing factors
13 that led you to this, to your criminality, to the
14 criminal lifestyle that you had chosen to take on
15 because it is very, very important that you be able to
16 discuss that with the panel because -- and, again, it
17 goes back to -- I'm going to make analogy.  When I was
18 discussing to you about parole plans and getting --
19 collecting as much information as possible so you can
20 make an informed decision.  Well, sir, that's what this
21 panel and every panel has to do also.  We have to
22 collect as much information over and above the written
23 documents, and also in the interactions that we have
24 with every prisoner.  So we gather as much as we can so
25 **GREENWOOD, GEORGE   C-57110     DECISION PAGE 8     7/19/07**

1  we can make as an informed a decision as possible, and

2  we felt a little limited today.  But that's not to say

3  that we didn't see a lot of good things in you.  So I

4  don't want you to get discouraged about getting a two-

5  year denial.  It's just we feel that you need that time

6  to get through some of these hurdles because,

7  apparently, you haven't been able to do that yet.  You

8  came off a two-year denial and yet we didn't have -- we

9  didn't see solid parole plans yet.  And for whatever

10  reasons, you weren't able to get that.  But hopefully,

11  you'll have the time to do that.  You'll have the time

12  to further develop the insight because, again, the psych

13  says you've developed some.  We didn't see a whole lot

14  there, but in order to get a date, you have to be able

15  to really talk about it and really have a better

16  understanding of what the triggers were in you that

17  caused you to get violent, to escalate it.  And you may

18  minimize that and think that by hitting that man, you

19  know, even though your intent wasn't to kill him, he

20  died.  You did attack the man.  So what will you do in

21  the future if something triggers you?  How will you

22  prevent yourself from ever escalating to violence again?

23  So these are key things that you really need time to

24  take a look at and be able to, hopefully in the next

25  GREENWOOD, GEORGE   C-57110      DECISION PAGE 9      7/19/07

1   panel, come back and really open up and talk about it.

2   So that's why we felt that a longer period of time is

3   required before a panel would find the prisoner suitable

4   for parole.  So we recommend that you become and remain

5   disciplinary free.  You need to get some more distance

6   between those disciplinaries because they are rather

7   recent.  You know, the 128's are, you know, so many of

8   them, and the last one was in '04, and then again the

9   115's.  At least you're getting some years between that,

10  and that, if available, you continue to participate in

11  self-help.  But another key thing, when you go to these

12  programs, be able to talk about -- pick out one maybe

13  and be able to say, you know, "I chose to go to this

14  program because this is my understanding of what

15  the program's all about, and the reason why I'm going because

16  this is how it fits for me personally in my situation.  And,

17  oh, by the way, this is what I got out of it, and this is how I

18  use it."  How do you apply what you've learned?  Okay.  Again,

19  that's providing the panel with more information so we can make

20  a more informed decision.  So, again, it's your choice whether

21  or not you want to pay any attention and listen to things and

22  follow anything.  It's your choice.  But I do believe that you

23  have developed some insight into your prior problems as a

24  juvenile because you really -- it appears that you really never

25  GREENWOOD, GEORGE   C-57110       DECISION PAGE 10     7/19/07

81

1  thought about the consequences of your actions, to you, or to

2  anybody else.  So be able to talk about that some more.  So

3  sir, I wish you luck.  That concludes the reading of the

4  decision.  And I'm going to ask if my fellow commissioner has

5  anything that he would like to add or if I missed anything.

6      **DEPUTY COMMISSIONER WOLK:**  Just be sure and read the

7  transcript, especially where it comes to Commissioner Eng's

8  recommendations about what you do because she really has laid

9  out a blueprint for you.  We both feel like there's hope for

10  you.

11      **INMATE GREENWOOD:**  Thank you.

12      **PRESIDING COMMISSIONER ENG:**  Don't give up.  You're on the

13  right path, okay, but just focus in and think in terms of what

14  you would expect to see, okay, in a person.

15      **INMATE GREENWOOD:**  Okay.  And thank you for that advice.

16      **PRESIDING COMMISSIONER ENG:**  Okay, okay, okay.  Good luck,

17  sir.  The time is 4:12.  Okay.

18      **ATTORNEY FOX:**  Thank you.

19                      **A D J O U R N M E N T**

20                          --o0o--

21  **PAROLE DENIED TWO YEAR**

22  **THIS DECISION WILL BE FINAL ON:**_____**NOV 1 6 2007**_____

23  **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

24  **DATE, THE DECISION IS MODIFIED.**

25  **GREENWOOD, GEORGE   C-57110      DECISION PAGE 11     7/19/07**

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**


     I, Michelle Bodem, as the Official Transcriber, hereby

certify that the attached proceedings:


In the matter of the Life      )    CDC Number:  C-57110
Term Parole Consideration      )
Hearing of:                    )
GEORGE GREENWOOD               )
_____  )

                    SAN QUENTIN STATE PRISON

                    SAN QUENTIN, CALIFORNIA

                         July 19, 2007

                          1:54 p.m.

were held as herein appears.  Further, this transcript is a

true, complete and accurate record, to the best of my ability,

of the recorded material provided for transcription.




         Michelle Bodem

_____
Michelle Bodem
August 4, 2007
WPU, Inc.

EXHIBIT "B"

1           CALIFORNIA BOARD OF PRISON TERMS

2                       D E C I S I O N

3           PRESIDING COMMISSIONER ORTEGA:  Let the Record

4     show that we have reconvened, the time now is

5     approximately 1:15.  And the Panel has reviewed all

6     the information received from the public, and relied

7     on the following circumstances, in concluding that the

8     prisoner is not suitable for parole, and would pose an

9     unreasonable risk of danger to society, and a threat

10    to public safety, if released from prison.  Number one

11    was the commitment offense.  It was carried out in an

12    especially cruel and callous manner.  It was carried

13    out in a manner, which exhibits a callous disregard

14    for the life and the suffering of another.  And these

15    conclusions are drawn from the Statement of Facts,

16    wherein, the prisoner came up behind the victim, and

17    in an attempt to steal his wallet, struck the victim

18    with his fist, resulting, ultimately, in the victim's

19    death.  His previous record, the prisoner had a record

20    of violence or assaultive behavior, and he had

21    escalating pattern of criminal conduct and violence.

22    He had a persistent pattern of tumultuous

23    relationships, and a criminal behavior, which

24    commenced at an early age.  He had an unstable social

25    history, and he failed previous grants of probation,

26    and parole, and can not be counted upon to avoid

27    GEORGE GREENWOOD   C-57110   DECISION PAGE 1   11/24/97

1    criminality. He failed to profit from society's
2    previous attempts to correct his criminality, and such
3    attempts did include juvenile camp, as well as, a CYA
4    commitment. He had an unstable social history and
5    prior criminality, which included arrests for
6    marijuana, kidnap, malicious mischief, robbery,
7    assault with a deadly weapon, and, also served time
8    in camp, as well as, CYA. Institutionally, the
9    prisoner has programmed in a limited manner, while
10   he's been incarcerated, in that, he's not participated
11   in beneficial self-help and/or therapy programming.
12   And the Panel makes the following findings: That the
13   prisoner needs therapy, in order to face, discuss,
14   understand, and cope with stress in a nondestructive
15   manner, and until that progress is made, and the
16   prisoner continues to be unpredictable, and a threat
17   to others. Also, the prisoner's gains are recent and
18   he must demonstrate an ability to maintain gains over
19   an extended period of time. Nevertheless, the
20   prisoner should be commended for completing his GED
21   and his high school diploma, and for completing
22   vocational electronic data processing. However, these
23   positive aspects of his behavior do not outweigh the
24   factors of unsuitability. Mr. Greenwood, this will be
25   a three year denial. The Panel finds that it's not
26   reasonable to expect that parole would be granted at a
27   **GEORGE GREENWOOD**   C-57110   DECISION PAGE 2   11/24/97

58

1    hearing during the next three years.  And the specific
2    reasons for this finding are as follows:  One, the
3    prisoner committed the offense in an especially cruel
4    and callous manner.  Specifically, attempting to steal
5    the wallet of the victim and, ultimately, resulted in
6    the victim's death, after he had been struck several
7    times.  As a result, a longer period of observation
8    and evaluation is required, before this Board should
9    set a parole date.  Also, the prisoner has a prior
10   record of violent behavior, that the prisoner had
11   previous arrests for -- and convictions for robbery,
12   as well as, assault with a deadly weapon.  Therefore,
13   he requires a longer period of observation and
14   evaluation, before the Board should set a parole date.
15   Also, the prisoner has not completed the necessary
16   programming, which is essential to his adjustment, and
17   needs additional time to gain such programming.  He
18   has failed to participate in sufficient therapy and
19   must involve himself, once again, in NA and/or AA,
20   since this seems to be the root of the problem, while
21   he was released -- or while he was on the streets.
22   And recommendations to the prisoner:  That he become
23   and remain disciplinary-free, that he work toward
24   reducing his custody level, so that program
25   opportunities become more available, that he continue
26   to upgrade vocationally and educationally, that he
27   GEORGE GREENWOOD   C-57110   DECISION PAGE 3   11/24/97

1    participate in self-help and therapy programs. It
2    would be an unanimous decision, Mr. Greenwood. I'm
3    not sure -- I'm sure your attorney could tell you. We
4    have the right to give you up to five years, but the
5    Board was impressed with the fact that you're making
6    an effort. It takes a little while. Often times
7    inmates come in, the first few years they're here,
8    they are uncooperative. You were, for a short period
9    of time. You still got a recent 115, I think it was
10   in 1996, and then you've got a 128-A in March of this
11   year. So you're learning, and I think Mr. Douglas
12   told you, every time you get a 115, it's another nail
13   in the door and it takes you that much longer to get
14   it out. But you're programming better, we're
15   impressed by that, because that's why it was a three
16   year denial. And we hope to see you with even better
17   programming, when you come back in three years. And I
18   would ask Mr. Koenig, if he has anything he'd like to
19   add?

20          COMMISSIONER KOENIG:  No.  Good luck to
21   you.

22          PRESIDING COMMISSIONER ORTEGA:  Mr. Douglas?
23          DEPUTY COMMISSIONER DOUGLAS:  I, too, will wish
24   you luck.

25          PRESIDING COMMISSIONER ORTEGA:  Thank you.
26   And that will conclude the hearing and we'll see you
27   GEORGE GREENWOOD   C-57110   DECISION PAGE 4   11/24/97

60

1   · in three years, so good luck.  Continue your good

2   work.

3           INMATE GREENWOOD:  Thank you.

4           PRESIDING COMMISSIONER ORTEGA:  And quit --

5                         --o0o--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED THREE YEARS

26   EFFECTIVE DATE OF THIS DECISION_____ **MAR**   9 1998

27   **GEORGE GREENWOOD**   C-57110   **DECISION PAGE 5**   11/24/97

61

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, MICHELLE MCGUIRE, a duly designated
transcriber, CAPITOL ELECTRONIC REPORTING, do hereby
declare and certify under penalty of perjury that I
have transcribed tape(s) which total one in number and
cover a total of pages numbered 1 through 60, and
which recording was duly recorded at FOLSOM STATE
PRISON at REPRESA, CALIFORNIA, in the matter of the
INITIAL PAROLE CONSIDERATION HEARING OF GEORGE
GREENWOOD, CDC No. C-57110, on November 24, 1997, and
that the foregoing pages constitute a true, complete,
and accurate transcription of the aforementioned
tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-captioned matter and have no
interest in the outcome of the hearing.

Dated December 27, 1997, at Sacramento,
California.

_Michelle McGuire_

Michelle McGuire
Transcriber
CAPITOL ELECTRONIC REPORTING

EXHIBIT "B-1"

62

1          . **CALIFORNIA BOARD OF PRISON TERMS**

2              **D E C I S I O N**

. 3      **DEPUTY COMMISSIONER BLONIEN:**    Okay.    We

4    are on record.

5      **PRESIDING COMMISSIONER DALY:**    Okay.    The

6    Panel has reviewed all of the information

7    received from the public and relied on the

8    following circumstances in concluding that the

9    prisoner is not suitable for parole and would

10   pose an unreasonable risk of danger to society

11   or a threat to public safety if released from

12   prison.    Mr. Greenwood, this is going to be a

13   one-year denial.    And I think -- We have some

14   very specific things we want to talk to you

15   about.    And then it's going to kind of be up

16   to you; you know, as where it goes from here.

17   But the offense was carried out in a very

18   callous manner.    And it was carried out in a

19   manner which showed a total disregard for the

20   consequences of the actions.    And the motive

21   for the crime, to just lift a wallet, was very

22   trivial in relation to the offense, in that

23   this man lost his life.    These conclusions are

24   drawn from the Statement of Facts, wherein the

25   prisoner hit the victim over the head with his

26   fist.    And the victim fell to the ground,

27   **GEORGE GREENWOOD   C-57110 DECISION PAGE 1   8/27/03**

63

1    striking his head, and subsequently died of

2    his injuries.  And I realize that the victim

3    had some serious health problems.  But you

4    didn't know that at the time of the assault

5    and it doesn't diminish, you know, the

6    callousness of the crime.  You do have a

7    record of violence, having been convicted of a

8    couple of armed robberies as a juvenile.  You

9    had an escalating pattern of criminal conduct.

10   You had a history of unstable relationships

11   with others, and you failed previous grants of

12   probation.  And you failed to profit from

13   society's previous attempts to correct your

14   criminality.  And those attempts included a

15   CYA commitment, juvenile camp, juvenile

16   probation.  And your unstable social history

17   and prior criminality consisted of the

18   kidnapping, the armed robberies, the

19   commitment offense.  And then as we had

20   discussed, the use of marijuana, PCP, cocaine.

21   Dropping out of high school before it was

22   completed.  And so you do have an unstable

23   social history.  The prisoner has failed to

24   evidence -- demonstrate evidence of positive

25   change.  And you're kind of a contrast,

26   because you appear to be very well liked, and

27   **GEORGE GREENWOOD  C-57110 DECISION PAGE 2  8/27/03**

64

1    you presented yourself well before the Panel.

2    And we both discussed this at the break.  We

3    are impressed with you.  And you've done a

4    lot, but you continue getting these little

5    write-ups.  And even after you were married,

6    you had a 115.  So your last 128 on January or

7    July 31st of '03.  You've had 25 of them all

8    together, and you've had eight 115's.  You

9    can't just let it lay there.  You need to

10   address it and see if you can get that worked

11   out.  And when I look at your 128's, you know

12   most of them are for very -- reasons that

13   could have been overcome.  You know, by just

14   not showing up to work or anything.  So you

15   need to make sure that you remain disciplinary

16   free prior to your next hearing.  Your

17   psychiatric/psychological report was done by

18   Doctor Beermann on September 19th of 2000.  And

19   we will request a new psych evaluation to be

20   done for your next hearing.  You have

21   residential plans, but you don't yet have

22   acceptable plans, so you need to work on that.

23   You really are going to have to work hard this

24   next year and seeing if you can firm up -- I

25   know that you have written some letters and

26   you are trying to find employment.  But you

27   **GEORGE GREENWOOD  C-57110 DECISION PAGE 3  8/27/03**

65

1    need to work on that and get it firmed up.

2    3042 notices indicate an opposition to a

3    finding of parole suitability. Specifically,

4    with the District Attorney of LA County. And

5    it is also noted that in the current Board

6    report, Officer Coughlin still feels that you

7    would be a moderate degree of threat if

8    released to the public at this time. And I

9    can understand where the assessment is made

10   when you look at the discipline history. And

11   it's important that you have to be able to

12   conform within the institution to show us that

13   you can conform to the rules outside the

14   institution. So we're looking at your gains.

15   You have done a lot of positive things. But a

16   lot of these things are within the very recent

17   past, because you weren't programming too well

18   when you came in. Except for your vocation.

19 - I meant you've had your voc janitorial, your

20   electronic data processing certificate in '91.

21   And you're in the vocational office services.

22   You are working as a porter. You're getting

23   average to exceptional work reports. And we do

24   note that you are participating in Narcotics

25   Anonymous, and you're doing your Yoga

26   Meditation. You've had Anger Management,

27   **GEORGE GREENWOOD  C-57110 DECISION PAGE 4  8/27/03**

66

1 Alternatives to Violence, and the Twelve Steps

2 Substance Abuse Program. It may be more

.3 difficult as time goes on to get the self-help

4 programs, so it's good that you have at least

5 these. If something happens that they cut out

6 all of the self-help programs and you can't

7 get into any or they don't -- they discontinue

8 some, you need to start reading books. Keep a

9 list of the books that you've read and what

10 you have gleaned from the books. Because you

11 are smart and so you do have the ability to do

12 that. So when we look at your positive

13 aspects, they just don't outweigh the factors

14 of unsuitability. So like I said, this will

15 be a one-year denial. And actually we had to

16 take a really hard look at this because in

17 light of your discipline, I would say that

18 another Panel may have given you two, maybe

19 ~ even three years. And it's just because of

20 the way you presented yourself today. And I

21 do think that you're prepared and you're

22 working hard. It's going to be up to you this

23 next year. But I have to tell you, you get

24 any discipline this next year, the next Panel

25 coming in is going to hit you hard. Because

26 it just -- it shows that you really don't

27 **GEORGE GREENWOOD  C-57110 DECISION PAGE 5  8/27/03**

67

1    care.  And if you don't, like I said, can't

2    pay attention to rules inside, then you can't

3    achieve on the outside.  Asking that you

4    remain disciplinary free.  Become and remain

5    disciplinary free.  And continue to upgrade

6    vocationally, if you can.  And participate in

7    whatever self-help you can get into.  The more

8    self-help you had, the better of a candidate

9    that you will appear.  So I wish you luck.

10    **DEPUTY COMMISSIONER BLONIEN:**  I just

11    wanted to tell you I found another letter

12    after I went through them all from --

13    **INMATE GREENWOOD:**  Doctor Doyle.

14    **DEPUTY COMMISSIONER BLONIEN:**  -- Doctor

15    Doyle, who is also extremely supportive and is

16    going to help you.  I guess the thing that I

17    just wanted to reiterate, you did make a very

18    positive presentation in person.  And if we

19    had just read the paper, you would have gotten

20    a two or three year denial.  But your own

21    advocacy and the way that you presented things

22    and got the letters from your family was

23    extremely supportive.  But when you look at

24    the Anger Management course you take, I'd take

25    a review course.  Because like the last 115

26    you got was because you didn't lose the -- use

27    **GEORGE GREENWOOD  C-57110 DECISION PAGE 6  8/27/03**

68

1    the strategy that you learned.

2         INMATE GREENWOOD:  Yeah.

3         DEPUTY COMMISSIONER BLONIEN:  And you know

4    that.  And so that reinforcement will only

5    help you do a better job in the upcoming year

6    and present even a better picture for the

7    Board to consider.  And I wish you good luck.

8         INMATE GREENWOOD:  Okay.  Thank you.

9         PRESIDING COMMISSIONER DALY:  Okay.

10        DEPUTY COMMISSIONER BLONIEN:  You're

11   welcome.

12        INMATE GREENWOOD:  Thank you.

13                    --o0o--

14

15

16

17

18

19  --

20

21

22

23

24

25   PAROLE DENIED ONE YEAR

26   FINAL DATE OF DECISION_____  NOV 2 5 2003

27   GEORGE GREENWOOD  C-57110 DECISION PAGE 7  8/27/03

69

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, SANDRA TRIPLETT, a duly designated
transcriber, CAPITOL ELECTRONIC REPORTING, do
hereby declare and certify under penalty of
perjury that I have transcribed tape(s) which
total one in number and cover a total of pages
numbered 1 through 68, and which recording was
duly recorded at FOLSOM STATE PRISON, at REPRESA,
CALIFORNIA, in the matter of the SUBSEQUENT PAROLE
CONSIDERATION HEARING of GEORGE GREENWOOD, CDC No.
C-57110, on AUGUST 27, 2003, and that the
foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned
tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-captioned matter and have no
interest in the outcome of the hearing.

Dated September 10, 2003, at Sacramento
County, California.

Sandra Triplett
Transcriber
**CAPITOL ELECTRONIC REPORTING**

EXHIBIT "B-2"

72

1        **CALIFORNIA BOARD OF PRISON TERMS**

2                   **D E C I S I O N**

3        **DEPUTY COMMISSIONER SMITH:**  We're on the

4   record.  Everyone previously identified is back in

5   the hearing room and the Deputy District Attorney

6   from Los Angeles County is also on video.

7        **PRESIDING COMMISSIONER FISHER:**  All right,

8   thank you.  Mr. Greenwood, the Panel reviewed all

9   the information received from the Public and relied

10  on the following circumstances in concluding that

11  you're not yet suitable for parole and would pose

12  an unreasonable risk of danger to society or a

13  threat to public safety if released from prison.

14  The first thing that we considered was the offense,

15  and we considered the offense, I have to say, taken

16  in context of your history.  This was another --

17  This was just another case of using violence or

18  threats, which was your history, to get something

19  from someone that didn't belong to you.  This was

20  the murder of Frank Coffey, Sr., who contrary to

21  the District Attorney's office, was not an elderly

22  man.

23       **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  Much

24  older than the inmate.

25       **PRESIDING COMMISSIONER FISHER:**  All right,

26  thank you.  We'll accept that.  But this --

27  GEORGE GREENWOOD  C-57110  DECISION PAGE 1  6/16/05

73

1   Seriously, this was the murder of a man who was

2   doing nothing more than trying to buy a newspaper.

3   He was -- He was attacked from behind.  As Mr.

4   Sequeira noted, there were multiple injuries and

5   whether or not Mr. Coffey had any health problems

6   prior to being attacked by the inmate is really

7   irrelevant.  His autopsy report, as was indicated

8   earlier, showed the cause of death as being

9   multiple cranio-cerebral injuries and acute

10  bronchopneumonia due to a consequence of blunt

11  force trauma, and also one of his ribs was

12  fractured.  So it doesn't matter that he may have

13  been, you know -- It doesn't matter that he may

14  have been frail.  What does matter is that he

15  shouldn't have had to have been the victim of a

16  violent attack.  The motive for this crime was very

17  trivial; it was theft.  It was to lift his wallet,

18  and that is a very trivial offense in relation to

19  the death of this man.  The prisoner does have a

20  significant criminal history and it's not just

21  situations where things got out of hand.  It's

22  situations where, in almost every case, there was a

23  threat of violence or violence.  And in every case

24  in discussing the situations today, and even in the

25  probation officer's report where the inmate

26  discussed the situations, there was minimization of

27  GEORGE GREENWOOD  C-57110  DECISION PAGE 2  6/16/05

74

 1   his responsibility. And the situation where the

 2   bus driver was threatened, he got on the bus with

 3   no money, but his friend threatened the bus driver.

 4   And the situation with the young girl, he used a

 5   weapon. Today he said, well, it wasn't a real gun;

 6   it was a pellet gun and it didn't even work. Well,

 7   she didn't know that. When discussing the robbery

 8   at the bus stop, the witnesses said that he

 9   demanded that they give him their money. He said

10   that he only took money from one of them, that the

11   court held him responsible for the other ones. In

12   the case of the January 11, '79 situation,

13   witnesses said that the inmate had committed an

14   assault with a pipe on an unknown female prior to

15   getting into the car and that this woman had been

16   taken by another woman for medical treatment. The

17   woman who was driving the gray Buick that he jumped

18   into that he said -- and this is the case where he

19   said there was no victim. Lady who was driving the

20   car said that he threatened to kill her if she

21   didn't drive him out of there. He said that

22   somebody else pulled a knife on him, that he was

23   defending himself with the pipe, and that he got

24   into the car because there were irate citizens in

25   the area and he did not threaten her at the time.

26   So there's just a lot of minimization, and it's the

27   **GEORGE GREENWOOD  C-57110  DECISION PAGE 3  6/16/05**

75

1   same kind of minimization that comes into play in

2   the prior hearing in 2003, where he talks about the

3   fact that the victim in this particular case had a

4   bone disease and that it wasn't his intention to

5   harm him.  Well, frankly, it doesn't matter.  You

6   were essentially a thug and you were using violence

7   and threats of violence against people on a regular

8   basis, apparently, and this was just another one of

9   those situations and a 54 year old man died because

10   of it.

11       **DEPUTY COMMISSIONER SMITH:**  Commissioner,

12   excuse me.  I'm going to turn the tapes.

13       **PRESIDING COMMISSIONER FISHER:**  Go ahead.

14       [Thereupon, the tape was turned over.].

15       **DEPUTY COMMISSIONER SMITH:**  Thank you.  Go

16   ahead.

17       **PRESIDING COMMISSIONER FISHER:**  Thank you.

18   I was interested to read in the probation officer's

19   report after the arrest how everybody around you

20   talked about what a well-behaved young man you were

21   and how you were a victim of your neighborhood.  It

22   seems to me that a lot of people in your

23   neighborhood were being victimized by you.  He does

24   have an unstable social history that includes his

25   criminal behavior.  It also includes substance

26   abuse.  He was a high school dropout and at 18 --

27   **GEORGE GREENWOOD  C-57110  DECISION PAGE 4  6/16/05**

76

1     I'm sorry, at 19 -- the longest job he'd held was

2     for eight weeks.  He has failed to develop a

3     marketable skill while he's been incarcerated.

4            **INMATE GREENWOOD:**  That's not true.

5            **DEPUTY COMMISSIONER SMITH:**  Excuse me, Mr.

6     Greenwood.

7            **PRESIDING COMMISSIONER FISHER:**  He's failed ✓

8     to complete a vocation and in his current

9     vocational program, he's not received a certificate

10    since January of '04.  He has not yet sufficiently

11    participated in beneficial .self-help.  He's had 11

12    128A counseling chronos.  He's had one since his

13    last hearing, which was being absent from his

14    assignment, and has had eight 115 disciplinary

15    reports, the last one in September of 2000, and

16    that was for disruptive behavior.  The

17    psychological evaluation dated 2/05 by Dr. Starrett

18    is not totally supportive of release in that it

19    states that there is, on the inmate's part,

20    minimization.  It states that his risk factor would

21    be a little lower than an average degree of

22    dangerousness in comparison to inmates who've

23    committed similar crimes, and that's just not quite

24    low enough.  He does have residences and does have

25    support in the community.  He doesn't have a job

26    offer, although he doesn't need a job offer, as

27    **GEORGE GREENWOOD  C-57110  DECISION PAGE 5  6/16/05**

1    long as he has employable skills.  The hearing

2    Panel notes that in response to 3042 notices, the

3    District Attorney of Los Angeles County had a

4    representative here today who spoke in opposition

5    to a finding of suitability at this time.  The

6    Panel finds that the prisoner needs to continue to

7    participate in self-help in order to understand and

8    cope with stress in a non-destructive manner, also

9    in order to gain insight into the underlying

10   factors of his commitment offense.  Prisoner's

11   gains are recent and he needs to demonstrate an

12   ability to maintain those gains over an extended

13   period of time, and that would be because he got

14   involved in NA as recently as 1999 and with

15   substance abuse being his reason for the commitment

16   offense and his other criminal behavior in the

17   past, substance abuse programming would be of

18   optimum importance.  Also, his last 115 was as

19   recent as the year 2000.  Nevertheless, we do want

20   to commend Mr. Greenwood for the work that he's

21   been doing.  He's been participating in NA since

22   three of '99.  He participated since his last

23   hearing in other self-help, including Network for

24   Life, anger management, which was in '03, and he's

25   been disciplinary free since the year 2000.  In a

26   separate decision, the hearing Panel finds that the

27   **GEORGE GREENWOOD  C-57110  DECISION PAGE 6  6/16/05**

1    prisoner has been convicted of murder and it's not

2    reasonable to expect that parole would be granted

3    at a hearing during the next two years.   The

4    specific reasons for this finding are as follows.

5    Primarily, it's the commitment offense and the

6    inmate's prior history.   This offense, once

7    again --

8         **DEPUTY COMMISSIONER SMITH:**   Excuse me.

9    Would you excuse Mr. Greenwood, please, and we'll

10   conclude the reading of the decision.

11        **PRESIDING COMMISSIONER FISHER:**   Thank you.

12        **DEPUTY COMMISSIONER SMITH:**   Thank you,

13   officer.

14        **PRESIDING COMMISSIONER FISHER:**   This

15   commitment offense, once again, was carried out in

16   a very dispassionate way.   This was a gentleman who

17   was doing nothing more than trying to buy a paper.

18   This was an offense that was carried out in a

19   manner that demonstrates a callous disregard for

20   human suffering.   This was a young man who used

21   thug behavior to intimidate people into giving up

22   their property, and this was another situation

23   where he was doing just that.   And as a result of

24   his thug behavior and his violent act against this

25   man who, unfortunately, apparently did happen to be

26   somewhat frail, Mr. Coffey lost his life in the

27   **GEORGE GREENWOOD   C-57110   DECISION PAGE 7   6/16/05**

79

1    course of Mr. Greenwood lifting his wallet, which

2    is a very trivial reason for this offense.  The

3    prisoner does have an extensive history of

4    criminality for one so young that includes

5    assaultive and threatening behavior.  And since I

6    went into detail about those crimes earlier, I'm

7    not going to go on ad nausem about them, but

8    needless to say that in almost every case where he

9    had contact with law enforcement, there was some

10   kind of threatening or assaultive behavior.  He has

11   a history of unstable relationships with others.

12   That would include his criminal behavior, being a

13   high school dropout, and his substance abuse.  And

14   a recent psychological evaluation authored by Dr.

15   Starrett indicates a need for a longer period of

16   observation and evaluation or treatment.  He's not

17   completed necessary programming which is essential

18   to his adjustment and needs additional time to gain

19   such programming.  That would be to complete a

20   vocation and to continue to participate in self-

21   help.  What the Panel recommends is that Mr.

22   Greenwood continue to remain disciplinary free.  He

23   has for the last several years in relation to 115s.

24   I want to note a couple of other things for the

25   record.  One is that with all the discussion of the

26   commitment offense and the psychological

27   **GEORGE GREENWOOD  C-57110  DECISION PAGE 8  6/16/05**

1    evaluation's version of the commitment offense, I

2    think it's important to note in discussing what

3    version of the crime we were going to read today,

4    we used the prior Board report that had a

5    prisoner's version in it.  Mr. Greenwood indicated

6    to us that that was correct.  It was substantially

7    similar to the probation officer's report.  In last

8    year's hearing, Mr. Greenwood described the crime

9    in this manner: He said he tried to lift Mr.

10   Coffey's wallet.  He said,

11        "I missed the first time.  I went to

12        reach for it, so I got up close to

13        him and I concentrated on lifting his

14        wallet.  At that time, he grabbed my

15        right arm and he pulled me next to

16        him.  Bernard Mason hit him a couple

17        of times and I hit him one time.  He

18        let me loose, he walked a few steps

19        past the liquor store, turned around,

20        and fell down."

21   Now, that is not at all similar to the version that

22   he said was correct today.  It's also not similar

23   to the version in the probation officer's report.

24   One of the other issues that he raised today was

25   the fact that the psychological evaluation included

26   information about him threatening witnesses.  He

27   **GEORGE GREENWOOD   C-57110   DECISION PAGE 9   6/16/05**

81

1   said in his own words at the last hearing -- This
2   is Mr. Greenwood speaking. He said, while I was in
3   the crosswalk running across the street, Jesse
4   Davis locked the door. He said, man, what you
5   doing, and I turned around and I told him, you
6   ain't seen nothing. If you snitch, I'll kill you.
7   So I think that the fact that Mr. Greenwood has at
8   this point, after being in prison for this long, so
9   much difficulty in coming to a bottom line
10  regarding what his behavior was, that I have to say
11  that certainly for this Panel member, it indicates
12  a real lack of insight. And I also would like to
13  note for the record that at last year's hearing,
14  during the reading of the decision, Ms. Daly said
15  to him,
16              "We had to take a really hard look at
17              this, because in light of your
18              discipline, I would say that another
19              Panel may have given you two, maybe
20              three years, and it's just because of
21              the way you presented yourself
22              today."
23  And I do want to note that although a 128 is not a
24  serious disciplinary, that they talk to him at
25  great length about the importance of remaining
26  disciplinary free, and he certainly has gotten 128s
27  **GEORGE GREENWOOD   C-57110   DECISION PAGE 10 6/16/05**

82

1    since the last hearing.  I think that it would be

2    important for Mr. Greenwood to continue to

3    participate in light of the hearing today in any

4    type of anger management self-help he might find

5    available in the institution and perhaps do some

6    reading on the side.  And that completes the

7    reading of the decision.  You have any comments,

8    Commissioner?

9        **DEPUTY COMMISSIONER SMITH:**  Did you indicate

10   the extent of the denial?

11       **PRESIDING COMMISSIONER FISHER:**  Yeah, it was

12   actually in the script, so I had to read it.  It's

13   two years.

14       **ATTORNEY RAMOS:**  I have one question for the

15   Commission.

16       **DEPUTY COMMISSIONER SMITH:**  Before we do

17   that, let me note for the record -- And I don't

18   know if it came across on the tape, but I asked for

19   Mr. Greenwood to be removed as a result of a vulgar

20   comment that he made during the reading of the

21   decision.  Counsel, I don't know if you heard that

22   or not and I'm not going to pin you down with

23   regard to that, but just so that the record will

24   note that my action was based on Mr. Greenwood's

25   vulgarity and no other reason.

26       **PRESIDING COMMISSIONER FISHER:**  There was

27   **GEORGE GREENWOOD  C-57110  DECISION PAGE 11 6/16/05**

83

1   something that you wanted to clarify?

2       **ATTORNEY RAMOS:**  Yeah, the decision said

3   that he has failed to develop a marketable skill,

4   but he has two vocations, and I'm just curious if

5   those vocations are not considered marketable, the

6   electronic data processing and voc janitorial

7   maintenance.

8       **DEPUTY COMMISSIONER SMITH:**  I didn't find

9   certifications to those effect in the C-File.  Now,

10   that's not to say that I didn't overlook them.  If

11   in fact -- And I have no reason to doubt that, that

12   he has those vocations, then he does have -- And

13   I'd be happy to have the record reflect that he

14   does have some viable skills.  However, the fact

15   that he has those two viable skills, which I'm

16   going to presume is correct, would not change the

17   length of time that we denied Mr. Greenwood, as

18   there are many, many other factors involved.

19      **ATTORNEY RAMOS:**  Should he present any

20   documentation for an amended decision if he has

21   certificates showing completion in those two

22   vocations?

23      **DEPUTY COMMISSIONER SMITH:**  The decision

24   wouldn't be amended, because the decision wasn't

25   based solely on those factors.  However, I'd

26   strongly recommend that prior to the next hearing,

27   **GEORGE GREENWOOD  C-57110  DECISION PAGE 12 6/16/05**

84

1   that when Mr. Greenwood does his review of the

2   file, that he makes copies or removes those items

3   from the C-File so that they're not overlooked and

4   can be presented to the Board at that time.

5   Certainly any Board, including this one, wants to

6   see all of the positives that are there and, all

7   too often, when you have voluminous, multiple C-

8   Files, me not being infallible, you know, clearly

9   overlooked them. And my apologies to you, Mr.

10  Greenwood, but again, the decision to deny for two

11  years was not based on that issue solely. And in

12  my opinion -- Commissioner Fisher may disagree, but

13  in my opinion, the fact that he has two prior

14  vocations would not change my decision on the two

15  year denial.

16  PRESIDING COMMISSIONER FISHER:  I agree with

17  that. The larger issues have to do with insight,

18  with his history, and with the offense, and the

19  manner in which he presented himself today. As I

20  said in the decision, anger management might be

21  good for him.

22      ATTORNEY RAMOS:  Thank you, Commissioners.

23      DEPUTY COMMISSIONER SMITH:  But thank you

24  for bringing that to our attention, Counsel.

25  Appreciate it.

26              --oOo--

27  GEORGE GREENWOOD  C-57110  DECISION PAGE 13 6/16/05

EXHIBIT "C"

09/12/2007  11:00

PAGE  01/34







(ENDORSED)
F I L E D
AUG 3 0 2007
KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of California County of Santa Clara
BRET MORROW
DEPUTY

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

In re                              )   No.: 71614
                                   )
    ARTHUR CRISCIONE,              )
                                   )   ORDER
On Habeas Corpus                   )
                                   )

## INTRODUCTION

Petitioner alleges that he has been denied due process of law because the Board has used standards and criteria which are unconstitutionally vague in order to find him unsuitable for parole. Alternatively, he argues that those standards, even if constitutionally sound, are nonetheless being applied in an arbitrary and meaningless fashion by the Board. He relies upon evidence that in one hundred percent of 2690 randomly chosen cases, the Board found the commitment offense to be "especially heinous, atrocious or cruel", a factor tending to show unsuitability under Title 15 §2402(c)(1).

### Are the Board Criteria Unconstitutionally Vague?

Our courts have long recognized that both state and federal due process requirements dictate that the Board must apply detailed standards when evaluating whether an individual inmate is unsuitable for parole on public safety grounds. (See In re Dannenberg (2005) 34

1

Cal.4th 1061 at p. 1096, footnote 16.) Those standards are found in

15 CCR §2402(c) (*Dannenberg, supra,* 34 Cal.4th at p. 1080,) and do

include detailed criteria to be applied by the Board when considering

the commitment offense:

> (c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:
>
> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>
> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>
> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>
> (C) The victim was abused, defiled or mutilated during or after the offense.
>
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

In response to Petitioners claim that the regulations are impermissibly vague, Respondent argues that while "especially heinous, atrocious or cruel" might be vague in the abstract it is limited by factors (A)-(E) of §2402(c)(1), and thus provides a 'principled basis' for distinguishing between those cases which are contemplated in that section and those which are not. An examination of cases involving vagueness challenges to death penalty statutes is instructive here and shows that Respondent's position has merit:

"Our precedents make clear that a State's capital sentencing

2

1   scheme also must genuinely narrow the class of persons eligible
for the death penalty.  When the purpose of a statutory
2   aggravating circumstance is to enable the sentencer to
distinguish those who deserve capital punishment from those who
3   do not, the circumstance must provide a principled basis for
doing so.  If the sentencer fairly could conclude that an
4   aggravating circumstance applies to every defendant eligible for
the death penalty, the circumstance is constitutionally infirm."
5   (Arave v. Creech (1993) 507 U.S. 463, 474, citing Maynard v.
Cartwright (1988) 486 U.S. 356, 364: "invalidating aggravating
6   circumstance that 'an ordinary person could honestly believe'
described every murder," and, Godfrey v. Georgia (1980) 446 U.S.
7   420, 428-429: "A person of ordinary sensibility could fairly
characterize almost every murder as 'outrageously or wantonly
8   vile, horrible and inhuman.'")

9

10      It cannot fairly be said that 'every murder' could be

categorized as "especially heinous, atrocious or cruel" under the
11

Board regulations, since the defining factors contained in
12

subdivisions (A)-(E) clearly narrow the group of cases to which it
13

applies.  Although Petitioner also argues that the "vague statutory
14

language is not rendered more precise by defining it in terms or
15

synonyms of equal or greater uncertainty"  (People v. Superior Court
16

(Engert) (1982) 31 Cal.3d 797, 803, Pryor v. Municipal Court (1979)
17

25 Cal.3d 238, 249. See also Walton v. Arizona (1990) 497 U.S. 639,
18

654), the factors in those subdivisions are not themselves vague or
19

uncertain.  The mere fact that there may be some subjective component
20

(such as "exceptionally callous" disregard for human suffering) does
21

not render that factor unconstitutionally vague.  The proper degree
22

of definition of such factors is not susceptible of mathematical
23

precision, but will be constitutionally sufficient if it gives
24

meaningful guidance to the Board.
25

    A law is void for vagueness if it "fails to provide adequate
26   notice to those who must observe its strictures and
impermissibly delegates basic policy matters to policemen,
27   judges, and juries for resolution on an ad hoc and subjective
basis, with the attendant dangers of arbitrary and
28

1   discriminatory application."  (People v. Rubalcava (2000) 23
    Cal.4th 322, 332, quoting People ex rel. Gallo v. Acuna (1997)
2   14 Cal. 4th 1090, 1116, quoting Grayned v. City of Rockford
    (1972) 408 U.S. 104, 108-109.)

3   A review of cases expressing approval of definitions to limit the

4   application of otherwise vague terms in death penalty statutes leads

5   inextricably to the conclusion that the limiting factors in §2402(c)

6   easily pass constitutional muster.  An Arizona statute was upheld

7   that provided a crime is committed in an 'especially cruel manner'

8   when the perpetrator inflicts mental anguish or physical abuse before

9   the victim's death," and that "mental anguish includes a victim's

10  uncertainty as to his ultimate fate."  (Walton v. Arizona (1990) 497

11  U.S. 639, 654.)  Similarly, the court in Maynard v. Cartwright, 486

12  U.S. at 364-365, approved a definition that would limit Oklahoma's

13  "especially heinous, atrocious, or cruel" aggravating circumstance to

14  murders involving "some kind of torture or physical abuse.  In

15  Florida, the statute authorizing the death penalty if the crime is

16  "especially heinous, atrocious, or cruel," satisfied due process

17  concerns where it was further defined as "the conscienceless or

18  pitiless crime which is unnecessarily torturous to the victim."

19  State v. Dixon (1973) 283 So. 2d 1 at p. 9.

20      Here, the factors in subdivisions (A)-(E) provide equally clear

21  limiting construction to the term "especially heinous, atrocious, or

22  cruel" in §2402(c).

23  **Has the Board Engaged in a Pattern of Arbitrary Application of the**
24  **Criteria?**

25      As previously noted, 15 CCR §2402 provides detailed criteria for

26  determining whether a crime is "exceptionally heinous, atrocious or

27  cruel" such that it tends to indicate unsuitability for parole.  Our

28

4

1  courts have held that to fit within those criteria and thus serve as

2  a basis for a finding of unsuitability, the circumstances of the

3  crime must be more aggravated or violent than the minimum necessary

4  to sustain a conviction for that offense.  (*In re Rosenkrantz* (2002)

5  29 Cal.4th 616, 682-683.)  Where that is the case, the nature of the

6  prisoner's offense, *alone*, can constitute a sufficient basis for

7  denying parole.  (*In re Dannenberg, supra*, 34 Cal.4th at p. 1095.)

8      Petitioner claims that those criteria, even if constitutionally

9  sound, have been applied by the Board in an arbitrary and capricious

10  manner rendering them devoid of any meaning whatever.  The role of

11  the reviewing court under these circumstances has been addressed

12  previously in the specific context of Parole Board actions:

13      "[Courts have] an obligation, however, to look beyond the facial
       validity of a statute that is subject to possible
14     unconstitutional administration since a law though fair on its
       face and impartial in appearance may be open to serious abuses
15     in administration and courts may be imposed upon if the
       substantial rights of the persons charged are not adequately
16     safeguarded at every stage of the proceedings.  We have
       recognized that this court's obligation to oversee the execution
17     of the penal laws of California extends not only to judicial
       proceedings, but also to the administration of the Indeterminate
18     Sentence Law."  (*In re Rodriguez* (1975) 14 Cal.3d 639, 648,
       quoting *Minnesota v. Probate Court* (1940) 309 U.S. 270, 277.)

19

20      Similarly, in *In re Minnis* (1972) 7 Cal.3d 639, 645, the case

21  closest on point to the present situation, the California Supreme

22  Court stated: "This court has traditionally accepted its

23  responsibility to prevent an authority vested with discretion from

24  implementing a policy which would defeat the legislative motive for

25  enacting a system of laws."  Where, as here, the question is whether

26  determinations are being made in a manner that is arbitrary and

27  capricious, judicial oversight "must be extensive enough to protect

28

·5·

1 | limited right of parole applicants 'to be free from an arbitrary
2 | parole decision... and to something more than mere pro-forma
3 | consideration.'" (In re Ramirez (2001) 94 Cal.App.4th 549 at p. 564,
4 | quoting In re Sturm (1974) 11 Cal.3d 258 at p. 268.)

5 | This Court, therefore, now examines Petitioner's "as applied"
6 | void for vagueness challenge.

7

8 |                          The Evidence Presented

9 | A similar claim to those raised here, involving allegations of
10 | abuse of discretion by the Board in making parole decisions, was
11 | presented to the Court of Appeal in In re Ramirez, supra. The court
12 | there observed that such a "serious claim of abuse of discretion"
13 | must be "adequately supported with evidence" which should be
14 | "comprehensive." (Ramirez, supra, 94 Cal.App.4th at p. 564, fn. 5.)
15 | The claim was rejected in that case because there was not "a
16 | sufficient record to evaluate." (Ibid.) In these cases, however,
17 | there is comprehensive evidence offered in support of Petitioner's
18 | claims.

19 | Discovery orders were issued in five different cases involving
20 | life term inmates (Petitioners) who all presented identical claims.[1]

21

22 | [1] This Court takes judicial notice of the several other cases currently
   | pending (Lewis #68038, Jameison #71194, Bragg #108543, Ngo #127611.) which
23 | raise this same issue and in which proof was presented on this same point.
   | (Evidence Code § 452(d). See specifically, in the habeas corpus context,
24 | In re Vargus (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which judicial
   | notice was taken of the evidence in four other cases and in which the court
25 | noted: "Facts from other cases may assist petitioner in establishing a
   | pattern." See generally McKell v. Washington Mutual, Inc. (2006) 142
   | Cal.App.4th 1457, 1491: "trial and appellate courts ... may properly take
26 | judicial notice of ... established facts from both the same case and other
   | cases." And see AB Group v. Wertin (1997) 59 Cal.App.4th 1022, 1036:
27 | Judicial notice taken of other cases when matters are "just as relevant to
   | the present [case] as they are to the others.")
28

09/12/2007  11:00 

PAGE  07/34

1  The purpose of the discovery was to bring before the Court a
2  comprehensive compilation and examination of Board decisions in a
3  statistically significant number of cases.  The Board decisions under
4  examination consisted of final decisions of the Board for life-term
5  inmates convicted of first or second degree murder and presently
6  eligible for parole.  Included were all such decisions issued in
7  certain months, chosen by virtue of their proximity in time to the
8  parole denials challenged in the pending petitions.  All Board
9  decisions in the months of August, September and October of 2002,
10  July, August, September, October, November, and December of 2003,
11  January and February of 2004, February of 2005, and January of 2006
12  were compiled.  This resulted in a review of 2690 cases decided in a
13  total of 13 months.

14      The purpose of the review was to determine how many inmates had
15  actually been denied parole based in whole or in part on the Board's
16  finding that their commitment offense fits the criteria set forth in
17  Title 15 §2402(c)(1) as "especially heinous, atrocious or cruel."  A
18  member of the research team conducting the review, Karen Rega,
19  testified that in its decisions the Board does not actually cite CCR
20  rule §2402(c), but consistently uses the specific words or phrases
21  ("verbiage from code") contained therein, so that it could easily be
22  determined when that criteria was being applied.  (For example,
23  finding "multiple victims" invokes §2402(c)(1)(A); finding the crime
24  "dispassionate" "calculated" or "execution style" invokes
25  §2402(c)(1)(B); that a victim was "abused" "mutilated" or "defiled"
26  invokes §2402(c)(1)(C);  a crime that is "exceptionally callous" or
27  demonstrated a "disregard for human suffering" fits criteria
28

1 §2402(c)(1)(D); and finding the motive for the crime "inexplicable"

2 or "trivial" invokes §2402(c)(1)(E).)

3       Petitioners provided charts, summaries, declarations, and the

4 raw data establishing the above in the cases of Lewis #68038,

5 Jameison #71194, Bragg #108543, and Ngo #127611.  In this case

6 (Criscione #71614) the evidence was presented somewhat differently.

7 Both to spread the burden of the exhaustive examination, and to

8 provide a check on Petitioners' methods, this Court ordered

9 Respondent to undertake an examination of two randomly chosen months

10 in the same manner as Petitioner had been doing.  Respondent complied

11 and provided periodic updates in which they continued to report that

12 at all "the relevant hearings the Board relied on the commitment

13 offense as a basis for denying parole."  (See "Respondent's Final

14 Discovery Update" filed April 5, 2007.)  At the evidentiary hearing

15 on this matter counsel for Respondents stipulated that "in all of

16 those cases examined [by Respondent pursuant to the Criscione

17 discovery orders] the Board relied on the commitment offense as a

18 basis for denying parole."  (See pages 34-35 of the June 1, 2007,

19 evidentiary hearing transcript.)

20       The result of the initial examination was that in over 90

21 percent of cases the Board had found the commitment offense to be

22 "especially heinous, atrocious or cruel" as set forth in Title 15

23 §2402(c)(1).  In the remaining 10% of cases either parole had been

24 granted, or it was unclear whether §2402(c)(1) was a reason for the

25 parole denial.  For all such cases, the decisions in the prior

26 hearing for the inmate were obtained and examined.  In every case,

27 the Board had determined at some point in time that every inmates

28

8


1  crime was "especially heinous, atrocious or cruel" under Title 15
2  §2402(c)(1).

3      Thus, it was shown that 100% of commitment offenses reviewed by
4  the Board during the 13 months under examination were found to be
5  "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1).

6      A further statistic of significance in this case is that there
7  are only 9,750 inmates total who are eligible for, and who are
8  currently receiving, parole consideration hearings as life term
9  inmates.  (See "Respondent's Evidentiary Hearing Brief," at p. 4,
10 filed April 16, 2007.)

11

12               USE OF STATISTICS

13     In *International Brotherhood of Teamsters v. United States*
14 (1977) 431 U.S. 324, 339-340, the United States Supreme Court
15 reaffirmed that statistical evidence, of sufficient "proportions,"
16 can be sound and compelling proof.  As noted by the court in *Everett*
17 *v. Superior Court* (2002) 104 Cal.App.4th 388, 393, and the cases cited
18 therein, "courts regularly have employed statistics to support an
19 inference of intentional discrimination."

20     More recently, the United States Supreme Court, in *Miller-El v.*
21 *Cockrell* (2003) 537 U.S. 322, 154 L.Ed.2d 931, when examining a habeas
22 petitioner's allegations that the prosecutor was illegally using his
23 peremptory challenges to exclude African-Americans from the
24 petitioner's jury, noted that "the statistical evidence alone" was
25 compelling.  The high court analyzed the numbers and concluded:
26 "Happenstance is unlikely to produce this disparity."  (See also
27 *People v. Hofsheier* (2004) 117 Cal.App.4th 438 in which "statistical
28

1  evidence" was noted as possibly being dispositive. And see *People v.*
2  *Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and
3  analysis, combined into an "actuarial instrument" was substantial
4  proof.)

5  A statistical compilation and examination such as has been
6  presented in these cases is entirely appropriate and sufficient
7  evidence from which to draw sound conclusions about the Board's
8  overall methods and practices.

9

10                              **THE EXPERT'S TESTIMONY**

11  Petitioners provided expert testimony from Professor Mohammad
12  Kafai regarding the statistics and the conclusions that necessarily
13  follow from them.  Professor Kafai is the director of the statistics
14  program at San Francisco State University, he personally teaches
15  statistics and probabilities, and it was undisputed that he was
16  qualified to give the expert testimony that he did.  No evidence was
17  presented that conflicts or contradicts the testimony and conclusions
18  of Professor Kafai.  By stipulation of the parties, Professor Kafai's
19  testimony was to be admissible and considered in the cases of all
20  five petitioners.  (See page 35 of the June 1, 2007, evidentiary
21  hearing transcript.)

22  Professor Kafai testified that the samples in each case, which
23  consisted of two or three months of Board decisions, are
24  statistically sufficient to draw conclusions about the entire
25  population of life term inmates currently facing parole eligibility
26  hearings.  Given that every inmate within the statistically
27  significant samples had his or her crime labeled "'particularly
28

10

1 | egregious'" or "especially heinous, atrocious or cruel" under Title
2 | 15 §2402(c)(1), it can be mathematically concluded that the same
3 | finding has been made for every inmate in the entire population of
4 | 9,750. Although he testified that statisticians never like to state
5 | unequivocally that something is proven to a 100% certainty, (because
6 | unforeseen anomalies are always theoretically possible,) he did
7 | indicate the evidence he had thus far examined came as close to that
8 | conclusion as could be allowed. Not surprisingly, Professor Kafai
9 | also testified that "more than 50% can't by definition constitute an
10 | exception."

11 |     Having found the data provided to the expert to be sound this
12 | Court also finds the expert's conclusions to be sound.  In each of
13 | the five cases before the Court over 400 inmates were randomly chosen
14 | for examination.  That number was statistically significant and was
15 | enough for the expert to draw conclusions about the entire population
16 | of 9,750 parole eligible inmates.  The fact that the approximately
17 | 2000 inmates examined in the other cases also had their parole denied
18 | based entirely or in part on the crime itself (§2402(c)(1)), both
19 | corroborates and validates the expert's conclusion in each individual
20 | case and also provides an overwhelming and irrefutable sample size
21 | from which even a non expert can confidently draw conclusions.

22 |

23 |                               DISCUSSION

24 |     Although the evidence establishes that the Board frequently says
25 | parole is denied "first," "foremost," "primarily," or "mainly,"
26 | because of the commitment offense, this statement of primacy or
27 | weight is not relevant to the question now before the Court.
28 |

11.

1  Petitioners acknowledge that the Board generally also cites other
2  reasons for its decision. The question before this Court, however,
3  is not whether the commitment offense is the primary or sole reason
4  why parole is denied -- the question is whether the commitment
5  offense is labeled "'particularly egregious'" and thus could be used,
6  under *Dannenberg,* primarily or exclusively to deny parole.

7      The evidence proves that in a relevant and statistically
8  significant period where the Board has considered life term offenses
9  in the context of a parole suitability determination, every such
10 offense has been found to be "particularly egregious" or "especially
11 heinous, atrocious or cruel."[2] This evidence conclusively
12 demonstrates that the Board completely disregards the detailed
13 standards and criteria of §2402(c). "Especially" means particularly,
14 or "to a distinctly greater extent or degree than is common,"[3] (EC §
15 451(e).) By simple definition the term "especially" as contained in
16 section 2402(C)(1) cannot possibly apply in 100% of cases, yet that
17 is precisely how it has been applied by the Board. As pointed out by
18 the Second District Court of Appeal, not every murder can be found to
19 be "atrocious, heinous, or callous" or the equivalent without "doing
20
21 [2] In a single case out of the 2690 that were examined Petitioner has conceded that
   the Board did not invoke §2402(c)(1). This Court finds that concession to be
   improvidently made and the result of over caution. When announcing the decision at
22 the initial hearing of S. Fletcher (H-10330) on 4/6/06, the commissioner did begin
   by stating "I don't believe this offense is particularly aggravated..." However
   the commissioner proceeds to describe the crime as a drug deal to which Fletcher
23 brought a gun so "we could say there was some measure of calculation in that." The
   commissioner continued by observing that the reason someone would bring a gun to a
   drug transaction was to make sure things went according to their plan "so I guess
24 we can say that that represents calculation and perhaps it's aggravated to that
   extent." As is the Board's standard practice, by using the word 'calculated' from
25 §2402(c)(1)(b) the Board was invoking that regulation. Certainly if Mr. Fletcher
   had brought a habeas petition Respondent's position would be that there is 'some
26 evidence' supporting this. The ambiguity created by the commissioner's initial
   statement was cleared up several pages later when he announces that "based upon the
27 crime coupled with ..." parole was denied for four years. (See *In re Burns* (2006)
   136 Cal.App.4th 1318, 1326, holding §2402(c)(1) criteria are necessary for a multi-
   year denial.)
28

12

09/12/2007  11:08    ▬▬▬▬        ▬▬▬▬▬                                    PAGE  13/34

1  violence" to the requirements of due process.  (*In re Lawrence* (2007)
2  150 Cal.App.4th 1511, 1557.)  This is precisely what has occurred
3  here, where the evidence shows that the determinations of the Board
4  in this regard are made not on the basis of detailed guidelines and
5  individualized consideration, but rather through the use of all
6  encompassing catch phrases gleaned from the regulations.

7
8                        THE BOARD'S METHODS

9      Because it makes no effort to distinguish the applicability of
10  the criteria between one case and another, the Board is able to force
11  every case of murder into one or more of the categories contained in
12  $2402(c).

13      For example, if the inmate's actions result in an instant death
14  the Board finds that it was done in a "dispassionate and calculated
15  manner, such as an execution-style murder."  At the same time the
16  Board finds that a murder not resulting in near instant death shows a
17  "callous disregard for human suffering" without any further analysis
18  or articulation of facts which justify that conclusion.  If a knife
19  or blunt object was used, the victim was "abused, defiled, or
20  mutilated."  If a gun was used the murder was performed in a
21  "dispassionate and calculated manner, such as an execution-style
22  murder."  If bare hands were used to extinguish another human life
23  then the crime is "particularly heinous and atrocious."

24      Similarly, if several acts, spanning some amount of time, were
25  necessary for the murder the Board may deny parole because the inmate
26  had "opportunities to stop" but did not.  However if the murder was

27  ————————————————————————————————————————————
   [5] Princeton University World Net Dictionary (2006).
28

13

p.14            058-0GP-678T                        Jacob Burland        Sep 07 07 11:34a

1  accomplished quickly parole will be denied because it was done in a
2  dispassionate and calculated manner and the victim never had a chance
3  to defend themselves or flee.  If the crime occurred in public, or
4  with other people in the vicinity, it has been said that the inmate
5  "showed a callous disregard" or "lack of respect" for the
6  "community."  However if the crime occurs when the victim is found
7  alone it could be said that the inmate's actions were aggravated
8  because the victim was isolated and more vulnerable.

9      In this manner, under the Board's cursory approach, every murder
10  has been found to fit within the unsuitability criteria.  What this
11  reduces to is nothing less than a denial of parole for the very
12  reason the inmates are present before the Board - i.e. they committed
13  murder.  It is circular reasoning, or in fact no reasoning at all,
14  for the Board to begin each hearing by stating the inmate is before
15  them for parole consideration, having passed the minimum eligible
16  parole date based on a murder conviction, and for the Board to then
17  conclude that parole will be denied because the inmate committed acts
18  that amount to nothing more than the minimum necessary to convict
19  them of that crime.  As stated quite plainly by the Sixth District:
20  "A conviction for murder does not automatically render one unsuitable
21  for parole."  (Smith, supra, 114 Cal.App.4th at p. 366, citing
22  Rosenkrantz, supra, 29 Cal.4th at p. 683.)

23      In summary, when every single inmate is denied parole because
24  his or her crime qualifies as a §2402(c)(1) exception to the rule
25  that a parole date shall normally be set, then the exception has
26  clearly swallowed the rule and the rule is being illegally
27  interpreted and applied.  When every single life crime that the Board
28

14

1 examines is "particularly egregious" and "especially heinous,

2 atrocious or cruel" it is obvious that the Board is operating without

3 any limits and with unfettered discretion.

4    Other examples of the failure to 'connect up' the facts of the

5 individual case with the criteria and the ultimate findings abound in

6 the decisions of the reviewing courts.  Some of the state cases to

7 have reversed Parole Board or Governor abuses of discretion in

8 denying parole include *In re Roderick, In re Cooper, In re Lawrence,*

9 *In re Barker, In re Gray, In re Lee, In re Elkins, In re Weider, In*

10 *re Scott, In re Deluna, In re Ernest Smith, In re Mark Smith,* and *In*

11 *re Capistran.*

12    When "the record provides no reasonable grounds to reject, or

13 even challenge, the findings and conclusions of the psychologist and

14 counselor concerning [the inmate's] dangerousness" the Board may not

15 do so.  (*In re Smith* (2003) 114 Cal.App.4th 343, 369.)

16    When an inmate, although only convicted of a second degree

17 murder, has been incarcerated for such time that, with custody

18 credits, he would have reached his MEPD if he had been convicted of a

19 first, the Board must point to evidence that his crime was aggravated

20 or exceptional even for a first degree murder if they are going to

21 use the crime as a basis for denying parole.  (*In re Weider* (2006)

22 145 Cal.App.4th 570, 582-583.)[4]

23

24 [4]   This rule, rooted in Justice Moreno's concurrence in *Rosenkrantz, supra,* is
particularly applicable in this case. Petitioner was convicted of second degree,
but acquitted of first degree, murder over 25 years ago.  (*People v. Criscione*
25 (1981) 125 Cal.App.3d 275.)  With his custody credits he is beyond the matrix even
had he been convicted of a first.  In a currently pending habeas petition in which
26 he challenges his 2007 parole denial the first reason the Board gave was the crime
itself and the presiding commissioner explained: "His actions go well beyond the
27 minimum necessary for a conviction of murder in the second degree."  (Decision page
2 of 4/2/07 transcript.)  For the Board to penalize the Petitioner for the fact
28 that he was acquitted of first degree is further proof of their willfulness and

1    A "petitioner's young age at the time of the offense" must be
2  considered.  (In re Elkins (2006) 144 Cal.App.4th 475, 500, quoting
3  Rosenkrantz v. Marshall (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1065,
4  1085: "The reliability of the facts of the crime as a predictor for
5  his dangerousness was diminished further by his young age of 18, just
6  barely an adult. 'The susceptibility of juveniles to immature and
7  irresponsible behavior means their irresponsible conduct is not as
8  morally reprehensible as that of an adult.'")[5]

9    The Board's formulaic practice of stating §2402(c)(1) phrased in
10  a conclusory fashion, and then stating "this is derived from the
11  facts" without ever linking the two together, is insufficient.  (In
12  re Roderick, (2007) ____ Cal.App.4th ____ (A113370): "At minimum, the
13  Board is responsible for articulating the grounds for its findings
14  and for citing to evidence supporting those grounds."  (See also In
15  re Barker (2007) 151 Cal.App.4th 346, 371, disapproving
16  "conclusorily" announced findings.)

17    After two decades, mundane "crimes have little, if any,
18  predictive value for future criminality.  Simply from the passing of
19  time, [an inmate's] crimes almost 20 years ago have lost much of
20  their usefulness in foreseeing the likelihood of future offenses than
21  if he had committed them five or ten years ago."  (In re Lee (2006)
22  143 Cal.App.4th 1400, 1412.)  It should be noted that this rule
23

24  bias.  The jury had a reasonable doubt that Petitioner committed first degree
25  murder but under the Board's 'reasoning' and 'analysis' this puts him in a worse
     position than if they had not.  Had the jury convicted him of the greater offense
     Petitioner has served so much time that he would already be having subsequent
     parole hearings on a first and the Board would not have been able to use the 'some
     evidence' of first degree behavior against him.  As observed previously, the
26  Board's position in this regard is "so ridiculous that simply to state it is to
     refute it."  (Weider, supra, 145 Cal.App.4th at p. 583.)
27  [5] This point is particularly significant in the case of Mike Ngo.  Mr. Ngo was only
     18 at the time of his crime.  The impetus behind the shooting was youth group or

28

16

1  applies with even more force when the Board is relying on any
2  criminality that occurred before the crime.  In that situation, just
3  as with the crime itself, the Board must explain why such old events
4  have any relevance and especially when the inmate has spent a decade
5  as a model prisoner.

6      Murders situationally related to intimate relationships are
7  unfortunately commonplace because emotions are strongest in such
8  domestic settings.  When a murder occurs because of "stress unlikely
9  to be reproduced in the future" this is a factor that affirmatively
10 points towards suitability.  (In re Lawrence (2007) 150 Cal.App.4th
11 1511 and cases cited therein.)

12     "The evidence must substantiate the ultimate conclusion that the
13 prisoner's release currently poses an unreasonable risk of danger to
14 the public.  It violates a prisoner's right to due process when the
15 Board or Governor attaches significance to evidence that forewarns no
16 danger to the public."  (In re Tripp (2007) 150 Cal.App.4th 306,
17 313.)

18     The Board "cannot rely on the fact that the killing could have
19 been avoided to show the killing was especially brutal."  (In re
20 Cooper (2007) 153 Cal.App.4th 1043, 1064.)

21     The Board's focus must be upon how the inmate "actually
22 committed his crimes" not the "incorporeal realm of legal
23 constructs."  (Lee, supra, 143 Cal.App.4th at p. 1413.)  This is
24 especially significant when the murder conviction is based on the
25 felony murder rule, provocative act doctrine, or accomplice liability
26 such that the inmate did not intend to kill or may not have even been
27 _____
   gang rivalries, posturing, and threats which mature adults would not have been
28

                              17



1 the actual killer.

2 　　The Board has ample guidance before it in the decisions of the

3 various reviewing courts to constrain its abuse, but has failed to

4 avail itself of the opportunity to do so.

5

6 　　　　　　　　SEPARATION OF POWERS DOCTRINE

7 　　The evidence presented, as discussed above, has established a

8 void for vagueness "as applied" due process violation. That same

9 evidence also proves a separate but related Constitutional violation

10 -- an as applied separation of powers violation.

11 　　The separation of powers doctrine provides "that the legislative

12 power is the power to enact statutes, the executive power is the

13 power to execute or enforce statutes, and the judicial power is the

14 power to interpret statutes and to determine their

15 constitutionality." (*Lockyer v. City and County of San Francisco*

16 (2004) 33 Cal.4th 1055, 1068.) Because the evidence has proven the

17 Board is not executing/enforcing the legislature's statutes as

18 intended it is this Court's duty to intervene. The question here is

19 whether the Board is violating the separation of powers doctrine by

20 appropriating to itself absolute power over parole matters and

21 disregarding the limits and guidelines placed by the statute.[6]

22 　　"Government Code section 11342.2 provides: 'Whenever by the

23

24 caught up in.
[6] "It is settled that Administrative regulations that violate acts of the
Legislature are void and no protestations that they are merely an exercise of

25 administrative discretion can sanctify them. They must conform to the legislative
will if we are to preserve an orderly system of government. Nor is the motivation

26 of the agency relevant: It is fundamental that an administrative agency may not
usurp the legislative function, no matter how altruistic its motives are."

27 (*Agricultural Labor Relations Board v. Superior Court of Tulare County* (1976) 16
Cal.3d 392, 419 quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 737, and *City of
San Joaquin v. State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374.)

28

18

1  express or implied terms of any statute a state agency has authority
2  to adopt regulations to implement, interpret, make specific or
3  otherwise carry out the provisions of the statute, no regulation
4  adopted is valid or effective unless consistent and not in conflict
5  with the statute and reasonably necessary to effectuate the purpose
6  of the statute.'  Administrative regulations that alter or amend the
7  statute or enlarge or impair its scope are void and courts not only
8  may, but it is their obligation to strike down such regulations."
9  (Pulaski v. Occupational Safety & Health Stds. Bd. (1999) 75
10  Cal.App.4th 1315, 1341, citations omitted.)

11     The vice of overbroad and vague regulations such as are at issue
12  here is that they can be manipulated, or 'interpreted,' by executive
13  agencies as a source of unfettered discretion to apply the law
14  without regard to the intend of the people as expressed by the
15  legislature's enabling statutes.  In short, agencies usurp unlimited
16  authority from vague regulations and become super-legislatures that
17  are unaccountable to the people.  As it has sometimes been framed and
18  addressed in the case law, a vague or all encompassing standard runs
19  the risk of "violat[ing] the separation of powers doctrine by
20  'transforming every [executive decisionmaker] into a "mini-
21  legislature" with the power to determine on an ad hoc basis what
22  types of behavior [satisfy their jurisdiction].'"  (People v. Ellison
23  (1998) 68 Cal.App.4th 203, 211, quoting People v. Superior Court
24  (Caswell) (1988) 46 Cal.3d 381, 402.)

25     "It is concern about 'encroachment and aggrandizement,' the
26  [United States Supreme Court] reiterated, that has animated its
27  separation of powers jurisprudence.  'Accordingly, we have not
28

1  hesitated to strike down provisions of law that either accrete to a
2  single Branch powers more appropriately diffused among separate
3  Branches or that undermine the authority and independence of one or
4  another coordinate Branch.'" (Kasler v. Lockyer (2000) 23 Cal.4th
5  472, 493, quoting Mistretta v. United States (1989) 488 U.S. 361,
6  382.)  This articulation of the principle speaks directly to the
7  situation at hand.  The Board, by its enactment and interpretation of
8  Title 15, §2402, has appropriated to itself absolute power over
9  'lifer' matters.  Overreaching beyond the letter and spirit of the
10 Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by
11 the Board to supply the power to declare every crime enough to deny
12 parole forever.  The fact that Title 15, §2402, has been invoked in
13 every case, but then sometime later not invoked, tends to show either
14 completely arbitrary and capricious behavior or that unwritten
15 standards are what really determine outcomes.  In either event, all
16 pretenses of taking guidance from, or being limited by, the
17 legislature's statutes have been abandoned.  "[I]t is an elementary
18 proposition that statutes control administrative interpretations."
19 (Ohio Casualty Ins. Co. v. Garamendi (2006) 137 Cal.App.4th 64, 78.)
20 Title 15 §2402 as applied, however, has no controls or limitations.
21      The PC § 3041(b) exception to the rule can only be invoked when
22 the "gravity of the current convicted offense or offenses, or the
23 timing and gravity of current or past convicted offense or offenses,
24 is such that consideration of the public safety requires a more
25 lengthy period of incarceration for this individual."  The word
26 "gravity" is a directive for comparison just as "more lengthy"
27 indicates a deviation from the norm.  While Dannenberg held there
28



1  does not need to be intra case comparison for the purposes of term
2  uniformity or proportionality, there necessarily has to be some sort
3  of comparison for the purposes of adhering to the legislative mandate
4  that parole is available.  The Board employs no meaningful yardstick
5  in measuring parole suitability.  This is a violation of the
6  separation of powers doctrine.  (*People v. Wright* (1982) 30 Cal.3d
7  705; 712-713.  And see *Terhune v. Superior Court* (1998) 65
8  Cal.App.4th 864, 872-873.  Compare *Whitman v. Am. Trucking Ass'ns*
9  (2001) 531 U.S. 457, 472, describing a delegation challenge as
10  existing when the legislature fails to lay down "an intelligible
11  principle to which the person or body authorized to act is directed
12  to conform.")

13

14                    RESPONDENT'S POSITION

15      The Attorney General has suggested, without pointing to any
16  concrete examples, that it is possible that the Board, when invoking
17  the crime as a reason to deny parole, is not placing it within
18  §2402(c)(1) but instead using is as some sort of 'lesser factor'
19  which, only when combined with other unsuitability criteria, can
20  contribute to a valid parole denial.  The two problems with this
21  position are, first, there is no evidentiary support for this
22  assertion, and second, it would have no impact on the constitutional
23  infirmities outlined and proven above.

24      Even if Respondent had produced evidence that the Board was
25  utilizing the crime as a 'lesser factor' which needs others to fully
26  support a parole denial, the Board would then be admitting it was
27  denying parole, in part, for the very reason that the person is

28

1 before the panel and eligible for parole in the first place — the
2 commitment offense. Respondent's argument suggests that a crime that
3 only qualified as the *Dannenberg* "minimum necessary" could still be
4 invoked as a reason for denying parole. Respondent argues that when
5 the crime is invoked 'not in the *Dannenberg* sense,' there must be
6 other reasons for the parole denial and the crime alone would not be
7 enough in this context. This position is inconsistent with the law
8 and fundamental logic.

9      A crime qualifies under *Dannenberg* when it is "particularly
10 egregious," or one where "no circumstances of the offense reasonably
11 could be considered more aggravated or violent than the minimum
12 necessary to sustain a conviction for that offense." (*Dannenberg*,
13 *supra*, 34 Cal.4th at pp. 1094-1095.) These are the only two choices.
14 If a crime consists of only the bare elements then it is not
15 aggravated and it cannot, in and of itself, serve as a basis for
16 parole denials once the inmate becomes eligible for parole. It is
17 the reason an inmate may be incarcerated initially for the equivalent
18 of 15 or 25 years, and then examined to determination rehabilitation
19 efforts when they come before the Board, but a crime that is no more
20 than the bare minimum cannot be factored into the equation pursuant
21 to PC § 3041(b) or any of the case law interpreting it.

22      In oral argument Respondent suggested a second way the
23 commitment offense can be used outside of §2402(c)(1). If for
24 example a crime had its roots in gang allegiances or rivalries and
25 the inmate continued to associate with gangs while incarcerated, then
26 an aspect of the crime, even if the crime otherwise consisted of no
27 more than the minimum elements, could be combined with other behavior
28

22



1  to support a parole denial.  Similarly, if a crime was rooted in an
2  inmate's then existing drug addiction, and the Board was to point to
3  a recent 115 involving drugs, the evidence that the inmate's drug
4  issues had not been resolved would justify a parole denial even if
5  the crime itself was not aggravated.  A finding that the inmate is
6  not suitable for release under these circumstances, however, is not
7  based on the facts of the commitment offense as tending to show
8  unsuitability.  It is based on the conclusion that can be drawn about
9  Petitioner's lack of rehabilitation or change since the offense, and
10  thus, his present dangerousness.

11     Respondent has not demonstrated any flaws in Petitioner's
12  methodology or analysis, nor provided any actual evidence of the
13  crime being invoked other than pursuant to §2402(c)(1).  Drawing
14  conclusions from the Board's direct statements, or its precise
15  recitations of the §2402(c)(1) language, logically indicates an
16  invocation of §2402(c)(1), and Respondent's suggestion otherwise is
17  insupportable.

18

19                    THE QUESTION OF BIAS

20     Because the issue has been squarely presented, and strenuously
21  argued by Petitioners, this Court is obligated to rule on the charge
22  that the Board's actions prove an overriding bias and deliberate
23  corruption of their lawful duties.

24     In the discrimination and bias case of USPS Bd. of Governors v.
25  Aikens (1983) 460 U.S. 711, the United States Supreme Court
26  acknowledged "there will seldom be 'eyewitness' testimony as to the
27  [] mental processes" of the allegedly biased decisionmaker.  Instead,
28

                                23

1 an examination of other cases for trends or patterns can provide the

2 necessary circumstantial evidence.  (See *Aikens, supra,* at footnote

3 2.)  Reaffirming that such circumstantial evidence will be sufficient

4 the Court stated: "The law often obliges finders of fact to inquire

5 into a person's state of mind.  As Lord Justice Bowen said in

6 treating this problem in an action for misrepresentation nearly a

7 century ago, 'The state of a man's mind is as much a fact as the

8 state of his digestion.  It is true that it is very difficult to

9 prove what the state of a man's mind at a particular time is, but if

10 it can be ascertained it is as much a fact as anything else.'"

11 (*Aikens,* at pp. 716-717, quoting *Edgington v. Fitzmaurice* (1885) 29

12 Ch. Div. 459, 483.)[7]

13     The discovery in these cases was granted in part due to the

14 Petitioners' prima facie showing of bias and the necessity that it be

15 "adequately supported with evidence" if such evidence is available.

16 (*Ramirez, supra,* 94 Cal.App.4th at p. 564, fn. 5.  See also *Nasha v.*

17 *City of Los Angeles* (2004) 125 Cal.App.4th 470, 483: "A party seeking

18 to show bias or prejudice on the part of an administrative decision

19 maker is required to prove the same 'with concrete facts.'"  And see

20 *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674,

21 841: "The challenge to the fairness of the adjudicator must set forth

22 concrete facts demonstrating bias or prejudice."  See also *Hobson v.*

23

24 [7] As occurred in *Aikens, supra,* and as suggested in prior orders of this Court, Respondent should have provided direct evidence from the decisionmakers.  While the

25 fact that a *Defendant* does not explain his or her actions cannot be held against him, (*Griffin v. California* (1965) 380 U.S. 609, *Doyle v. Ohio* (1976) 426 U.S.

26 610,) it is appropriate to give some weight to the consideration that the Board has failed to offer any direct evidence or explanation on its own behalf.  While the

27 case of *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095 stands for the proposition that Petitioner may not inquire into the Board members mental

28 processes, Respondent is not precluded from offering such direct evidence if they were able to testify as to their good faith and conscientious efforts.

24

1   *Hansen* (1967) 269 F.Supp. 401, 502, the watershed Washington D.C.
2   school desegregation case in which the court determined from a
3   statistical and factual analysis that racial bias was influencing
4   policy.)

5        In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255,
6   a similar claim of biased decision making was asserted and it was
7   rejected because, although the defendant clearly articulated it, "he
8   has not demonstrated it. Therefore, he has failed to bear his burden
9   of showing a constitutional violation as a demonstrable reality, not
10  mere speculation." In the present cases Petitioners have provided
11  overwhelming concrete evidence. It is difficult to believe that the
12  Board's universal application of §2402(c)(1) has been an inadvertent
13  mistake or oversight on their part. It is hard to credit the Board's
14  position that it does not know its own patterns and practices reveal
15  a complete lack of standards or constraints on their power.
16  Respondent's protestations ring hollow, and it seems a statistical
17  impossibility, that the Board's use of "detailed" criteria in such a
18  fashion that they are rendered meaningless is a result of good faith
19  efforts on their part. That every murder is "especially heinous,
20  atrocious or cruel," and can therefore be an exception to the rule
21  that a parole date should be set, does not seem to be an accident on
22  their part.

23       Although no court has thus far agreed with the accusation that
24  the Board approaches its duties with a predetermination and a bias,
25  no court has previously been presented the comprehensive evidence
26  outlined herein. While this Court does not turn a blind eye to the
27  reasonable conclusion that the Board's unconstitutional practices are
28

25

09/12/2007  11:00

1   willful, there is another possibility.  The pattern of errors
2   demonstrated by the discovery in this case, and the continuously
3   growing body of Court of Appeal opinions finding consistent and
4   persistent abuse of discretion, may instead be caused by the fact
5   that the Board is simply overworked and substantively untrained.  The
6   impossibility of the blanket applicability of §2402(c)(1) may be only
7   the result of sloppy preparation and inadvertent carelessness.

8        The Board must first be given an opportunity to comply with the
9   necessary remedy provided by this court before it is possible to
10  enter a finding of conscious bias and illegal sub rosa policy.  To do
11  otherwise would ignore the complexities and magnitude of the largely
12  discretionary duties with which that Board is vested.

13

14                              CONCLUSION

15       The conclusive nature of the proof in this case, and the
16  suggestion of institutional bias do not preclude formulation of an
17  remedy which will guarantee adequate restrictions on, and guidance
18  for, the Board's exercise of discretion in making parole suitability
19  determinations.  The Board can be made to lawfully perform its duties
20  if given explicit instructions.

21       As noted supra, a reason the proof in this case irrefutably
22  establishes constitutional violations is because the Board does not,
23  in actual fact, operate within the limiting construction of the
24  regulations.  The Board's expansive interpretation allows it to
25  operate without any true standards.  Although numerous rulings of
26  both state and federal courts of appeal have invalidated the Board's
27  application of the §2402(c) criteria to particular facts, the Board

28

                              26.



1 | does not take guidance from these binding precedents and ignores them
2 | for all other purposes.  In the most recent of these cases, *In re*
3 | *Roderick*, (2007) ___ Cal.App.4th ___ (A113370) the First District
4 | held four of five §2402 factors "found" by the Board to be
5 | unsupported by any evidence.  At footnote 14 the court took the time
6 | to criticize the Board for its repeated use of a "stock phrase"
7 | "generically across the state."  The court also clarified that "at
8 | minimum, the Board is responsible for articulating the grounds for
9 | its findings and for citing to evidence supporting those grounds."
10 |     There is nothing in the evidence presented that would allow any
11 | conclusion but that, without intervention of the Courts, the Board
12 | will ignore the lessons of these rulings in the future and continue
13 | to employ its formulaic approach of citing a criteria from
14 | §2402(c)(1), repeating the facts of the crime, but never
15 | demonstrating a logical connection between the two.  This is the
16 | core problem with the Board's methodology -- they provide no
17 | explanation or rationale for the findings regarding the crime itself.
18 |  This practice results in violence to the requirements of due
19 | process and individualized consideration which are paramount to the
20 | appropriate exercise of its broad discretion.
21 |     The only solution is one that compels the Board to identify the
22 | logical connection between the facts upon which it relies and the
23 | specific criteria found to apply in the individual case.  For
24 | example, the Board often finds that an inmate's motive is "trivial"
25 | without ever suggesting why, on these facts, that motive is not just
26 | as trivial as the motive behind any other murder.  What motive is not
27 | trivial?  By any definition "trivial" is a word of comparison and
28 |

1  only has meaning when there can be examples that are not "trivial."

2      Similarly, although the Sixth District made it plain four years

3  ago that "all [] murders by definition involve some callousness," (In

4  re Smith (2003) 114 Cal.App.4th 343, 345,) the Board has continued to

5  deny countless paroles labeling the crime "callous" without ever

6  suggesting what crime would not qualify as "callous" and without

7  consistently explaining why the individual case before it

8  demonstrates "exceptional" callousness.

9      Respondent has consistently refused to suggest what possible

10  instances of murder would not fit the Board's amorphous application

11  of the §2402 criteria.  Citing Dannenberg, Respondent insists such

12  comparative analysis is unnecessary.  Respondent fundamentally

13  misunderstands the Dannenberg holding.

14      The PC § 3041(b) exception to the rule can only be invoked when

15  the "gravity of the current convicted offense or offenses, or the

16  timing and gravity of current or past convicted offense or offenses,

17  is such that consideration of the public safety requires a more

18  lengthy period of incarceration for this individual."  The word

19  "gravity" is a directive for comparison just as "more lengthy"

20  indicates a deviation from the norm.  While Dannenberg held there

21  does not need to be intra case comparison for the purposes of term

22  uniformity or proportionality, there necessarily has to be some sort

23  of comparison for the purposes of adhering to the legislative mandate

24  that parole is available.  This is implicit in §2402 because the

25  qualifier "especially," in "especially heinous atrocious or cruel,"

26  requires that some form of comparison be made.  While the original

27  drafters of §2402 seemed to have recognized this fact, the ongoing

28


1  conduct of the Board has completely ignored it, and this is the

2  essence of the due process violation Petitioners have asserted.

3      As noted in his dissent in the recent case of *In re Roderick,*

4  *supra,* Justice Sepulveda would have deferred to the Board's

5  'exercise' of discretion because "Board members have both training

6  and vast experience in this field.  They conduct literally thousands

7  of parole suitability hearings each year.  The Board therefore has

8  the opportunity to evaluate the egregiousness of the facts of a great

9  number of commitment offenses.  ...  The Board's training and

10  experience in evaluating these circumstances far exceeds that of

11  most, if not all, judges."  The evidence in this case, however,

12  suggests a flaw in granting such deference.  Since the Board

13  continues to place every murder in the category of offenses "tending

14  to show unsuitability," something is certainly wrong.  Since the

15  Board's vast experience is undeniable, the problem must be in the

16  Board's training and understanding of the distinguishing features of

17  the guidelines and criteria.  Although Justice Sepulveda presumes

18  that Board members receive substantive training, there is no evidence

19  before this court to suggest that it does, and substantial

20  circumstantial evidence to suggest that it does not.

21      In the vast numbers of Santa Clara County cases reviewed by this

22  Court, the Board's formulaic decisions regarding the commitment

23  offense do not contain any explanation or thoughtful reasoning.

24  Instead, the Board's conclusionary invocation of words from

25  §2402(c)(1) is linked to a repetition of the facts from the Board

26  report by the stock phrase: "These conclusions are drawn from the

27  statement of facts wherein ..."  Thereafter the inmate files a habeas

28

1  corpus petition and Respondent, after requesting an extension of
2  time, files a boilerplate reply asserting the Board's power is
3  "great" and "almost unlimited" and thus any "modicum" of evidence
4  suffices.  Respondent does not cite or distinguish the expanding body
5  of case law that is often directly on point as to specific findings
6  made.  Thereafter, if the writ is granted, the Board is directed to
7  conduct a new hearing "in compliance with due process" and that order
8  is appealed by Respondent.  On appeal the order is usually upheld
9  with modifications and in the end, after countless hours of attorney
10 and judicial time, the Board conducts a new two hour hearing at which
11 they abuse their discretion and violate due process in some different
12 way.

13      This system is malfunctioning and must be repaired.  The
14 solution must begin with the source of the problem.  The Board must
15 make efforts to comply with due process in the first instance.  The
16 case law published over the last five years provides ample and
17 sufficient guidelines and must be followed.  Although the Board
18 methods suggest it believes this to be optional, it is not.

19

20              THE REMEDY

21      Thus, it is the order of this Court that the Board develop,
22 submit for approval, and then institute a training policy for its
23 members based on the current and expanding body of published state,
24 and federal, case law reviewing parole suitability decisions, and
25 specifically the application of §2402 criteria.  In addition to
26 developing guidelines and further criteria for the substantive
27 application of §2402 the Board must develop rules, policies and
28

30 ·

1  procedures to ensure that the substantive guidelines are followed.

2      This Court finds its authority to impose this remedy to flow

3  from the fundamental principles of judicial review announced over two

4  centuries ago in *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137.

5  Citing that landmark case, the California Supreme Court has

6  recognized "Under time-honored principles of the common law, these

7  incidents of the parole applicant's right to 'due consideration'

8  cannot exist in any practical sense unless there also exists a remedy

9  against their abrogation." (*In re Sturm* (1974) 11 Cal.3d 258, 268.)

10      In *Strum* the court directed that the Board modify its rules and

11  procedures so that thereafter "The Authority will be required [,]

12  commencing with the finality of this opinion, to support all its

13  denials of parole with a written, definitive statement of its reasons

14  therefor and to communicate such statement to the inmate concerned."

15  (*Sturm* at p. 273.)

16      Similarly, in the case of *Minnis, supra*, the California Supreme

17  Court held the Board's policy of categorically denying parole to drug

18  dealers was illegal.  Based on its analysis the court there was

19  clearly prepared to order that Board to modify its rules and

20  procedures however such was unnecessary because the Board

21  "voluntarily rescinded" the illegal policy.  While the remedy in this

22  case is of greater scope than that necessary in either *Strum* or

23  *Minnis, supra*, so too has been the showing of a systematic abuse of

24  discretion and distortion of process.

25      The most recent case to address the court's roles and duties in

26  overseeing the parole suitability process has been *In re Rosenkrantz,*

27  *supra*, 29 Cal.4th 616.  In that case the court explained that

28

31

1  judicial review of a Governor's parole determination comports with,
2  and indeed furthers, separation of powers principles because the
3  courts are not exercising "complete power" over the executive branch
4  and do not "defeat or materially impair" the appropriate exercise or
5  scope of executive duties. (*Rosenkrantz* at p. 662.) Citing *Strum*,
6  *supra*, the court reaffirmed that a life term inmate's "due process
7  rights cannot exist in any practical sense without a remedy against
8  its abrogation." (*Rosenkrantz* at p. 664.)

9      The *Rosenkrantz* court also put forth what it believed was an
10 extreme example but which, unfortunately, has been shown to exist in
11 this case. The court stated: "In the present context, for example,
12 judicial review could prevent a Governor from usurping the
13 legislative power, in the event a Governor failed to observe the
14 constitutionally specified limitations upon the parole review
15 authority imposed by the voters and the Legislature." This is
16 exactly what the evidence in this case has proven. As noted above
17 the Board has arrogated to itself absolute authority, despite
18 legislative limitations and presumptions, through the mechanism of a
19 vague and all inclusive, and thus truly meaningless, application of
20 standards. The remedy this Court is imposing is narrowly tailored to
21 redress this constitutional violation.

22      The consequence of the Board's actions (of giving § 2402(c)(1)
23 such a broadly all encompassing and universal application) is that
24 they have unwittingly invalidated the basis of the California Supreme
25 Court's holding in *Dannenberg*. The reason the four justice majority
26 in *Dannenberg* upheld the Board's standard operating procedures in the
27 face of the Court of Appeal and dissent position is because "the
28



1  Board must apply detailed standards when evaluating whether an
2  individual inmate is unsuitable for parole on public safety grounds."
3  (*Dannenberg* at p. 1096, footnote 16. See also page 1080: "the
4  regulations do set detailed standards and criteria for determining
5  whether a murderer with an indeterminate life sentence is suitable
6  for parole.") However, Petitioners in these cases have proven that
7  there are no "detailed standards" at all. Instead the Board has
8  systematically reduced the "detailed standards" to empty words. The
9  remedy this Court orders, that there truly be "detailed standards,"
10 requires the promulgation of further rules and procedures to
11 constrain and guide the Board's powers. This remedy differs in
12 specifics, but not in kind, from what courts have previously imposed
13 and have always had the power to impose.

14      The Board must fashion a training program and further rules,
15 standards and regulations based on the opinions and decisions of the
16 state and federal court cases which provide a limiting construction
17 to the criteria which are applied.[8] The Board must also make
18 provisions for the continuing education of its commissioners as new
19 case law is published and becomes binding authority. This Court will
20 not, at this point, outline the requirements and lessons to be taken
21 from the above cases. It is the Board's duty, in the first instance
22 to undertake this task. The training program, and associated rules
23 and regulations, shall be served and submitted to this Court, in

24
25 [8] While the showing and analysis in this case was limited to § 2402(c)(1), the
   conclusions that the evidence compelled, that the Board has been carelessly
   distorting and misapplying the regulations, is not so limited. Accordingly, the
26 training program that is necessary for the Board can not reasonably be limited to
   just § 2402(c)(1). Thus, to the extent case law recognizes, clarifies and
   establishes remedies for other due process violations they must also be
27 incorporated into the necessary rules and training the Board is required to abide
   by.
28

33

1  writing, within 90 days.  Counsel for Petitioners, and any other
2  interested parties, may submit briefs or comments within 30 days
3  thereafter.  After receipt and review of the materials this Court
4  will finalize the training program, and associated rules, and the
5  Petitioners in these cases shall receive a new hearing before a Board
6  that does not operate with the unfettered discretion and caprice
7  demonstrated by the evidence here presented.

8                              ORDER

9      For the above reasons the habeas corpus petition is granted and
10 it is hereby ordered that Petitioner be provide a new hearing which
11 shall comply with due process as outlined above.  Respondent shall
12 provide weekly updates to this Court on the progress of its
13 development of the new rules and regulations outlined above.

14

15

16

17 DATED:  _Aug 30_, 2007    _Linda R. Condron_
18                             LINDA R. CONDRON
                             JUDGE OF THE SUPERIOR COURT
19

20 cc:  Petitioner's Attorney (Jacob Burland)
        Attorney General (Denise Yates, Scott Mather)
21

22

23

24

25

26

27

28

                              34

EXHIBIT 

## *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

DEPT 100

| Date: | DECEMBER 12, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | B. PEREZ | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004935

In re,
GEORGE G. GREENWOOD,                    Counsel for Petitioner:

Petitioner,
                                        Counsel for Respondent:
On Habeas Corpus

Nature of Proceedings: ORDER RE: PETITION FOR WRIT OF HABEAS CORPUS

The Court has read and considered the Petition for Writ of Habeas Corpus filed on October 12, 2007 by the Petitioner. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the determination that the Petitioner presents an unreasonable risk of danger to society and is, therefore, not suitable for release on parole. See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667.

The Petitioner was received in the Department of Corrections on December 3, 1982 after a conviction for murder in the first degree. He was sentenced to 25 years to life. His minimum parole eligibility date was November 3, 1998.

The record reflects that on June 29, 1981, the Petitioner saw the victim, Frank Coffey, Sr. bending to look at a newspaper dispenser and decided to steal his wallet. The Petitioner hit the victim in the head and the victim fell to the ground. While the victim was on the ground the Petitioner took his wallet from his pants pocket and fled the scene. The victim died days later from head injuries.

The Board found the Petitioner unsuitable for parole after a parole consideration hearing held on July 19, 2007. The Petitioner was denied parole for two years. The Board concluded that the Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including his commitment offense and his previous record of violence.

The Court finds that there is some evidence to support the Board's finding that the motive was very trivial in relation to the offense. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E). The Petitioner did not know the victim, nor had the victim provoked the Petitioner in any way prior to the offense. The Petitioner apparently chose the victim merely because he was vulnerable and appeared to have a large wallet. The Petitioner's motive of obtaining the victim's wallet was very trivial in relation to the victim's death.

The Court also finds that there is some evidence to support the Board's finding that the Petitioner has a previous record of violence. Cal. Code Regs., tit. 15, §2402, subd. (c)(2). The Petitioner has several juvenile convictions, including one for kidnapping with a pellet gun and three counts of robbery. This demonstrates

1

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | DECEMBER 12, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | B. PEREZ | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004935

In re,
GEORGE G. GREENWOOD,
               Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

serious assaulting behavior at an early age and may be some evidence that the Petitioner is a risk of danger to society.

The Board also considered the Petitioner's eight non-violent 115 disciplines in prison; his psychological report, which indicated an anti-social personality disorder diagnosis; his previous varied versions of the offense; as well as his lack of solid employment plans. While these factors may not justify a finding of unsuitability, the Board may properly consider them as relevant to a determination of whether the Petitioner is suitable for parole. Cal. Code Regs., tit. 15, §2402(b).

The Board also considered the Petitioner's post-conviction gains, including his extensive participation in self-help and educational programs; the three vocations he earned; his ability to participate in several programs while working full time; as well as his consistent participation in Alcoholics Anonymous and Narcotics Anonymous since 1990. However, they still concluded that the Petitioner would pose an unreasonable threat to public safety. Penal Code §3041(b). The Court finds that there is some evidence to support this determination because of the Petitioner's trivial motive and previous record of violence.

The Court finds that the Board did not err in denying the Petitioner parole for a period of two years. The Board must articulate reasons that justify a postponement, but those reasons need not be completely different from those justifying the denial of parole. See *In re Jackson* (1985) 39 Cal.3d 464, 479. The Board indicated that the Petitioner was denied parole for two years because of the nature of his commitment offense; his need to participate in more programs in order to gain greater insight into his offense; as well as his lack of a solid employment plan. These reasons were sufficient to justify a two-year denial.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

George G. Greenwood
C-57110
San Quentin State Prison
San Quentin, California 94964

2

Minutes Entered
12-12-07
County Clerk

# *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

**DEPT 100**

| Date: | DECEMBER 12, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | B. PEREZ | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004935
In re,
GEORGE G. GREENWOOD,
    Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Department of Justice- State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Cynthia Lumely

3

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | CONFORMED COPY<br><br>DEC 1 9 2007<br><br>LOS ANGELES<br>SUPERIOR |
| PLAINTIFF/PETITIONER:<br><br>GEORGE G. GREENWOOD | |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004935 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time                         ☒ Order re: Petition for Writ of Habeas Corpus
☐ Order to Show Cause                          ☐ Order
☐ Order for Informal Response                  ☐ Order re:
☐ Order for Supplemental Pleading              ☐ Copy of

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to the cause.  I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

December 19, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____, Clerk
            B. Perez

George G. Greenwood                            Department of Justice- State of California
C-57110                                        Office of the Attorney General
San Quentin State Prison                       110 West A Street, Suite 1100
San Quentin, California 94964                  San Diego, California 92101
                                               Attn: Cynthia Lumely

EXHIBIT "E"

Court of Appeal, Second Appellate District, Div. 1 - No. B205088
**S160951**

# IN THE SUPREME COURT OF CALIFORNIA

En Banc

In re GEORGE G. GREENWOOD on Habeas Corpus

The petition for review is denied.

George, C.J., was absent and did not participate.

SUPREME COURT
FILED

APR 1 6 2008

Frederick K. Ohlrich Clerk

Deputy

Acting Chief Justice

GEORGE G. GREENWOOD C-57110
SAN QUENTIN STATE PRISON 4-N-91
SAN QUENTIN, CA 94974

Legal Mail

RECEIVED

MAY 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102-3493

UNITED STATES POSTAGE
$ 04.60°
MAILED FROM ZIP CODE